**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Leanne Heine Solish (#280297)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

***Co-Lead Counsel for Plaintiffs***
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELDA ZAMIR, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>BRIDGEPOINT EDUCATION, INC., ANDREW S. CLARK, DANIEL J. DEVINE, PATRICK T. HACKETT; ADARSH SARMA; WARBURG PINCUS LLC; WARBURG PINCUS & CO.; WARBURG PINCUS PARTNERS LLC; WARBURG PINCUS PRIVATE EQUITY VIII, L.P.<br><br>                              Defendants. | Case No. 15-CV-408 JLS (DHB)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

AMENDED CLASS ACTION COMPLAINT                    Case No. 15-CV-408 JLS (DHB)

# **TABLE OF CONTENTS**

**Page**

I.     PRELIMINARY STATEMENT.......................................................................... 1

II.    JURISDICTION AND VENUE ....................................................................... 5

III.   PARTIES ......................................................................................................... 6

IV.    DEFENDANTS FACE INTERNAL PROCESSING ISSUES THAT APPEAR TO AFFECT BRIDGEPOINT'S BAD DEBT EXPENSE .............. 10

V.     DEFENDANTS RESTATE REVENUES AND ADMIT TO RECOGNIZING REVENUES WHEN COLLECTABILITY WAS NOT REASONABLY ASSURED........................................................................... 13

    A.     The 2013 Restatement ......................................................................... 13

    B.     The SEC Probes Into Bridgepoint's Increasing Bad Debt Expense, Related Accounts Receivables, and Revenue Recognition Policy......... 17

        1.     The SEC's Initial Letter and Defendants' Answer....................... 17

        2.     The SEC's Numerous Follow-Up Questions and Conclusion that the Company Must Restate Its Financial Results Due to Its Material Misstatement of Revenue........................................... 19

        3.     The SEC Launches an Investigation into Both Restatements...... 21

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................................ 21

    A.     Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements ........................................................................... 23

    B.     Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results ........................................ 26

    C.     Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results .................................................................. 28

    D.     Materially False or Misleading Statements in the Company's Disclosure of 2Q 2013 Results .................................................................. 29

    E.     Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results .................................................................. 30

    F.     Materially False and Misleading Statements in the Company's Tender Offer Schedule.............................................................................. 30

    G.     Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results ........................................ 31

H.    The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications ................................................................. 31

VII.    LOSS CAUSATION ................................................................................ 34

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ..................................... 37

A.    Defendants Analyzed the Exact Metrics that Should Have Warned Them that Revenue Was Not Reasonably Collectable .......................... 38

1.    Defendants Analyzed Accounts Receivable Balances When Students Withdrew from Bridgepoint's Institutions ................... 38

2.    Bridgepoint's Enrollment Related Measures ............................. 39

B.    Bridgepoint's Ineffective Internal Controls ........................................... 41

C.    The Ongoing SEC Investigation of Bridgepoint ..................................... 41

D.    The Individual Defendants and the Warburg Defendants Were Motivated to Sell Back A Significant Amount of Stock to the Company at an Unusual and Suspicious Time ....................................... 42

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ....................................................................... 44

X.    NO SAFE HARBOR ............................................................................. 45

XI.    CLASS ACTION ALLEGATIONS ..................................................... 46

XII.    COUNTS ................................................................................................ 47

XIII.    PRAYER FOR RELIEF ........................................................................ 51

XIV.    JURY TRIAL DEMANDED ................................................................. 52

1.     Lead Plaintiffs Nelda Zamir ("Zamir") and Thomas G. Prosch ("Prosch") (collectively "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") from March 12, 2013 and May 30, 2014, inclusive (the "Class Period").

2.     Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation of court-appointed Co-Lead Counsel Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. This investigation included, among other things, a review and analysis of: (i) Bridgepoint's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Bridgepoint's investor calls; (vi) review of information provided under the Freedom of Information Act ("FOIA"); (vii) interviews with former employees and other potential witnesses with relevant information; and (viii) other publicly available material and data identified herein.

I.     **PRELIMINARY STATEMENT**

3.     Bridgepoint provides for-profit postsecondary education to students through its two wholly-owned institutions, Ashford University ("Ashford") and the University of the Rockies.

4.     During the Class Period, Defendants (defined below) engaged in securities fraud by recognizing revenue they knew, or recklessly disregarded, was not reasonably collectable in violation of Generally Accepted Accounting Principles ("GAAP") and SEC guidance, which requires revenue to be recognized only if collectability is reasonably assured. Rather, Defendants continued to recognize revenue for a significant number of students even though Defendants knew these students had lost their financial

aid assistance, and later wrote-off the improperly recognized revenue as bad debt. This fraudulent accounting practice allowed the Company to artificially inflate revenues and financial results it reported during the Class Period.

5.      In mid-2012, prior to the start of the Class Period, Bridgepoint faced technical issues during its annual upgrade of its student management system. These technical issues caused delays in "packaging" students for financial aid qualification in between financial aid award years. Because corrective actions took longer than anticipated, a significant number of students were not able to be packaged prior to leaving Bridgepoint's institutions, and were no longer eligible for financial aid funding at the time the students left Bridgepoint's institutions. Thus, these students were required to pay any outstanding balances to Bridgepoint's institutions without the assistance of financial aid. It is obvious that, as Bridgepoint admitted in a later, non-public, letter to the SEC, "[i]ndependent payments from students have a lower collection rate than financial aid funding, which results in greater bad debt expense."

6.      At this point, the Company should have stopped recognizing revenue for the significant number of students who were no longer eligible for financial aid due to the internal financial aid processing issue. However, the effects of this financial aid processing issue were not felt until at least the end of 2012, or 120 days after a student's payment due date, when if not paid, an outstanding account is considered delinquent. Predictably, based on Defendants' intentional or deliberate continuance of recognizing revenue in this manner, on March 12, 2013, the first day of the Class Period, Bridgepoint reported a large increase in its bad debt expense for the fourth quarter of 2012 and the 2012 fiscal year when compared to the Company's historical bad debt expense. On an earnings conference call held the same day, Defendants explained that the increase was due to the mid-2012 internal processing issues and fraudulently represented to investors that this increase in bad debt expense would not repeat during 2013.

7.      In reality, this was not a one-time issue and bad debt had not been resolved. Unbeknownst to investors, the 2012 internal processing issue caused a backlog in

packaging financial aid for students into and throughout 2013. Nevertheless, Bridgepoint continued to inappropriately record its revenue and, as a result, Bridgepoint continued to report elevated percentages of bad debt expense to revenue in each of Bridgepoint's financial results reported during the remainder of the Class Period. But investors and analysts had expected the bad debt expenses to work its way back down to historic levels, as Defendants had earlier assured investors it would, and so when Bridgepoint reported an even higher bad debt expense as a percent of revenue for the fourth quarter of 2013 on March 11, 2014, investors and analysts began to be concerned that the elevated percentage of bad debt to revenue was lingering too long and whether this percentage would actually work its way down back to historic levels. As a result of this news, Bridgepoint's stock dropped almost 16% in one day.

8. A few months later, over the course of May 2014, Bridgepoint slowly revealed and admitted that it had been materially misstating revenue during the Class Period. On May 12, 2014, on an earnings conference call, Bridgepoint's Chief Financial Officer ("CFO"), Defendant Daniel J. Devine ("Devine"), admitted that Bridgepoint had previously been recognizing revenues subsequent to a student losing financial aid eligibility, and if that revenue was not collected, as was to be expected, it was written off as a bad debt expense. On May 30, 2014, the Company further announced that it would restate the financial results for the fiscal 2013 year and for each quarter in 2013, as well as revise the financial results for the fiscal year ending December 31, 2012 and 2011 and for each quarter in 2012 to correct this material revenue recognition error.

9. As a result of the announcements on May 12, 2014 and May 30, 2014, Bridgepoint's stock fell even further, falling nearly 9%, or $1.41 per share, to close at $14.51 per share on May 12, 2014 and continuing to fall over another 3%, or $0.46 per share, on May 13, 2014 to close at $14.05 per share. On June 2, 2014, the first trading day after Bridgepoint announced the restatement on May 30, 2014 after the market's close, Bridgepoint's stock declined 1.31% more, or $0.17 per share, to close at $12.82 per share.

10.     This was not an innocent accounting mistake that was voluntarily disclosed. Rather, the true catalyst behind Bridgepoint's restatement announcement was the SEC, which started inquiring about red flags: beginning in December 2013, the SEC raised numerous questions with Defendants concerning the financial aid processing issue and why it caused a jump in Bridgepoint's bad debt expense as a percentage of revenue, and further delved into the Company's revenue recognition policy, specifically inquiring as to how Defendants determined that collectability of the revenues recognized were reasonably assured.

11.     In response to the SEC's inquiry, Defendants justified their revenue recognition policy by highlighting that because approximately 85% of students pay for tuition through Title IV of the Higher Education Act of 1965 ("Title IV") federal student loan programs, they determined whether collectability of revenues was reasonably assured based on the *government's* ability to pay as of a course start date. Thus, when the financial aid processing issue left a significant number of students without financial aid assistance to pay Bridgepoint's tuition, a greater number of students were delinquent in paying the tuition bills they were saddled with, raising the Company's bad debt expense during the Class Period.

12.     Ultimately, the SEC told Defendants that a reassessment of their revenue collectability criterion "should be performed when you have new information that would affect a student's ability to pay[,]" such as the 2012 financial aid processing issue that left a significant number of students without out financial aid funding, and that a restatement was necessary to correct this material error. Indeed, the SEC could have come to no other conclusion; Defendants' incorrect revenue recognition policy was absurd in light of the fact that they knew over 85% of their revenues came from financial aid and knew that a significant number of students had lost this financial aid funding due to Bridgepoint's processing issues and continued backlog.

13.     When Bridgepoint ultimately restated its financial results to correct its material revenue recognition errors, the restated revenue decreased by millions of dollars

and the corresponding bad debt expense also decreased by millions. Predictably, the bad debt expenses as a percentage of revenues fell back in line with Bridgepoint's historic rates. It is also unsurprising that the SEC is conducting an investigation regarding the circumstances surrounding Bridgepoint's restatement and its accounting practices.

14. Defendants were motivated to inflate Bridgepoint's revenues and financial results during the Class Period in order to undertake an enormous tender offer in the end of 2013, in which the Company offered to buy back up to 10.25 million of Bridgepoint's shares at the inflated price of $19.50 per share; effectively agreeing to hand over almost $200 million, close to half of the $432 million Bridgepoint had in cash or cash equivalents at the end of the third quarter of 2013 to its shareholders. Defendants were among the shareholders participating in the offer, receiving over $141.4 million for their shares, or about one-third of Bridgepoint's cash.

15. Had it not been for Defendants willful or reckless disregard for the Company's internal financial aid processing issues and the effect it had on simple revenue recognition concepts, Plaintiffs and other Class members would not have suffered significant losses and damages, and are entitled to redress.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

1  Additionally, Bridgepoint's principal executive offices are located within this Judicial

2  District.

3       19.    In connection with the acts, transactions, and conduct alleged herein,

4  Defendants directly and indirectly used the means and instrumentalities of interstate

5  commerce, including the United States mail, interstate telephone communications, and

6  the facilities of a national securities exchange.

7  **III.    PARTIES**

8       20.    Lead Plaintiff Zamir, as set forth in a previously-filed certification (Dkt.

9  No. 1 at 45-46), incorporated by reference herein, purchased Bridgepoint common stock

10  and options during the Class Period, and suffered damages as a result of the federal

11  securities law violations and false and/or misleading statements and/or material

12  omissions alleged herein.

13       21.    Lead Plaintiff Prosch, as set forth in a previously-filed certification (Dkt.

14  No. 3-4 at 3-4), incorporated by reference herein, purchased Bridgepoint common stock

15  during the Class Period, and suffered damages as a result of the federal securities law

16  violations and false and/or misleading statements and/or material omissions alleged

17  herein.

18       22.    Defendant Bridgepoint is a Delaware corporation with its principal

19  executive offices located at 13500 Evening Creek Drive North, Suite 600, San Diego,

20  California 92128. Bridgepoint is a provider of postsecondary education services. Its

21  wholly-owned subsidiaries, Ashford and the University of the Rockies, are regionally

22  accredited academic institutions that offer associate's, bachelor's, master's and doctoral

23  programs online, as well as at their traditional campuses located in Clinton, Iowa, and

24  Denver, Colorado. Bridgepoint's common stock trades under the ticker symbol "BPI" on

25  the New York Stock Exchange (the "NYSE"), which is an efficient market.

26       23.    Defendant Andrew S. Clark ("Clark"), a co-founder of Bridgepoint, is, and

27  at all relevant times was, Chief Executive Officer ("CEO"), President, and a director of

28  Bridgepoint. Prior to launching Bridgepoint in November 2003, Defendant Clark

consulted with several private equity firms examining the postsecondary education sector. Defendant Clark worked for Career Education Corporation as Divisional Vice President of Operations and Chief Operating Officer for American InterContinental University in 2002. From 1992 to 2001, Defendant Clark worked for Apollo Group, Inc. (University of Phoenix), where he served in various management roles, culminating in his position as Regional Vice President for the Mid-West region from 1999 to 2001. Defendant Clark earned an M.B.A. from the University of Phoenix and a B.A. from Pacific Lutheran University.

24.     Throughout the Class Period, Defendant Clark spoke frequently to investors at industry conferences and on quarterly earnings calls. Defendant Clark possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012, Form 10-K for the fiscal year ended December 31, 2013, and certified the accuracy of Bridgepoint's Forms 10-Q for each quarterly period from March 31, 2013 through September 30, 2013.

25.     Defendant Devine has served as the CFO of Bridgepoint since January 2004. From November 2008 to December 2010, Defendant Devine also served as a Senior Vice President of Bridgepoint. In January 2011, Defendant Devine was also promoted to Executive Vice President. He has over 20 years of managerial financial experience. From March 2002 to December 2003, Defendant Devine served as the CFO of A-Life Medical. From 1994 to 2000, Defendant Devine served in various management roles for Mitchell International Inc. culminating in serving as CFO from 1998 to 2000. From 1987 to 1993, Defendant Devine served in various management roles for Foster Wheeler Corporation, rising to divisional CFO from 1990 to 1993. Defendant Devine earned a B.A. from Drexel University and is a certified public accountant.

26.     Throughout the Class Period, Defendant Devine spoke frequently to investors at industry conferences and on quarterly earnings calls. Defendant Devine

possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012, Form 10-K for the fiscal year ended December 31, 2013, and Forms 10-Q for each quarterly period from March 31, 2013 through September 30, 2013.

27.    Defendant Patrick T. Hackett ("Hackett") has served as a director of the Company since March 2008 and as Chairman of the Board since February 2009. He is a managing director and co-head of the technology, media and telecommunications group at Warburg Pincus LLC ("WP LLC"), which he joined in 1990, and a general partner of Warburg Pincus & Co. ("WP"). He is Chair of the Compensation Committee of the Board.

28.    Defendant Hackett possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012 and Form 10-K for the fiscal year ended December 31, 2013.

29.    Defendant Adarsh Sarma ("Sarma") has served as a director of the Company since July 2005. He is a managing director in the technology, media and telecommunications group at WP LLC, which he joined as a principal in 2005. He is Chair of the Nominating and Governance Committee of the Board and a member of the Compensation and Strategic Oversight Committees of the Board.

30.    Defendant Sarma possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012 and Form 10-K for the fiscal year ended December 31, 2013.

31.    Defendant WP is a corporation organized under the laws of the State of New York. WP is the managing member of Warburg Pincus Partners LLC ("WP Partners"). WP maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.

32.     Defendant WP LLC is a limited liability corporation organized under the laws of the State of New York. WP LLC maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.

33.     Defendant WP Partners is a limited liability corporation organized under the laws of the State of Delaware. WP Partners is the sole general partner of Warburg Pincus Private Equity VIII, L.P. ("WP VIII"). WP Partners is a direct subsidiary of WP. WP Partners maintains its corporate headquarters at 450 Lexington Avenue, New York, New York.

34.     Defendant WP VIII is a limited partnership organized under the laws of the State of Delaware. Defendant WP VIII is the Warburg entity that directly owns the shares of Bridgeport common stock owned by the Warburg entities. Defendant WP VIII is managed by WP LLC. WP VIII maintains its corporate headquarters at 450 Lexington Avenue, New York, New York. Defendant WP VIII is Bridgepoint's controlling stockholder, and as of October 31, 2013 owned approximately 63.4% of the Company's outstanding stock.

35.     Defendants Clark and Devine are collectively referred to as "Officer Defendants."

36.     Defendants Hackett and Sarma are collectively referred to as "Board Defendants."

37.     Together, defendants WP, WP LLC, WP Partners, and WP VIII may be referred to herein as the "Warburg Defendants" or "Warburg."

38.     Defendants Bridgepoint, the Officer Defendants, the Board Defendants, and the Warburg Defendants are collectively referred to as "Defendants."

39.     Defendants Clark, Devine, Hackett and Sarma are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Bridgepoint's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each

defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. DEFENDANTS FACE INTERNAL PROCESSING ISSUES THAT APPEAR TO AFFECT BRIDGEPOINT'S BAD DEBT EXPENSE

40.     Bridgepoint, through its wholly-owned subsidiaries, offers its students a postsecondary education, but as a publically traded company, among Bridgepoint's primary focuses are revenue and profit. Bridgepoint charges high tuitions to its students to generate large revenues and returns. The vast majority of the Company's revenues come from tuition and related fees.

41.     Because of the high costs of tuition at both Ashford and the University of the Rockies, the vast majority of Bridgepoint's students' tuition is paid via federal financial aid. As a result, the Company's revenues largely come from Title IV federal student loan programs under federal regulations. For example, in 2012 and 2013 respectively, 86.4% and 85.6% of Ashford's revenues came from Title IV funds. Similarly, the University of the Rockies derived 87.3% and 87.6% of its revenues from Title IV funds in 2012 and 2013, respectively.

42.     On the first day of the Class Period, March 12, 2013, during an earnings conference call, the Officer Defendants explained to investors and analysts that in the middle of 2012, Bridgepoint faced "internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years." Defendant Devine assured investors on this call that "[t]he Company has

1  addressed this process and issues and expects that it will not repeat in 2013." Defendants

2  pointed to these one-time internal processing issues with financial aid packaging as the

3  reason behind the Company's rising bad debt expenses, which almost doubled as a

4  percentage of revenues from historical results in the fourth quarter of 2012.

5       43.   In reality, this one-time internal processing issue was unresolved and was

6  getting worse. Despite knowing this, Defendants continued to knowingly or recklessly

7  record revenues during 2013.

8       44.   On May 10, 2013, the Company filed a Form 8-K and Form 12b-25 (or "NT

9  10-Q") signed by Defendant Devine. The Form 8-K explained that the financial results

10  for the first quarter of 2013 the Company had announced earlier in the week included

11  $5.6 million in bad debt expenses that should have been reflected in 2012, and further

12  explained:

13       We determined our accounts receivable aging was incorrect in 2012. We
         have corrected the aging and our estimate of the allowance for doubtful
14       accounts, which resulted in the increase in bad debt expense. We have
         performed testing to validate the accuracy of the corrected aging.
15       Management has concluded that these matters relating to our bad debt
         expense estimates constitute a material weakness and has determined that
16       our disclosure controls and procedures and internal control over financial
         reporting were not effective as of December 31, 2012 and March 31, 2013.
17       However, there has been no material misstatement of our financial
         statements, which can be relied upon for all prior periods.

18

19  The NT 10-Q notified investors of its inability to timely file the 1Q 2013 10-Q, citing the

20  reasons above for the delay, and further stated that "[m]anagement has determined to

21  revise its financial statements for the year ended, as well as for each quarterly period

22  within the fiscal year ended December 31, 2012."

23       45.   On May 17, 2013, Bridgepoint issued an amended Form 10-K for the 2012

24  fiscal year in order to: (i) restate the Individual Defendants' conclusions regarding

25  controls and procedures as of December 31, 2012; (ii) discuss the material weakness in

26  internal control over financial reporting as of December 31, 2012; and (iii) reissue the

27  financial statements as a result of the revision for bad debt expense (the "2012

28  Restatement") as explained in the May 10, 2013 Forms 8-K and NT 10-Q.

46.     Although Defendants restated the 2012 financial results to revise Bridgepoint's bad debt expense, they claimed that the increase in bad debt for the year was immaterial. Defendants pointed to ineffective internal controls over accounts receivable as the material weakness, explaining that (1) "the process for estimating the allowance for doubtful accounts in 2012 was not designed to appropriately incorporate all relevant qualitative factors" and that (2) "accounts receivable aging was not correct."

47.     In the 2012 Restatement, Defendants also announced a purported remediation plan, in which Defendant Devine was responsible for implementing these remedial changes and improvements. Defendants explained that they were focusing on "improvements in the accounting processes, including additional oversight and review, and performing additional analytical procedures," to remediate Bridgepoint's control deficiencies. By the filing of the amended Form 10-K for the 2012 fiscal year on May 17, 2013, Defendants had "not completed all of the corrective processes, procedures and related evaluation or remediation that [they] believe are necessary," but promised investors to continue making improvements in the accounting processes.

48.     Following the 2012 Restatement, Defendants continued to report higher than normal bad debt expenses as a percentage of revenues ("Bad Debt Percentage") in each of the quarterly and fiscal year results for 2013, even though Defendants at first indicated that the increase in bad debt for the fourth quarter of 2012 was due to the one-time processing issue and bad debt should go back down from 12% of revenue to about 6% throughout 2013. Defendants cited continuing effects of the internal processing issues and a change in modeling due to the accounts receivable aging not being correct as the reason for this continuing higher than normal Bad Debt Percentage. For example, on a May 6, 2013 earnings conference call with investors, when asked about a "spike" in bad debt expense, the Officer Defendants cited the accounts receivable changes: "During the quarter, the Company performed a review of its Accounts Receivable" which revealed that Bridgepoint's accounts receivable was incorrect, and that Defendants had correspondingly changed its modeling methodology for writing off accounts receivable

as a bad debt expense, but assured investors that the Bad Debt Percentage would "work its way back down over several quarters" and would "be more in line with historical levels in coming quarters."

49.   However, the Bad Debt Percentage remained elevated throughout the remainder of the Class Period. This was because the purported "bad debt" was in reality revenues that had been fraudulently recorded in the first instance. When Bridgepoint reported an uptick to the higher than average Bad Debt Percentage for the fourth quarter of 2013 on March 11, 2014, investors and analysts began to question if the Bad Debt Percentage would actually work its way back down to its historic levels as promised or if there was some other problem occurring.

## V.   DEFENDANTS RESTATE REVENUES AND ADMIT TO RECOGNIZING REVENUES WHEN COLLECTABILITY WAS NOT REASONABLY ASSURED

### A.   The 2013 Restatement

50.   On May 12, 2014, Defendants stated that the Company would be unable to timely file its Form 10-Q for the first quarter of 2014 in announcing the preliminary financial results for the quarter, explaining:

> The Company is working to quantify the impact of an outstanding comment the Company received from the Securities and Exchange Commission. The comment was received in connection with the SEC's review of the Company's periodic reports, and **relates to the Company's revenue recognition policy and accounting for doubtful accounts. Specifically, the Company has historically not determined it necessary to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions. On May 2, 2014, the SEC informed the Company that such a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.**

Defendants also noted that they were evaluating whether to restate Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 due to the lack of student-by-student reassessment.

51.   Based on the SEC's comment to Bridgepoint, Defendants were forced to correct the Company's revenue recognition policy to properly reassess collectability

upon certain changes in circumstances, which Defendant Devine described on a May 12, 2014 earnings conference call:

> Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

52.     Suspiciously, Defendant Devine described this change at first as prospective in nature. However, a couple of weeks later, on May 30, 2014, Defendants announced that they were restating Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as a revision of the financial statements for the fiscal years ending December 31, 2012 and 2011 and the quarterly financial results for each of the three quarterly financial results during 2012, to reflect Bridgepoint's now proper revenue recognition policy. On August 4, 2014, the Company issued the restated and revised financials on an amended Form 10-K for the fiscal year ending December 31, 2013 and on amended Form 10-Qs for the three fiscal quarters for 2013 (the "2013 Restatement").

53.     The 2013 Restatement corrected Bridgepoint's materially misstated revenue figures, which correspondingly caused a decrease in the Bad Debt Percentage back down in line with Bridgepoint's historical rates. The 2013 Restatement also reclassified certain of the Company's reported cash on its balance sheet as restricted cash to account for Title IV financial aid funds held by Bridgepoint for students that result in credit balances on a student's account.

54.     Significantly, in the 2013 Restatement Defendants admitted that:

> on the revenue recognition, the **process for analyzing the collectibility assertion was not designed to reassess collectibility on a student-by-student basis throughout the period revenue was recognized by the Company's institutions. As a result, the Company has changed its revenue recognition policy and has identified adjustments, relating to revenue, provision for bad debts,** accounts receivable, which should have been recognized during the prior periods, and restricted cash balances, which should have been presented differently during the prior periods.

AMENDED CLASS ACTION COMPLAINT

14

Case No. 15-CV-408 JLS (DHB)

55.     As explained in more detail in §VI.A, *infra*, pursuant to SEC guidance and GAAP, revenue should not be recognized until all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) *collectability is reasonably assured*. During the Class Period, Defendants were recognizing millions in revenue for students who had lost financial aid eligibility, and thus were less likely to pay tuition. As a result, Defendants were recognizing revenue where the collectability of the Company actually receiving payment from these students was not reasonably assured.

56.     Prior to the 2013 Restatement, Bridgepoint's revenue recognition policy failed to address whether it met any of the SEC's criteria for revenue recognition. In the 2013 Restatement, Defendants published Bridgepoint's updated revenue and deferred revenue policy, adding additional language (highlighted in bold below) to address the reassessment of the collectability criterion based on the Company's analysis of revenue to account for a student's ability to pay upon a change in circumstances:

> **The Company recognizes revenue when persuasive evidence of an arrangement exists, services have been rendered or delivery has occurred, our fees or price is fixed or determinable, and collectibility is reasonably assured.** The Company's revenue consists of tuition, technology fees, course digital materials and other miscellaneous fees. Tuition revenue is deferred and recognized on a straight-line basis over the applicable period of instruction net of scholarships and expected refunds[.]

> * * * *

> The Company's institutions' online students generally enroll in a program that encompasses a series of five to six-week courses which are taken consecutively over the length of the program. With the exception of those students under conditional admission, the online students are billed on a payment period basis on the first day of class. The Company's institutions' campus-based students enroll in a program that encompasses a series of nine-week or 16-week courses. Campus-based students are billed at the beginning of each term. **The Company assesses collectibility at the start of a student's payment period (generally five courses for undergraduates and four courses for graduates) for the courses in that payment period.**

> If a student's attendance in a class precedes the receipt of cash from the student's source of funding, the Company establishes an account receivable and corresponding deferred revenue in the amount of the tuition due for that payment period. Cash received either directly from the student or from

the student's source of funding reduces the balance of accounts receivable due from the student. Financial aid from sources such as the federal government's Title IV programs pertains to the online student's award year and is generally divided into two disbursement periods. As such, each disbursement period may contain funding for up to four courses. Financial aid disbursements are typically received during the online student's attendance in the first or second course. Since the majority of disbursements cover more courses than for which a student is currently enrolled, the amount received in excess effectively represents a prepayment from the online student for up to four courses. At the end of each accounting period, the deferred revenue and student deposits and related account receivable balances are reduced to present amounts attributable to the current course.

For those students under conditional admission, the student is not obligated for payment until after their conditional admission period has lapsed, so there is no required refund. For all subsequent courses, the Company records a provision for expected refunds and reduces revenue for the amount that is expected to be subsequently refunded. Provisions for expected refunds have not been material to any period presented. If a student withdraws from a program prior to a specified date, a portion of such student's tuition is refunded, subject to certain state requirements which require a pro rata refund. **The Company reassess collectibility throughout the period revenue is recognized by the Company's institutions, on a student-by-student basis. The Company reassess collectibility based upon new information and changes in facts and circumstances relevant to a student's ability to pay. For example, the Company reassesses collectibility when a student drops from the institution (i.e., is no longer enrolled) and when a student attends a course that was not included in the initial assessment at the start of a student's payment period.**

57.     As reflected in the table below, the consistent decline in restated revenue and bad debt expense numbers from the original reported figures is evidence reflecting Defendants' fraudulent recording of revenue – revenue that should have never been reported, and was not actually a bad debt expense.

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Original Bad Debt Expense[1] (millions) | Restated Bad Debt Expense (millions) | Original Bad Debt/ Revenue | Restated Bad Debt/ Revenue |
|---|---|---|---|---|---|---|
| 4Q 2012 | $209.4 | $206.5 | $21.3 | $16.2 | 10.2% | 7.8% |
| FY 2012 | $968.2 | $943.4 | $73.7 | $52.8 | 7.6% | 5.6% |
| 1Q 2013 | $222.0 | $213.0 | $18.3 | $13.0 | 8.2% | 6.1% |
| 2Q 2013 | $197.6 | $193.5 | $18.6 | $11.4 | 9.4% | 5.9% |
| 3Q 2013 | $185.6 | $182.8 | $16.8 | $7.3 | 9.0% | 4.0% |
| 4Q 2013 | $163.5 | $162.2 | $18.7 | $15.4 | 11.4% | 9.5% |
| FY 2013 | $768.6 | $751.4 | $72.3 | $47.1 | 9.4% | 6.3% |

---

[1] Original Bad Debt Expense reports the bad debt expense reported by the Company after the 2012 Restatement.

**B.    The SEC Probes Into Bridgepoint's Increasing Bad Debt Expense, Related Accounts Receivables, and Revenue Recognition Policy**

58.    After reviewing Bridgepoint's amended 2012 fourth quarter and fiscal year financial results and the financial results for the nine months ending September 30, 2013 filed on Form 10-Q on November 5, 2013, the SEC had numerous comments and questions for Defendants concerning Bridgepoint's perplexing decline in enrollments but reported increase in revenue for the 2012 fiscal year, and the Company's elevated Bad Debt Percentage. Over a series of non-public letters and communications between the SEC and Defendant Devine from December 11, 2013 through at least July 9, 2014 (collectively, the "SEC Comment Letters"), the SEC determined that Bridgepoint's financial results for each fiscal period from 2011 through 2013 contained material errors relating to Bridgepoint's recognition of revenue and failure to report financial aid funds held for students as restricted cash, and should be restated.

59.    In these letters, the SEC asked numerous questions concerning Bridgepoint's revenue policy, refund policy, and its policy relating to writing off accounts receivable, or how the Company reported bad debt expense. However, the key takeaway from the SEC Comment Letters was that it was only after the SEC continued to probe the circumstances surrounding the one-time processing issues and the Company's higher-than-average reported Bad Debt Percentage and came to the conclusion "that a reassessment of the collectability criterion should be performed when you have new information that would affect a student's ability to pay[,]" that Defendants began to properly recognize revenue in accordance with GAAP and SEC guidance.

**1.    The SEC's Initial Letter and Defendants' Answer**

60.    In the SEC's first letter to Defendant Devine dated December 11, 2013, commenting on the 2012 fiscal year results, the SEC perplexedly noted that "You state that the increase in revenue was primarily due to the 3% tuition increase effective April 1, 2012. However, it is not clear how the 5.6% decrease in total student enrollment from 86,642 to 81,810 in 2012 contributed to the total change in reported revenue." The SEC

also asked for further information as to why the "internal processing issues with financial aid packages" affected Bridgepoint's Bad Debt Percentage.

61.     Defendant Devine's January 10, 2014 response letter cited Bridgepoint's "internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years" as the cause of the Company's increase in the Bad Debt Percentage. Defendant Devine further explained these processing issues to the SEC:

> In the middle of each calendar year, a material number of our continuing students are required to be packaged to qualify for Title IV financial aid as they cross over award years as defined by the Department of Education. Our student management system is an integral piece of the financial aid qualification process. . . . **In 2012, we experienced technical issues with the annual upgrade of our student management system, which caused delays in packaging students. As the corrective actions took longer than anticipated, we were not able to package a significant number of students prior to the students departure from the institution and, at the time the students left the institution, they were no longer eligible for financial aid. As a result, these students were required to pay their outstanding balance without financial aid assistance. Independent students have a lower collection rate than financial aid funding which results in greater bad debt expense.**

62.     Defendant Devine also pointed to the remaining effects of this one-time internal processing issue, as the cause for the elevated Bad Debt Percentage throughout 2013:

> Although the Company resolved the accounts receivable aging issue, which resulted in the revision of bad debt for fiscal year 2012, **the Company continued to be indirectly impacted within fiscal year 2013**. As a result of the prior aging and the prior financial aid packaging issues, a backlog of work resulted for our financial aid and collections departments. **Due to this backlog, the ability to package or collect prospective accounts throughout 2013 was reduced and resulted in higher bad debt. Additionally, due to the timing of the aging issue, in certain cases this resulted in the inability to package students timely in the first half of 2013.**

63.     The January 10, 2014 letter also detailed Bridgepoint's payment terms for its accounts receivable, and how the Company "charges off" these accounts creating a bad debt expense: "The Company charges off uncollectible accounts receivable when the student account is deemed uncollectable by internal collection efforts or by a third party

collection agency." Bridgepoint considered past due or delinquent accounts receivable to be those accounts where a payment had not been made 120 days subsequent to the course start date, the date in which payments are due. This enabled Bridgepoint to delay recognition of bad debt expense until, at the earliest, the fourth quarter of 2012 and carried well into the 2013 fiscal year.

64.     The SEC also asked for more information concerning Bridgepoint's revenue and refund policies, specifically asking Defendant Devine, in relation to Bridgepoint's revenue recognition policy, to "please tell us how you determined that ***collectability is reasonably assured*** and the price is fixed and determinable per SAB Topic 13:A1 and 13:A4." Defendant Devine's January 10, 2014 response letter explained that:

> With respect to collectability is reasonably assured, we note that historical collection rates have been high as evidenced by our bad debt expense as a percentage of revenue. **Further, as noted above, approximately 85 percent of our students pay for tuition and fees via Title IV funding. As of a course start date, the majority of students are eligible for financial aid, which is validated by the Company.** Further, given our low cost model, a student is eligible to receive financial aid to cover all of their tuition and fees on a course start date. **As such, as of a course start date, we conclude our collectability assessment based on the government's ability to pay as opposed to a student's ability to pay.**

### 2.     The SEC's Numerous Follow-Up Questions and Conclusion that the Company Must Restate Its Financial Results Due to Its Material Misstatement of Revenue

65.     After reviewing Defendant Devine's January 10, 2014 response letter, the SEC had numerous additional comments and requests in a February 12, 2014 letter. In this letter the SEC asked for greater detail on the underlying reasons for the continuing rise in the Bad Debt Percentage. The SEC also asked Defendant Devine to define what "a significant number of students" meant in his January 10, 2014 letter when discussing the one-time internal processing issues.

66.     Critically, the SEC married Defendants' ongoing higher than average Bad Debt Percentage with the collectability criterion of the Company's revenue recognition policy which, as Defendant Devine explained in his January 10, 2014 letter, was

assessed based on the *government's ability to pay*. In the February 12, 2014 letter the SEC commented and requested the following:

> Considering that your bad debt expense for the nine months ended September 30, 2013 approximated 9% of total revenue and appears to relate mostly to former students, please explain to us why it is appropriate to base your collectability assessment on the government's ability to pay. In this regard, please tell us why you believe that collection is reasonably assured.

67.     After the SEC sent Defendant Devine the February 12, 2014 letter, Defendant Devine responded on behalf of Bridgepoint on February 28, 2014. On at least May 1, 2014 and May 6, 2014, the SEC and representatives from the Company also verbally conversed via telephone, to which Bridgepoint sent a responding letter on June 3, 2014. On June 20, 2014, after Bridgepoint announced to investors its conclusion that the Company needed to restate the 2013 Form 10-K and the 2013 Form 10-Qs, the SEC responded with another letter.

68.     In the June 20, 2014 letter, the SEC made two pertinent comments:

> • Based upon the information provided in your SAB 99 analysis, we believe that the qualitative and quantitative assessments indicate that **the errors relating to revenue recognition** and restricted cash **were material to all periods presented**. In this regard, please restate 2011 and 2012 in addition to 2013.
>
> In addition, include a note to your financial statements to reflect the impact of the restatement on all quarterly periods for 2011, 2012 and 2013.[2]
>
> • **[A] reassessment of the collectability criterion should be performed when you have new information that would affect a student's ability to pay**. Please provide us with your corrected revenue recognition policy disclosures.

69.     On July 9, 2014, Defendant Devine, on behalf of Bridgepoint, responded to the SEC's June 20, 2014 letter, and explained in detail why Defendants believed that the revenue recognition and restricted cash errors were not material to the years ended December 31, 2011 and 2012. Ultimately, in the 2013 Restatement, Defendants revised

---

[2] SAB 99 clarified that a material misstatement is not just based on quantitative threshold, as explained in §VI.A, *infra*.

the financial results for or the years ended December 31, 2012 and 2011, as well as for all the 2012 quarterly periods.

70.    Defendant Devine also provided the SEC with Bridgepoint's corrected revenue recognition policy disclosures. The Company corrected its revenue recognition policy by adding the highlighted language in ¶56 to address the collectability criterion.

### 3.    The SEC Launches an Investigation into Both Restatements

71.    On July 22, 2014, shortly after Defendant Devine's July 9, 2014 letter to the SEC, Bridgepoint received a subpoena from the SEC "relating to certain of the Company's accounting practices, including revenue recognition, receivables and other matters relating to the Company's previously disclosed intention to restate its financial statements for fiscal year ended December 31, 2013 and revise its financial statements for the years ended December 31, 2011 and 2012, and the prior revision of the Company's financial statements for fiscal year ended December 31, 2012." In their subpoena, the SEC requested documents and detailed information from January 1, 2009, to present, suggesting a thorough investigation into the Company's revenue recognition practices and other related accounting policies.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

72.    During the Class Period, Bridgepoint filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. The following chart identifies the date, signatories, and period covered by each report:

///

///

///

AMENDED CLASS ACTION COMPLAINT

Case No. 15-CV-408 JLS (DHB)

| FORM | PERIOD | DATE FILED | SIGNATORIES | REFERRED TO BELOW AS |
|---|---|---|---|---|
| | **BRIDGEPOINT'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD** | | | |
| 10-K | 2012 Fiscal Year | 3/12/2013 | Defendants Clark, Devine, Hackett, and Sarma | FY 2012 10-K |
| 10-Q | 2013 Fiscal 1st Quarter | 5/15/2013 | Defendant Devine | 1Q 2013 10-Q |
| 10-K/A | 2012 Fiscal Year | 5/17/2013 | Defendants Clark, Devine, Hackett, and Sarma | FY 2012 10-K/A |
| 10-Q | 2013 Fiscal 2nd Quarter | 8/6/2013 | Defendant Devine | 2Q 2013 10-Q |
| 10-Q | 2013 Fiscal 3rd Quarter | 11/5/2013 | Defendant Devine | 3Q 2013 10-Q |
| 10-K | 2013 Fiscal Year | 3/17/2014 | Defendants Clark, Devine, Hackett, and Sarma | FY 2013 10-K |

73.     As reflected by the chart below, during the Class Period, Bridgepoint issued the following press releases announcing its financial and operating results, which were attached to Form 8-Ks filed with the SEC by the Company and were signed by Defendant Devine. These press releases contained financial statements as was included in the Company's periodic reports:

| PERIOD | DATE | REFERRED TO BELOW AS |
|---|---|---|
| **PRESS RELEASES ISSUED BY BRIDGEPOINT DURING THE CLASS PERIOD ANNOUNCING THE COMPANY'S FINANCIAL RESULTS** | | |
| 2012 Fiscal 4th Quarter and Year | 3/12/2013 | FY 2012 PR |
| 2013 Fiscal 1st Quarter | 5/6/2013 | 1Q 2013 PR |
| 2013 Fiscal 2nd Quarter | 8/6/2013 | 2Q 2013 PR |
| 2013 Fiscal 3rd Quarter | 11/5/2013 | 3Q 2013 PR |
| 2013 Fiscal 4th Quarter and Year | 3/11/2014 | FY 2013 PR |

74.     During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Bridgepoint's SEC filings and during its investor conference calls.

A.     **Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements**

75.     Each of Bridgepoint's financial statements issued during the Class Period, as well as the financial results that were derived from those financial statements discussed in the quarterly and annual SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

76.     Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Bridgepoint to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4- 01(a)(1).

77.     During the Class Period, certain of Bridgepoint's financial statements violated GAAP, rendering them materially false and misleading. The FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K financial statements, as well as the financial results that were derived from those financial statements discussed in these SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were rendered false and misleading due to Defendants' failure to comply with SEC rules and GAAP.

78.     Furthermore, the fact that Bridgepoint restated its financial statements and disclosed that its financial statements issued during the Class Period should not be relied upon is an admission that they were false and misleading when originally issued

(Accounting Principles Board Opinion No. 20 at ¶¶7-13; Financial Accounting Standards Board Statement No. 154 at ¶25).

79.     The financial statements and financial results listed above in ¶77 violated GAAP, rendering them materially false and misleading because Bridgepoint failed to properly recognize revenue in these financial statements.

80.     Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. ASC 105-10-05-1.

81.     Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

82.     The SEC prohibits the management of earnings. On September 28, 1998, in response to growing concerns about registrants' managing earnings to achieve earnings estimates, then-SEC Chairman Arthur Levitt gave a speech titled "The Numbers Game." One earnings management gimmick that SEC Chairman Levitt addressed in his speech was abusive revenue recognition practices. In response to Chairman Levitt's comments regarding abusive earnings management, the SEC issued two staff accounting bulletins relevant to this case to address earnings management problems: Staff Accounting

Bulletin No. 99 ("SAB 99"); and Staff Accounting Bulletin No. 101, Topic 13, Revenue Recognition ("SAB 101, Topic 13").

83.     SAB 99 provides that misstatements of a financial statement item for the purpose of managing earnings to mask a change in earnings or other trends or to hide a failure to meet analyst consensus expectations for the enterprise are material under GAAP. "It is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as a part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings." SAB 99.

84.     SAB 101, Topic 13, provides that revenue generally is realized or realizable and earned when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectability is reasonably assured.

85.     ASC Topic 605-10, Revenue Recognition ("ASC 605-10"), provides that revenues are not recognized until realized or realizable and earned.

86.     Further, each registrant with securities registered pursuant to Section 12 of the Exchange Act must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

87.     For the reasons set forth in §V, *supra*, and ¶¶90-91, *infra*, due to Defendants' failure to apply these basic accounting principles and properly recognize revenue in violation of GAAP, its publicly disclosed financial statements during the Class Period were prepared in violation of GAAP rules SAB 99; SAB 101, Topic 13; and ASC 605-10.

AMENDED CLASS ACTION COMPLAINT                              Case No. 15-CV-408 JLS (DHB)

1

2

**B.      Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results**

3

4

5

6

7

8

9

10

11

88.      On March 12, 2013, Bridgepoint issued its FY 2012 PR and FY 2012 10-K in which the Company reported revenue of $209.4 million for the fourth quarter of 2012 and $968.2 million in revenue for the 2012 fiscal year. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. Later, on May 17, 2013, Bridgepoint filed an amended report of Bridgepoint's 4Q and FY 2012 financial results on the FY 2012 10-K/A. The FY 2012 10-K/A repeated the earlier reported revenue of $209.4 million for the fourth quarter of 2012 and $968.2 million in revenue for the 2012 fiscal year.

12

13

14

15

16

17

18

89.      As disclosed in the 2013 Restatement, Defendants materially misstated Bridgepoint's 2012 fourth quarter and fiscal year reported revenue in Bridgepoint's FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call by overstating fourth quarter of 2012 revenue by $2.9 million from $209.4 million to revised revenue of $206.5 million, and overstating revenue for the 2012 fiscal year by $24.8 million dollars from $968.2 million to revised revenue of $943.4 million.

19

20

21

22

23

24

25

26

27

28

90.      The materially false and misleading statements regarding Bridgepoint's revenue in the FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call were also made with scienter because at the time Defendants reported the materially overstated revenues, they knew or recklessly disregarded the necessity to reassess whether collectability was reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with Bridgepoint's institutions upon a change in facts or circumstances that would affect a student's ability to pay, in violation of GAAP and SEC guidance. As Defendant Devine explained in his response comments to the SEC, in the middle of 2012, the Company experienced one-time student financial aid processing issues,

1    resulting in students' inability to receive financial aid funding prior to them leaving
2    Bridgepoint's institution, and creating a greater likelihood that these student could not
3    independently pay their tuition bills (*see, e.g.*, ¶¶42, 61). As soon as Defendants learned
4    that this processing issue would affect a significant number of students and their ability
5    to pay their tuitions, a reassessment of revenue collectability was necessary under GAAP
6    and SEC guidance, especially when Defendant Devine admitted the obvious fact that
7    students without financial aid assistance "have a lower collection rate than financial aid
8    funding which results in greater bad debt expense" (¶61). However, rather than reassess
9    collectability upon receiving this new information concerning students' ability to pay,
10   Defendants either purposely or recklessly continued to recognize revenue for these
11   students, with the intention to subsequently write off this improperly recognized revenue
12   as a bad debt expense (*see* ¶63).

13     91. Further evidence of Defendants' deliberate recklessness includes:

14      a. The efforts taken as part of the purported 2012 Restatement
15   remediation plan spearheaded by Defendant Devine (¶47), in which Defendants analyzed
16   Bridgepoint's accounts receivable in the first quarter of 2013. Part of this analysis
17   included a monitoring of sub-populations of accounts receivable, including a sub-
18   population of students who left the institution, "to ensure a deeper understanding of how
19   student behavior . . . affects related receivable balances" (¶47, §VIII.A.1). If Defendants
20   had not realized that revenue collectability was not reasonably assured for the students
21   affected by the financial aid processing issue and the lingering effects of the issue (¶62),
22   after deeply analyzing Bridgepoint's accounts receivables, and specifically monitoring a
23   sub-population of accounts receivable balances for students who had left the institution,
24   it should have been readily apparent to Defendants that the revenue recognized for these
25   students was not reasonably assured.

26      b. The Individual Defendants and the Warburg Defendants pocketing
27   almost $141.4 million from Bridgepoint in their sale of over 7.25 million shares in a
28   December 2013 tender offer. During the Class Period, as a result of this falsely inflated

revenue, Bridgepoint's board of directors decided to return some of Bridgepoint's "success" to its shareholders via a tender offer in which the Company would buy back its own shares from investors, including Bridgepoint's controlling shareholder, directors, and officers, using close to half of Bridgepoint's cash. All of the Individual Defendants and Warburg participated in this tender offer, even though they knew or recklessly disregarded that the financial condition and operations of the Company were premised on false revenues, and sold back a significant number of shares to Bridgepoint, reaping millions of the Company's own funds (*see* §VIII.D, *infra*).

92.     Additionally, on the March 12, 2013 earnings conference call, Defendant Devine, in his opening remarks, stated:

> In the fourth quarter, the increase in bad debt was related to internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years. ***The Company has addressed this process and issue and expects that it will not repeat in 2013.***

93.     The highlighted statement in the preceding paragraph was materially false and misleading and made with scienter because at this time Defendant Devine knew, or was deliberately reckless in not knowing, that the internal processing issue was not a one-time issue and had not been resolved. Rather, the problem was getting worse because as Defendants subsequently admitted to the SEC, the 2012 internal financial aid processing issue continued to create a backlog in Bridgepoint's ability to package students throughout 2013, which resulted in the higher Bad Debt Percentage throughout 2013 (¶62).[3]

### C.     Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results

94.     On May 6, 2013, Bridgepoint issued the 1Q 2013 PR announcing its quarterly results for the first quarter of 2013. For the quarter, the Company reported

---

[3] As explained throughout, the increased "bad debt" was really revenue that never should have been recorded.

1 revenue of $222.0 million, beating the analyst consensus for revenue expectation. Also
2 on that day, Defendants Clark and Devine held a quarterly conference call with analysts,
3 during which they reiterated the financial results reported in the press release. On May
4 15, 2013, Bridgepoint filed its 1Q 2013 10-Q, in which the reported revenue number
5 from the 1Q 2013 PR was repeated.

6      95.    As disclosed in the 2013 Restatement, Defendants materially misstated
7 Bridgepoint's first quarter of 2013 reported revenue in Bridgepoint's 1Q 2013 PR, 1Q
8 2013 10-Q, and on the May 6, 2013 earnings conference call by overstating revenue by
9 $7 million from $222.0 million to revised revenue of $213.0 million.

10      96.    The materially false and misleading statements regarding Bridgepoint's
11 revenue in the 1Q 2013 PR, 1Q 2013 10-Q, and on the May 6, 2013 earnings conference
12 call were also made with scienter for the reasons stated in ¶¶90-91.

13      **D.**    **Materially False or Misleading Statements in the Company's**
14              **Disclosure of 2Q 2013 Results**

15      97.    On August 6, 2013, Bridgepoint issued the 2Q 2013 PR announcing its
16 financial results for the second quarter of 2013. The Company reported revenue of
17 $197.6 million for the quarter, in line with management's and analyst consensus. Also on
18 that day, Defendants Clark and Devine held a quarterly conference call with analysts,
19 during which they reiterated the financial results reported in the press release. Lastly, on
20 this same day, August 6, 2013, Bridgepoint filed its 2Q 2013 10-Q, in which the reported
21 revenue number from the 2Q 2013 PR was repeated.

22      98.    As disclosed in the 2013 Restatement, Defendants materially misstated
23 Bridgepoint's second quarter of 2013 reported revenue in Bridgepoint's 2Q 2013 PR, 2Q
24 2013 10-Q, and on the August 6, 2013 earnings conference call by overstating revenue
25 by $4.1 million from $197.6 million to revised revenue of $193.5 million.

26      99.    The materially false and misleading statements regarding Bridgepoint's
27 revenue in the 2Q 2013 PR, 2Q 2013 10-Q, and on the August 6, 2013 earnings
28 conference call were also made with scienter for the reasons stated in ¶¶90-91.

**E.    Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results**

100.    On November 5, 2013, Bridgepoint issued the 3Q 2013 PR announcing its financial results for the third quarter of 2013. The Company reported revenue of $185.6 million for the quarter. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. Lastly, on this same day, November 5, 2013, Bridgepoint filed its 3Q 2013 10-Q, in which the reported revenue number from the 3Q 2013 PR was repeated.

101.    As disclosed in the 2013 Restatement, Defendants materially misstated Bridgepoint's third quarter of 2013 reported revenue in Bridgepoint's 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call by overstating revenue by $2.8 million from $185.6 million to revised revenue of $182.8 million.

102.    The materially false and misleading statements regarding Bridgepoint's revenue in the 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call were also made with scienter for the reasons stated in ¶¶90-91.

**F.    Materially False and Misleading Statements in the Company's Tender Offer Schedule**

103.    On November 13, 2013, Bridgepoint issued a Form SC TO-I (the "Tender Offer"), signed by Defendant Clark. Each of the Defendants participated in the issuance of the Tender Offer, as explained in further detail in §VIII.D, *infra*. In the Tender Offer, Defendants reported revenue of $605.2 million for the nine months ending September 30, 2013, and $968.2 million in revenue for the 2012 fiscal year.

104.    As disclosed in the 2013 Restatement, Defendants materially misstated Bridgepoint's reported revenue for the nine months ending September 30, 2013 and the 2012 fiscal year in Bridgepoint's Tender Offer by overstating revenue for the nine months ending September 30, 2013 by $16 million from $605.2 million to revised

revenue of $589.2 million, and overstating revenue for the 2012 fiscal year by $24.8 million dollars from $968.2 million to revised revenue of $943.4 million.

105.   The materially false and misleading statements regarding Bridgepoint's revenue in the Tender Offer were also made with scienter for the reasons stated in ¶¶90-91.

### G.   Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results

106.   On March 11, 2014, Bridgepoint issued its FY 2013 PR in which the Company reported revenue of $163.5 million for the fourth quarter of 2013 and $768.6 million in revenue for the 2013 fiscal year, both in line with analyst consensus. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. On March 17, 2014, Bridgepoint filed its FY 2013 10-K, in which the reported revenue number from the FY 2013 PR was repeated.

107.   As disclosed in the 2013 Restatement, Defendants materially misstated Bridgepoint's fourth quarter and 2013 fiscal year reported revenue in Bridgepoint's FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call by overstating fourth quarter of 2013 revenue by $1.3 million from $163.5 million to revised revenue of $162.2 million, and overstating revenue for the 2013 fiscal year by $17.2 million dollars from $768.6 million to revised revenue of $751.4 million.

108.   The materially false and misleading statements regarding Bridgepoint's revenue in the FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call were also made with scienter for the reasons stated in ¶¶90-91.

### H.   The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications

109.   Each of Bridgepoint's FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K contained Sarbanes-Oxley required certifications, signed by Defendants Clark and Devine, who certified:

1.   I have reviewed this Quarterly Report on Form 10-Q of Bridgepoint Education, Inc.:

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report:***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report:***

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared:

   b.   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, ***to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:***

   c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation: and

   d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting: and

5.   ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

a. ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information: and***

b. ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

110.   As admitted in the 2013 Restatement, the statements set forth in the preceding paragraph were materially false and misleading when issued. Contrary to the Officer Defendants' certifications that Bridgepoint's internal controls over financial reporting were "effective" and were designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," Bridgepoint's management, including the Officer Defendants, concluded in the 2013 Restatement that the Company's disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013, and December 31, 2013:

> Our management has concluded that there are two material weaknesses in internal control over financial reporting, as **we did not maintain effective controls over the selection and application of GAAP related to revenue recognition** and restricted cash. Specifically, the members of our management team with the requisite level of accounting knowledge, experience and training commensurate with our financial reporting requirements did not analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances. **One control deficiency related to our failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions. This control deficiency resulted in the misstatement of our revenue, bad debt expense, and accounts receivables and related financial disclosures,** and resulted in the restatement of the Company's consolidated financial statements for the year 2013 and each of the quarters of 2013 and revision of the Company's consolidated financial statements for the years 2012 and 2011 and each of the quarters of 2012 and 2011.

111.   Each of the statements listed in ¶109 were also made with scienter for the reasons stated in ¶¶90-91.

## VII.   LOSS CAUSATION

112.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

113.   The truth regarding Bridgepoint's falsely reported revenue in violation of the collectability criterion was partially revealed, and/or the concealed risks materialized, on or about: March 11, 2014; May 12, 2014; and May 30, 2014. As a direct result of these partial disclosures, the price of Bridgepoint's stock declined precipitously on heavy trading volume.

114.   During the Class Period, investors were focused on the Company's declining revenues and increasing Bad Debt Percentage.

115.   The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to continue recognizing revenue that did not meet the collectability criterion in Bridgepoint's financial statements and financial results and the subsequent significant decline in the value of Bridgepoint securities when the truth regarding Defendants' fraudulent recognition of revenue in violation of the collectability criterion was revealed.

116.   On March 11, 2014, Bridgepoint preliminarily announced its fourth quarter and 2013 fiscal year financial results in its FY 2013 PR. In the press release Defendants reported revenue of $163.5 million for the quarter and $768.6 million for the year and a bad debt expenses of $72.3 million for the year. Additionally, from the reported bad debt expense for the year, investors and analysts were able to discern bad debt expenses for the fourth quarter of 2013 of $18.7 million, or 11.4% of quarterly revenues.

117.   Later that day, Defendants held an earnings call in which they reiterated the financial results and explained that the increase in operating costs (called instructional costs and services) for Bridgepoint's 2013 fiscal year was due in great part to higher bad debt expenses for the year. Also on this call, the Individual Defendants fielded questions relating to the uptick in the Bad Debt Percentage for the quarter:

TIMO CONNOR: Okay, thanks. Then final one for me, bad debt expense ticked up in the quarter. What are the expectations for that for 2014? And what are more normalized levels for bad debt expense in the future?

DAN DEVINE: It did pick up in the quarter. We expect that going forward it should be at 7% or below for 2014, and our goal is to drive it below that number.

\* \* \* \*

JEFF SILBER, ANALYST, BMO CAPITAL MARKETS: Just to follow-up on the question, why did bad debt expense tick up so much?

ANDREW CLARK: Why did it spiked up so much? We discussed it last quarter. We're finishing basically our final completion of the adjustments we made to our model.

118.   On this news, the price of Bridgepoint's stock tumbled, falling 15.73% or $2.99 per share, to close at $16.02 on March 11, 2014, on unusually heavy trading volume.

119.   The disclosures on March 11, 2014, partially revealed or the concealed risks partially materialized that the higher than historical Bad Debt Percentage was not "work[ing] its way back down over several quarters" as Defendant Devine had earlier explained. The bad debt expense reflected the eventual result of revenues fraudulently recording during 2013 (and which never should have been recorded) being written off as uncollectable. Indeed, the March 11, 2014 disclosures indicated to investors and analysts that the higher Bad Debt Percentages the Company had been experiencing during the Class Period may not be due solely to Bridgepoint's (allegedly one-time and resolved) 2012 internal processing issues or Defendants' change in the accounts receivable model, and could be more indicative of a deeper seeded problem with Bridgepoint's operations. For example, on March 12, 2014, an analyst for Deutsche Bank noted that the weak financial results for the fourth quarter "suggest that to hit their start growth guidance in 4Q it came at a significant economic cost, with rising bad debt and weak persistence." The same analyst also commented that "[l]ingering concerns that Bridgepoint is sacrificing student quality for growth will likely persist until rising bad debt trends reverse and persistence improves YoY."

120.   On May 12, 2014, in a press release attached to a Form 8-K filed with the SEC, Defendants announced Bridgepoint's preliminary first quarter of 2014 financial and operating results. Also in this press release, Defendants explained that the Company would be unable to timely file its financial results for the first quarter of 2014 on Form 10-Q, stating:

> The Company is working to quantify the impact of an outstanding comment the Company received from the Securities and Exchange Commission. The comment was received in connection with the SEC's review of the Company's periodic reports, and **relates to the Company's revenue recognition policy and accounting for doubtful accounts. Specifically, the Company has historically not determined it necessary to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions.** On May 2, 2014, the SEC informed the Company that such a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.

Defendants also disclosed that they were evaluating whether a restatement of Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 was necessary due to the lack of student-by-student reassessment.

121.   Later that day, the Officer Defendants held an earnings conference call, and Defendant Devine admitted that the Company's prior revenue recognition policy was incorrect: "Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense."

122.   The following day Defendant Devine, on behalf of Bridgepoint, filed a notification of late filing for the first quarter of 2014 on Form 12b-25 with the SEC. The notice largely reiterated the previous day's announcement.

123.   On this news, shares of Bridgepoint declined an additional $1.41 per share, nearly 9%, to close on May 12, 2014 at $14.51 per share on unusually heavy trading volume. The following day, Bridgepoint's share price continued to fall another 3.17%, or $0.46 per share, to close on May 13, 2014 at $14.05 per share.

124.   On May 30, 2014, after the market closed, Bridgepoint announced in a Form 8-K filed with the SEC that one week earlier, Bridgepoint's management concluded that there were "material misstatements of revenue, bad debt expense and accounts receivable" for each of the reported financial results in the Class Period, fully revealing the extent of Defendants' reckless accounting errors in recognizing revenues during the Class Period and its effect on Bridgepoint's Bad Debt Percentage.

125.   The May 30, 2014 disclosure also revealed that there were material weaknesses over financial reporting, "[s]pecifically, the process for analyzing the collectibility criterion for revenue recognition was not designed appropriately to reassess collectibility of funds owed by students, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions." Defendants also provided an estimate of what restated revenue and expenses would be for the 2013 fiscal year: estimating a revenue decrease of around $15 to $20 million along with an even larger decrease in bad debt expense of $23.2 to $26.2 million.

126.   On this news, shares of Bridgepoint declined 1.31%, or $0.17 per share, to close on June 2, 2014 at $12.82 per share, the first trading day after the May 30, 2014 press release, on heavy trading volume.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

127.   The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the Company's improper revenue recognition; and/or (b) their failure to properly reassess collectability of tuition upon a change in facts or circumstances that would affect a student's ability to pay; and/or (c) their intentional issuance of materially false or misleading financial statements which improperly recognized revenue on certain transactions; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

128.   The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

129.   In addition to the foregoing allegations, the following facts support a strong inference that Bridgepoint and the Individual Defendants knew, or with deliberate recklessness disregarded, that the challenged statements alleged herein were materially false or misleading when made.

**A.   Defendants Analyzed the Exact Metrics that Should Have Warned Them that Revenue Was Not Reasonably Collectable**

130.   Throughout the Class Period, Defendants tracked the exact metrics that would indicate that the collectability of revenues from students upon a change of circumstances, such as losing financial aid and/or dropping out, was not reasonably assured.

**1.   Defendants Analyzed Accounts Receivable Balances When Students Withdrew from Bridgepoint's Institutions**

131.   As part of Defendants' purported remediation plan following the 2012 Restatement, Defendants reported specific actions taken to improve Bridgepoint's accounts receivable (and as explained in Class Period earnings calls was the reason for the rise in Bad Debt Percentage) in each of the 2013 quarterly financial reports. Among the improvement actions taken, were:

- implementing additional oversight and review;
- gathering insights from operational personnel to ensure a better understanding of account balances and reasons for fluctuations; and
- monitoring the receivable sub-populations to ensure a deeper understanding of how student behavior at the institutions affects related receivable balances.

132.   Part of the monitoring of the receivable sub-population included specifically examining those accounts receivable balances of students who had withdrawn from Bridgepoint's institutions, as explained by Defendant Devine during the May 6, 2013 earnings conference call, when answering a question on the reasons behind the "spike" in the Bad Debt Percentage:

> **We did a deeper analysis.** The issue that kind of caused the spike so to speak is that, in our underlying data we use to build our models, those models that certain credits applied to them from when **a student would leave the institution** or receive a credit for another reason. That created one version of kind of our aging buckets, and then we made the decision that it may be more appropriate if we kind of suppressed those credits and that created another view of the aging buckets which we feel is more appropriate.

### 2.    Bridgepoint's Enrollment Related Measures

133.   During the Class Period, the Officer Defendants also carefully tracked various enrollment related numbers, such as student persistence and retention. Although these number directly measure how many students have stayed at Bridgepoint's institutions, by virtue of having total enrollment, as well as persistence and retention numbers, Defendants Clark and Devine also had access to the number of students who dropped out of Bridgepoint's institutions.

134.   The Officer Defendants frequently displayed their knowledge of the Company's persistence and enrollment numbers and trends, as well as when and why students leave Bridgepoint's institutions, during the Class Period earnings conference calls. For example, during the May 6, 2013 earning conference call, Defendant Clark fielded a request from an analyst asking for the retention and persistence numbers for the quarter:

> **[S]tudent persistence was down a little bit more than what we expected internally, but that was due to the tuition assistance disruption for the military primarily**. There is a little bit of, as you know, noise quarter to quarter that impacts your view of persistence externally. Our overall view that persistence directionally should be positive, especially in the back half of the year, with all of the new admissions standards and criteria that Ashford has put in place.

In response to a follow-up question from a different analyst asking for Bridgepoint's persistence rates, Defendant Clark responded:

> I mean we don't give the exact percentage numbers out, but it would have been slightly lower and not materially lower. In other words, **we see that -- those fluctuations occur from quarter to quarter.** And what's important more is the overall trend. You know, I think, publicly, we've indicated that the initiatives – the admissions criteria that we've put in place has **led to better persisting students in their second and third courses or their fourth course and beyond.**

135.   During the August 6, 2013 earnings conference call, Defendant Devine responded to a question asking what percent of bad debt comes from students dropping out in their first quarter:

> I would say approximately **a third of students who are enrolled in the institution, who leave the institution either prior to receiving their eligibility for Title IV funds** or leave the institution after, effectively somebody in their second class, because in their first class there's very little financial exposure.

136.   Lastly, on the March 11, 2014 and May 12, 2014 earnings conference calls the Officer Defendants divulged retention based statistics as well as how these statistics helped Defendants reach the Company's goals. On the March 11, 2014 call, in his opening remarks, Defendant Clark stated:

> One tool that will track our future progress is an annual measure of Ashford's cohort-based retention. This metric compares the total number of students who are active on a census date in early September, to the next census date on the following September, adjusted to account for students who have graduated. From September of 2012 to September of 2013, this statistic was 60%, a number that has been consistent for Ashford over the past four years.

Later in this call, Defendant Devine reported that "[a]s of December 31, 2013, total student enrollment decreased to 63,624 from 81,810 at December 31, 2012. **Persistence in the quarter was 77.9% after accounting for higher graduates**, and was essentially flat as compared to the fourth quarter of 2012." And in Defendant Clark's opening remarks on the May 12, 2014 call, he explained in more detail one of the ways Defendants measure student persistence:

> Turning to enrollment, I would like to describe how we measure the success of our efforts to help students persist and complete their academic studies. Historically on our fourth-quarter earnings call, we have provided

our annual student cohort retention statistic. Going forward, we will now provide a 12-month retention of active students from the end of every quarter. We then compare that to the 12-month retention for students who are actively enrolled at the end of the year-ago quarter.

## B.   Bridgepoint's Ineffective Internal Controls

137.   The Officer Defendants' knowledge or recklessness is also evidenced by the fact that they personally reviewed the internal controls and Defendant Devine took ultimate authority over remediating Bridgepoint's internal controls as part of the purported 2012 Restatement remediation plan (*see* ¶47, §VIII.A.1). In the 2013 Restatement, Bridgepoint also disclosed that it had identified "material weaknesses" in its "internal control over financial reporting." These material weaknesses included the Company's failure to:

- analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances;

- maintain effective internal controls over the accounting for revenue recognition; and

- maintain effective internal controls over the presentation of certain funds as restricted cash.

138.   To remediate these material weaknesses, Bridgepoint represented that it planned to implement the following measures: "additional training efforts," "ensuring appropriate review of the related significant accounting policies by the members of management with the requisite level of knowledge, experience and training to appropriately apply GAAP," and undertaking "additional review processes to ensure the related significant accounting policies are implemented and applied properly on a consistent basis throughout the Company." However, as the Defendants later admitted in the 2013 Restatement, management was not appropriately applying GAAP as it relates to properly recognizing revenue.

## C.   The Ongoing SEC Investigation of Bridgepoint

139.   On July 25, 2014, shortly after the end of this Class Period, Bridgepoint disclosed that the SEC was investigating its accounting practices, including revenue

recognition and receivables, in addition to other matters relating to Bridgepoint's forthcoming 2013 Restatement and the prior 2012 Restatement. Not only did the SEC issue this subpoena for the revised and restated time periods, but requested documents and information dating back to July 1, 2009 to the present.

**D.    The Individual Defendants and the Warburg Defendants Were Motivated to Sell Back A Significant Amount of Stock to the Company at an Unusual and Suspicious Time**

140.    On November 13, 2013, Bridgepoint announced that a special committee of Bridgepoint's board of directors approved a plan to purchase up to 10,250,000 shares of its common stock through a tender offer at a purchase price of $19.50 per share, a price higher than the Company's average 10-day, 30-day, 60-day, 90-day, 6-month, 12-month and year-to-date closing stock prices up through November 12, 2013. The Tender Offer and press release announcing the offer also explained that both Warburg, Bridgepoint's controlling stockholder, and the Company's officers and directors (including the Individual Defendants) planned to participate in the tender offer. The officers and directors were eligible to tender both their shares and vested stock options.

141.    On December 18, 2013, Bridgepoint announced the results of the tender offer. The Company accepted for purchase 10,249,766 shares of its common stock, including all "odd lots" properly tendered, shares tendered through the conditional exercise of options, and shares tendered by Warburg and Bridgepoint's officers and directors.

142.    Both the Individual Defendants and Warburg pocketed handsome sums in the selling shares back to Bridgepoint in the tender offer. Pursuant to the tender offer, Warburg sold back 6,878,646 shares to Bridgepoint, or nearly 20% of the number of shares Warburg held prior to the tender offer. Defendant Clark disposed of 254,114 shared held beneficially, or 12.8%, of his beneficial holdings prior to the tender offer.[4] In

---

[4] The holdings or position held prior to the tender offer includes the current number of shares held by each Individual Defendant plus the number of shares subject to options

the tender offer, Defendant Devine sold 114,136 shares, or about 22% of his position prior to the tender offer. Defendants Hackett and Sarma each sold back 2,004 shares of Bridgepoint stock back to the Company, or nearly 10% of their respective positions prior to the tender offer.

143.   The timing of the announcement and execution of the tender offer was both unusual and suspicious. At this time, both the Individual Defendants and Warburg knew or were deliberately reckless in not knowing that the results for the fourth quarter of 2013 would be particularly bad due to the inevitable bad debt expense the Company reported in the period (¶¶116-119) and that Bridgepoint continued to experience continuing backlog in financial aid packaging (¶62) and thus was continuing to improperly record revenues. At the time of the tender offer, the Individual and Warburg Defendants knew that they could not keep continuing to hide the improper revenues forever, and thus sought to cash in, using Bridgepoint's own cash to do so, and tendered over 7.25 million shares back to the Company, about 70% of the total number of shares repurchased by Bridgepoint in the tender offer, and received almost $141.4 million from Bridgepoint's coffers in exchange.

144.   Additionally, the fact that these insider sales were conducted by a tender offer is further evidence of these transactions being unusual and suspicious. Indeed, an underwriter had to be used to conduct this massive tender offer – such a large sale of Bridgepoint's stock could not have simply been sold on the open market for the prices these defendants received for their shares. In all, Warburg and the Individual Defendants were able to orchestrate a transaction in which close to half of Bridgepoint's cash and cash equivalents as of the end of third quarter of 2013 would be returned to shareholders, of which one-third went into Warburg and the Individual Defendants' pockets.

---

exercisable within 60 days, as published in Defendants' November 12, 2013 Tender Offer. For the Board Defendants, these holdings also exclude the shares held by Warburg.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

145.   The market for Bridgepoint's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Bridgepoint's securities traded at artificially inflated prices during the Class Period. On October 29, 2013, the Company's stock closed at a Class Period high of $20.16 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bridgepoint's securities and market information relating to Bridgepoint, and have been damaged thereby.

146.   During the Class Period, the artificial inflation of Bridgepoint's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bridgepoint's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Bridgepoint and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

147.   At all relevant times, the market for Bridgepoint's securities was an efficient market for the following reasons, among others:

> a.   Bridgepoint stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.     As a regulated issuer, Bridgepoint filed periodic public reports with the SEC and/or the NYSE;

c.     Bridgepoint regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.     Bridgepoint was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

148.   As a result of the foregoing, the market for Bridgepoint's securities promptly digested current information regarding Bridgepoint from all publicly available sources and reflected such information in Bridgepoint's stock price. Under these circumstances, all purchasers of Bridgepoint's securities during the Class Period suffered similar injury through their purchase of Bridgepoint's securities at artificially inflated prices and a presumption of reliance applies.

## X.    NO SAFE HARBOR

149.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bridgepoint who knew that the statement was false when made.

## XI.   CLASS ACTION ALLEGATIONS

150.   Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Bridgepoint's securities between March 12, 2013 and May 30, 2014, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

151.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bridgepoint's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Bridgepoint shares were traded publicly during the Class Period on the NYSE. As of March 10, 2014, Bridgepoint had 44,979,199 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Bridgepoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

152.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

153.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

154.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bridgepoint; and

c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

155.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   COUNTS

### FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendant Bridgepoint and the Individual Defendants

156.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

157.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii)

cause Plaintiffs and other members of the Class to purchase Bridgepoint's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

158.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bridgepoint's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

159.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bridgepoint's financial well-being and prospects, as specified herein.

160.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bridgepoint's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bridgepoint and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

161.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the

Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

162.   The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bridgepoint's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

163.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bridgepoint's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of

material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Bridgepoint's securities during the Class Period at artificially high prices and were damaged thereby.

164.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Bridgepoint was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Bridgepoint securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

165.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants and the Warburg**
**Defendants**

167.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

168.   The Individual Defendants and the Warburg Defendants acted as controlling persons of Bridgepoint within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants and the Warburg

Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants and the Warburg Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

169.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. In addition, the Warburg defendants, as the controlling shareholder of Bridgepoint, and through Defendants Hackett and Sarma, had the power to influence and control and did influence and control the decision-making of the Company.

170.   As set forth above, Bridgepoint and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants and the Warburg Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      (c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      (d)    Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated:  September 18, 2015          **GLANCY PRONGAY & MURRAY LLP**

          By:  *s/ Robert V. Prongay*
          Lionel Z. Glancy
          Robert V. Prongay
          Leanne Heine Solish
          1925 Century Park East, Suite 2100
          Los Angeles, CA 90067
          Telephone:  (310) 201-9150
          Facsimile:   (310) 201-9160

          **THE ROSEN LAW FIRM, P.A.**
          Laurence M. Rosen, Esq. (SBN 219683)
          355 South Grand Avenue, Suite 2450
          Los Angeles, CA 90071
          Telephone: (213) 785-2610
          Facsimile: (213) 226-4684
          Email: lrosen@rosenlegal.com

          *Co-Lead Counsel for Plaintiffs*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO SOUTHERN DISTRICT OF CALIFORNIA LOCAL RULES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On September 18, 2015, I caused to be served the following document:

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Southern District of California, for receipt electronically by the parties as listed on the Court's ECF Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 18, 2015, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay