1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  NELDA ZAMIR, Individually and on          Case No.: 15-CV-408 JLS (DHB)
    Behalf of All Others Similarly Situated,

12                                             **ORDER: (1) GRANTING THE**
                                   Plaintiff,  **BRIDGEPOINT DEFENDANTS'**
13                                             **REQUEST FOR JUDICIAL NOTICE,**
    v.                                         **(2) DENYING LEAD PLAINTIFFS'**
14                                             **MOTION TO STRIKE,**
    BRIDGEPOINT EDUCATION, INC.;              **(3) GRANTING THE BRIDGEPOINT**
15  ANDREW S. CLARK; DANIEL J.                **MOTION TO DISMISS, AND**
    DEVINE; PATRICK T. HACKETT;               **(4) GRANTING THE WARBURG**
16  ADARSH SARMA; WARBURG                     **MOTION TO DISMISS**
    PINCUS & CO.; WARBURG PINCUS
17  PARTNERS LLC; WARBURG PINCUS
    PRIVATE EQUITY VIII, L.P.,
18                                             (ECF Nos. 28, 30, 37)
                                  Defendants.
19

20

21          Presently before the Court are Defendants Bridgepoint Education, Inc.; Andrew S.

22  Clark; Daniel J. Devine; Patrick T. Hackett; and Adarsh Sarma's (collectively, the

23  Bridgepoint Defendants) Motion to Dismiss Plaintiffs' Amended Class Action Complaint

24  (the Bridgepoint MTD, ECF No. 28) and Request for Judicial Notice (RJN, ECF No. 28-

25  3); Defendants Warburg Pincus Private Equity VIII, L.P., Warburg Pincus LLC; Warburg

26  Pincus Partners L.P. (successor-in-interest to Warburg Pincus Partners LLC); and Warburg

27  Pincus & Co.'s (collectively, the Warburg Defendants) Motion to Dismiss Amended Class

28  Action Complaint for Violations of the Federal Securities Laws (the Warburg MTD, ECF

No. 30); and Lead Plaintiffs' Nelda Zamir and Thomas G. Prosch's Motion to Strike and Objection to Defendants' Request for Judicial Notice (Mot. to Strike, ECF No. 37).  Also before the Court are the parties' Oppositions to (ECF Nos. 36, 37) and Replies in Support of (ECF Nos. 41, 42, 43) the various motions, as well as two Notices of Supplemental Authority filed by Lead Plaintiffs (ECF Nos. 44, 46).  The Court vacated the hearing and took these matters under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  (ECF No. 45.)  Having considered the parties' arguments and the law, the Court **GRANTS** the Bridgepoint Defendants' RJN (ECF No. 28-3), **DENIES** Lead Plaintiffs' Motion to Strike (ECF No. 37), **GRANTS** the Bridgepoint MTD (ECF No. 28), and **GRANTS** the Warburg MTD (ECF No. 30).

## BACKGROUND

### I.    The Defendants

Defendant Bridgepoint provides for-profit higher education through two wholly-owned subsidiaries, Ashford University and the University of the Rockies.  (Am. Class Action Compl. (AC) ¶¶ 3, 22, ECF No. 17; *see also id.* at ¶ 40.)  Its common stock is publicly traded on the New York Stock Exchange.  (*Id.* at ¶ 22; *see also id.* at ¶ 40.)

Defendant Warburg Pincus Private Equity VIII, L.P. (Warburg VIII) is Defendant Bridgepoint's controlling shareholder.  (*Id.* at ¶ 34.)  As of October 31, 2013, Defendant Warburg VIII owned approximately 63.4% of Defendant Bridgepoint's outstanding stock. (*Id.*)  Defendant Warburg Pincus & Co. (Warburg Co.) is a managing member of Defendant Warburg Pincus Partners LLC (Warburg LLC) (*id.* at ¶ 31), which is the sole general partner of Defendant Warburg VIII (*id.* at ¶ 33).

Defendant Clark is a co-founder of Defendant Bridgepoint, as well as its Chief Executive Officer, President, and a director.  (*Id.* at ¶ 23.)  Defendant Devine has served as Defendant Bridgepoint's Chief Financial Officer since January 2004 and its Executive Vice President since January 2011.  (*Id.* at ¶ 25.)  Defendant Hackett has served as a director of Defendant Bridgepoint since March 2008 and as Chairman of the Board since February 2009.  (*Id.* at ¶ 27.)  He is also a managing director at Defendant Warburg LLC and a

general partner of Defendant Warburg Co.  (*Id.*)  Defendant Sarma has served as a director of Defendant Bridgepoint since July 2005 and is also Chair of its Nominating and Governance Committee of the Board and a member of the Defendant Bridgepoint's Compensation and Strategic Oversight Committee of the Board.  (*Id.* at ¶ 29.)  He is also a managing director at Defendant Warburg LLC.  (*Id.*)  Defendants Clark, Devine, Hackett, and Sarma are collectively referred to as the Individual Defendants.

## II.   Factual Background

Defendant Bridgepoint's primary source of revenue is tuition and related fees.  (*Id.* at ¶ 40.)  The vast majority of this tuition is paid via federal financial aid.  (*Id.* at ¶ 41.)  In 2012 and 2013, over 85% of Ashford University's and University of the Rockies' revenues came from Title IV federal student loan programs.  (*Id.*; *see also id.* at ¶ 64.)

In mid-2012, Defendant Bridgepoint experienced technical issues during an annual upgrade of its student management system.  (*Id.* at ¶¶ 5, 42.)  These technical issues resulted in delays in packaging students for financial aid qualification in between financial aid award years.  (*Id.* at ¶ 5.)  As a result, a significant number of students were not packaged prior to leaving Defendant Bridgepoint's institutions and were consequently not eligible for financial aid funding.  (*Id.*)  These students were therefore required to pay outstanding balances without the assistance of financial aid.  (*Id.*)

On March 12, 2013, Defendant Bridgepoint reported an increase over historic levels in its bad debt expense for the fourth quarter of 2012 and the 2012 fiscal year.  (*Id.* at ¶ 6.)  Defendants Clark and Devine explained to investors and analysts on an earnings conference call that Defendant Bridgepoint's technical issues were to blame, but that they did not expect the issue to repeat in 2013.  (*Id.* at ¶¶ 6, 42.)  On May 17, 2013, Defendant Bridgepoint issued an amended Form 10-K for the 2012 fiscal year to reissue its financial statements.  (*Id.* at ¶ 45.)

Despite Defendant Bridgepoint's assurances to the contrary, the 2012 technical issues caused a backlog in packaging financial aid throughout 2013.  (*Id.* at ¶ 7; *see also id.* at ¶ 43.)  Consequently, Defendant Bridgepoint continued to report higher than normal

bad debt expenses as a percentage of revenues.  (*Id.* at ¶ 48.)

On November 13, 2013, Defendant Bridgepoint issued a Form SC TO-I, announcing that a special committee of its board of directors had approved a plan to purchase up to 10,250,000 shares of its common stock through a tender offer at a purchase price of $19.50 per share.  (*Id.* at ¶¶ 103, 140.)  The special committee consisted of three independent directors: Dale Crandall, Marye Anne Fox, and Robert Harman.  (Decl. of Teodora E. Manolova (Manolova Decl.) Ex. A at 7, ECF No. 28-2 at 10.[1])  The high and low sales price per share reported by the NYSE in the fourth quarter 2013 through November 12, 2013 were $20.33 and $15.64, respectively.  (Manolova Decl. Ex. H at 21, ECF No. 28-2 at 56.)  The $19.50 per share tender offer price thus represented a 4.2% discount to the stock price two weeks before the announcement.  (Bridgepoint MTD Mem. 21 & n.20 (citing Manolova Decl. Ex. H at 21, ECF No. 28-2 at 56); *see also* MTD Opp'n 26 n.13, ECF No. 36; Bridgepoint MTD Reply 16 n.10, ECF No. 41.)  The Form SC TO-I and press release noted that the Warburg Defendants and Defendant Bridgepoint's officers and directors, including the Individual Defendants, planned to participate in the tender offer. (AC ¶ 140, ECF No. 17.)

The Warburg Defendants ultimately sold back 6,878,646 shares to Defendant Bridgepoint, or nearly 20% of the shares the Warburg Defendants held prior to the tender offer.  (*Id.* at ¶ 142.) Defendant Clark disposed of 254,114 (12.8%) of his shares, Defendant Devine 114,136 (22%), and Defendants Hackett and Sarma 2004 (10%) each.  (*Id.*) Excluding transactions executed to satisfy tax withholding obligations, Defendant Clark sold 185,326 shares (*see* Manolova Decl. Ex. K at 75, ECF No. 28-2 at 88), Defendant Devine 42,519 (*see* Manolova Decl. Ex. L at 86, ECF No. 28-2 at 100), and Defendants Hackett and Sarma 925 each (*see* Manolova Decl. Ex. M at 93, ECF No. 28-2 at 108; Manolova Decl. Ex. N at 101, ECF No. 28-2 at 117.).  Defendants Clark and Devine

---

[1] Pin citations to docketed materials refer to the CM/ECF page numbers electronically stamped at the top of each page.

retained approximately 94% and 87% of their respective stock holdings in Defendant Bridgepoint during the class period, while Defendants Hackett and Sarma—excluding shares held by Warburg—each increased their holdings.  (*See* Manolova Decl. Ex. F at 36, ECF No. 28-2 at 44; Manolova Decl. Ex. G at 40, ECF No. 28-2 at 49.)

On December 11, 2013, the United States Securities and Exchange Commission (SEC) contacted Defendant Devine with comments and questions regarding Defendant Bridgepoint's declining enrollments but increased revenue for the 2012 fiscal year.  (AC ¶¶ 58, 60, ECF No. 17.)   The SEC also asked Defendant Devine how Defendant Bridgepoint's internal processing issues with financial aid packages had affected its bad debt percentage.  (*Id.* at ¶ 60.)  Defendant Devine's January 10, 2014 response detailed Defendant Bridgepoint's 2012 technical issues and the backlog affecting financial aid packaging through 2013.  (*Id.* at ¶ 62.)  In response to the SEC's inquiry regarding Defendant Bridgepoint's determination that collectability is reasonably assured, Defendant Devine noted that because "approximately 85 percent of [Defendant Bridgepoint's] students pay for tuition and fees via Title IV funding . . . , [Defendant Bridgepoint] conclude[s its] collectability assessment based on the government's ability to pay as opposed to a student's ability to pay."  (*Id.* at ¶ 64 (emphasis omitted).)

Defendant Devine's response prompted the SEC to ask for additional information on February 12, 2014, including "why it is appropriate to base your collectability assessment on the government's ability to pay."  (*Id.* at ¶ 66.)  Defendant Devine replied on February 28, 2014 and a number of additional communications with the SEC followed, including two telephone conversations in May 2014 and an additional letter on June 3, 2014.  (*Id.* at ¶ 67.)

On March 11, 2014, Defendant Bridgepoint preliminarily announced its fourth quarter and 2013 fiscal year financial results in a press release.  (*Id.* at ¶ 116.)  Later that day, Defendants held an earnings call, at which the Individual Defendants fielded questions relating to Defendant Bridgepoint's increase bad debt percentage for the quarter.  (*Id.* at ¶ 117.)  Following this news, the price of Defendant Bridgepoint's stock fell 15.73%, or

$2.99 per share, closing at $16.02 per share following unusually heavy trading volume. (*Id.* at ¶ 118.)

On May 12, 2014, Defendants announced in a press release attached to a Form 8-K that Defendant Bridgepoint would be unable to file its Form 10-Q for the first quarter of 2014 on time because "[t]he Company is working to quantify the impact of an outstanding comment the Company received from the [SEC]."  (*Id.* at ¶¶ 50, 120.)  Defendants also explained that Defendant Bridgepoint was evaluating whether to restate its financial results for the periods from January 1, 2011 through December 31, 2013.  (*Id.*)  Defendants Clark and Devine held an earnings conference call later that day, during which Defendant Devine admitted that Defendant Bridgepoint's prior revenue recognition policy was incorrect.  (*Id.* at ¶ 121.)  Consequently, the price of Defendant Bridgepoint's shares declined nearly 9%, closing at $14.51 per share after unusually heavy trading volume.  (*Id.* at ¶ 123.)

The following day, Defendant Devine filed a notification of late filing for the first quarter of 2014 on Form 12b-25 with the SEC.  (*Id.* at ¶ 122.)  This resulted in an additional decline of 3.17% in Defendant Bridgepoint's share price, which closed at $14.05 per share. (*Id.* at ¶ 123.)

On May 30, 2014, Defendants announced that they were restating Defendant Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as revising the financial statements for the fiscal years ending in December 31, 2012 and 2011.  (*Id.* at ¶¶ 52, 124–25.)  On June 2, 2014, the first trading day following the press release, the price of Defendant Bridgepoint's shares declined by 1.31%, or $0.17 per share, closing at $12.98. (*Id.* at ¶ 126.)  Defendant Bridgepoint issued its restated 2013 financials on August 4, 2014. (*Id.*)

As a result of the restatement, Defendant Bridgepoint saw a decrease in revenues, but a corresponding decrease in its bad debt expense and increase in net income:

/ / /

/ / /

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Difference in Revenue | Original Bad Debt Expense (millions) | Restated Bad Debt Expense (millions) | Original Bad Debt/ Revenue | Restated Bad Debt/ Revenue | Original Net Income (millions) | Restated Net Income/ Loss (millions) | Difference in Net Income/ Loss |
|---|---|---|---|---|---|---|---|---|---|---|
| FY 2012 | $968.2 | $943.4 | (2.6%) | $73.7 | $52.8 | 7.6% | 5.6% | $123.4 | $121.1 | (1.9%) |
| 1Q 2013 | $222.0 | $213.0 | (4.1%) | $18.3 | $13.0 | 8.2% | 6.1% | $27.0 | $24.7 | (8.5%) |
| 2Q 2013 | $197.6 | $193.4 | (2.1%) | $18.6 | $11.4 | 9.4% | 5.9% | $10.4 | $12.1 | 16.3% |
| 3Q 2013 | $185.6 | $182.8 | (1.5%) | $16.8 | $7.3 | 9.0% | 4.0% | $10.1 | $14.2 | 40.6% |
| 4Q 2013 | $163.5 | $162.2 | (0.8%) | $18.7 | $15.4 | 11.4% | 9.5% | ($6.5) | ($5.1) | (21.5%) |
| FY 2013 | $768.6 | $751.4 | (2.2%) | $72.3 | $47.1 | 9.4% | 6.3% | $41.0 | $45.9 | 12.0% |

(*Id.* at ¶ 57; Bridgepoint MTD Mem. 16–17, ECF No. 28-1; Manolova Decl. Ex. E at 32–33, ECF No. 28-2 at 39–40.)

On June 20, 2014, the SEC sent another letter to Defendant Bridgepoint indicating the SEC's belief that "the errors relating to revenue recognition and restricted cash were material to all periods presented" and requesting that Defendant Bridgepoint "please restate 2011 and 2012 in addition to 2013." (AC ¶ 68, ECF No. 17 (emphasis omitted).) The SEC added that "a reassessment of the collectability criterion should be performed when you have new information that would affect a student's ability to pay" and asked Defendant Bridgepoint to "please provide us with your corrected revenue recognition policy disclosures." (*Id.* (emphasis omitted).)

On July 22, 2014, the SEC sent Defendant Bridgepoint a subpoena "relating to certain of the Company's accounting practices, including revenue recognition" and requesting documents and information dating back to July 1, 2009. (*Id.* at ¶¶ 71, 139.)

## III.   Procedural Background

Lead Plaintiff Zamir filed an initial complaint on February 24, 2015, alleging two causes of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5 and violation of Section 20(a) of the Exchange Act. (*See generally* ECF No. 1.) Lead Plaintiffs moved for appointment as lead plaintiffs and approval of choice of counsel on April 27, 2015. (*See* ECF No. 3.) Because the motion was unopposed (*see* ECF No. 13), the Court granted Lead Plaintiffs' motion (*see* ECF No. 14).

On September 18, 2015, Lead Plaintiffs filed the AC, asserting the same causes of action as in the original complaint. (*See* ECF No. 17.) The Bridgepoint and Warburg

MTDs were filed on November 24, 2015.  (*See* ECF Nos. 28, 30.)  On January 11, 2016, Lead Plaintiffs filed the instant Motion to Strike.  (*See* ECF No. 37.)

### THE BRIDGEPOINT DEFENDANTS' REQUEST FOR JUDICIAL NOTICE & LEAD PLAINTIFFS' MOTION TO STRIKE

The Bridgepoint Defendants ask the Court to take judicial notice of seventeen documents.  (*See generally* RJN, ECF No. 28-3.)  Exhibits A through H and K through O consist of documents filed with the SEC (*see id.* at 2–4), while Exhibits I and J provide historical stock prices for Defendant Bridgepoint and the U.S. For-Profit Education Index, respectively (*see id.* at 4–5).  Lead Plaintiffs do not object to the Court taking judicial notice of these documents.  (*See generally* Mot. to Strike, ECF No. 37; *see also* RJN Reply 2, ECF No. 42.)  Indeed, Ninth Circuit precedent establishes that the Court may judicially notice both SEC filings and historic stock prices.  *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

The Bridgepoint Defendants also ask the Court to take judicial notice of two analyst reports, Exhibits P and Q (*see* RJN 5–6, ECF No. 28-3), which are cited in one footnote of the Bridgepoint MTD memorandum (*see* Bridgepoint MTD Mem. 28 n.31, ECF No. 28-1).  Lead Plaintiffs object to these exhibits and ask that both the exhibits and any references to them in the Bridgepoint MTD memorandum be stricken pursuant to Rule 12(f).  (Mot. to Strike 6, ECF No. 37.)  As the Bridgepoint Defendants note (*see* RJN 5, ECF No. 28-3), "[h]owever, courts routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public."  *In re Century Aluminum Co. Sec. Litig.*, No. C 09-1001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011), *aff'd*, 704 F.3d 1119; 729 F.3d 1104 (9th Cir. 2013).  Moreover, "[t]he []AC quotes from . . . analyst reports . . . . While the competing analyst reports proffered by [the Bridgepoint] Defendants may not be considered 'for the truth of their contents' . . . , the Court may properly look to those reports to understand the 'total mix' of information available to investors over the class period."  *Reinschmidt v. Zillow, Inc.*, No. C12-2084 RSM, 2014 WL 5343668, at *3 (W.D. Wash.

Oct. 20, 2014) (citations omitted).

Accordingly, the Court **GRANTS** the Bridgepoint Defendants' RJN in its entirety (ECF No. 28-3) and **DENIES** Lead Plaintiffs' Motion to Strike (ECF No. 37).  The Court will "mind its Ps and Qs," however, considering Exhibits P and Q only "for the limited purpose of considering what information was disclosed to the market and at what point during the class period." *Reinschmidt*, 2014 WL 5343668, at *3.

## THE BRIDGEPOINT AND WARBURG MOTIONS TO DISMISS

## I.    Legal Standard

Rule 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss.  The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (alteration in original).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6).  A claim is facially plausible when the facts pled "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  "[F]acts that are

'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* at 678–79 (citing *Twombly*, 550 U.S. at 555). This review requires "context-specific" analysis involving the Court's "judicial experience and common sense." *Id.* at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). The Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

"Claims brought under Rule 10b-5 . . . must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *In re Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1016 (S.D. Cal. 2006) (alteration in original) (quoting Fed. R. Civ. P. 9(b)) (citing *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005), *cert. denied* 546 U.S. 1172 (2006); *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999)). "In addition, in 1995, Congress enacted the Private Securities Litigation Record Act of 1995 (PSLRA) and altered the pleading requirements in private securities fraud litigation by requiring a complaint plead with particularity both falsity and scienter." *Id.* at 1016–17 (quoting *Daou Sys.*, 411 F.3d at 1014) (internal quotation marks omitted).

## II.   Analysis

Lead Plaintiffs assert two causes of action: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 against the Bridgepoint Defendants, and (2) violation of Section 20(a) of the Exchange Act against the Individual and Warburg Defendants. (*See generally* AC, ECF No. 17.) Defendants ask the Court to dismiss Lead Plaintiffs' AC with prejudice. (*See* Bridgepoint MTD Mem. 32, ECF No. 28-1; *see also* Warburg MTD Mem.

4, ECF No. 30-1 (joining in the Bridgepoint MTD).)

### A.    Section 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 15 U.S.C. § 78j(b)). "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Id.* (quoting 17 CFR § 240.10b-5 (2004)). "The basic elements of a Rule 10b-5 claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Daou Sys.*, 411 F.3d at 1014 (citing *Dura Pharms.*, 544 U.S. at 341–42). The Bridgepoint Defendants challenge the adequacy of Lead Plaintiffs' allegations concerning only the second and fourth elements. (*See generally* Bridgepoint MTD Mem. 14–28, ECF No. 28-1; *see also* MTD Opp'n 16, ECF No. 36; Bridgepoint MTD Reply 9–23, ECF No. 41.)

### 1.    Scienter

A private securities plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 987–88 (S.D. Cal. 2002). "[T]he PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness." *Silicon Graphics*, 183 F.3d at 979; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007). Recklessness amounts to "'an extreme departure from the standards of ordinary care, and . . . presents a

danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)).  To satisfy this pleading requirement, "the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the defendants knew or were deliberately reckless of the false or misleading nature of the statements when made."  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 988 (N.D. Cal. 2007). The Court must consider competing inferences that could be drawn in favor of plaintiffs or defendants and determine whether plaintiffs have pled a "strong inference" of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

The Bridgepoint Defendants argue that Lead Plaintiffs fail to meet their burden both because "the alleged scheme makes no sense" and "there is barely any mention of the Individual Defendants other than the CFO, Mr. Devine, and, even as to him, the AC only succeeds in making the case that the accounting treatment for the independent paying students involved a reasonable disagreement over the application of relevant accounting principles."  (Bridgepoint MTD Mem. 14–15, ECF No. 28-1.)  The Court agrees.[2]

### a.    GAAP Violations and Restatement

The Bridgepoint Defendants first argue that Lead Plaintiffs' alleged scheme lacks economic rationality—and therefore cannot be "cogent and compelling"—because "[t]here is no plausible story to tell where someone supposedly commits securities fraud just to report a paltry one to two percent revenue gain, and in so doing deliberately forgoes reporting approximately forty percent better net income and EPS than one would have been

---

[2] Although the Court addresses a number of Lead Plaintiffs' allegations individually, "it is cognizant of the duty to conduct a holistic analysis of Plaintiffs' scienter allegations.  The flaws of the various allegations must be exposed as part of the Court's holistic analysis."  *Westley v. Oclaro, Inc.*, No. C-11-2448 EMC, 2013 WL 2384244, at *5 (N.D. Cal. May 30, 2013).

legally entitled to report."  (Bridgepoint MTD Mem. 17, ECF No. 28-1.)   Specifically, restated fiscal year 2013 revenues were reduced by $17.2 million, or 2.2%, whereas new income and earnings per share for the same period improved by approximately 12% overall and by approximately 40% in the third quarter of 2013, the quarter immediately preceding the tender offer.  (Bridgepoint MTD Reply 10, ECF No. 41.)

Lead Plaintiffs counter that "Defendants consistently significantly violated GAAP." (MTD Opp'n 20, ECF No. 36.)   Specifically, "Defendants violated SAB No. 101 and Accounting Standards Codification Topic 605-10 by recognizing tuition revenue prior to it being recognizable by failing to determine if the collectability was reasonably assured, even when . . . Defendants knew that the government would not be paying the tuitions for a significant number of students."  (*Id.*)  "Moreover, . . . these revenue recognitions guidelines are basic accounting principles.  In no way are they new, obscure, or overly complicated."  (*Id.* at 21 (footnote omitted).)

But "GAAP is not the lucid or encyclopedic set of pre-existing rules that [Lead Plaintiffs] might perceive it to be."  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995).  "There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question."  *Id.* (citing Robert S. Kay & D. Gerald Searfoss, Handbook of Accounting and Auditing: 1994 Update With Cumulative Index, ch. 5, at 6–7 (2d ed. 1993)).  Consequently, GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979).  The Ninth Circuit therefore recognizes that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."  *DSAM*, 288 F.3d at 390 (quoting *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)).  Violations of GAAP, "even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state."  *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (collecting cases).  In other words:

> At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that principal was being interpreted.  The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing."

*In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (citing *Medicis*, 689 F. Supp. 2d 1192, 1204 (2009)).

Such allegations are missing here.  The crux of Lead Plaintiffs' GAAP allegations is that Defendants "knew or recklessly disregarded the necessity to reassess whether collectability was reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with Bridgepoint's institutions upon a change in facts or circumstances that would affect a student's ability to pay, in violation of GAAP."  (AC ¶ 90, ECF No. 17.)  But "[t]he []AC does not allege that [Bridgepoint]'s external auditors counseled against the practice or that [any of the Individual Defendants] admitted or was aware it was improper."  *Metzler*, 540 F.3d at 1069.  Instead, Lead Plaintiffs emphasize the obviousness of the violations:

> It was only until the SEC probe that [Bridgepoint] Defendants even considered reassessing collectability . . . .  This is not a matter of a difference of opinion: common sense dictates that where student tuition would not be paid by the government, due to Bridgepoint's own errors, collecting this tuition from the government was *not* reasonably assured.  In fact it was impossible.

(MTD Opp'n 20–21, ECF No. 36 (emphasis in original).)  But "[a] plaintiff . . . cannot merely point at a GAAP principle and contend that a correct interpretation was simple or obvious."  *Medicis Pharm.*, 2010 WL 3154863, at *5.  As in *Metzler*, "[a]lthough the []AC does draw its own legal conclusion that the practice was improper, . . . the []AC's factual allegations point only to disagreement and questioning . . . about the practice."  *See* 540 F.3d at 1069.  The Bridgepoint Defendants make several persuasive points, including that "the non-accountants, non-audit committee members would [not] have had any reason to

believe that dealing with [the independent paying students] as presenting a bad debt issue was erroneous under GAAP, much less fraudulent" (Bridgepoint MTD Reply 12, ECF No. 41) and that Defendant Devine's "dialog [with the SEC] over the relevant accounting issues that spanned seven months . . . suggest[s] that there was at least some room for debate, even if Bridgepoint did ultimately come to the conclusion that it should restate" (*id.* at 13). In short, Lead Plaintiffs' allegations concerning the GAAP violations do not lead to an inference of scienter more compelling than the inference raised by the Bridgepoint Defendants.

With regard to restatements, "[i]n general, the mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009), *as amended* (Feb. 10, 2009). The Ninth Circuit does recognize two "narrow" exceptions to this general rule, however. *Id.* (citing *S. Ferry*, 542 F.3d at 785).

> The first exception permits general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" to create a strong inference of scienter when these allegations are buttressed with "detailed and specific allegations about management's exposure to factual information within the company."

*Id.* (quoting *S. Ferry*, 542 F.3d at 785). "The second exception . . . permits an inference of scienter where the information misrepresented is readily apparent to the defendant corporation's senior management," i.e., "where the falsity is patently obvious—where the facts [are] prominent enough that it would be absurd to suggest that top management was unaware of them." *Id.* at 1001 (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)) (internal quotation marks omitted).

Lead Plaintiffs' allegations satisfy neither of these exceptions for many of the same reasons discussed above. Moreover, the restated revenue for fiscal year 2013 differed by only 2.2%. (*See* AC ¶ 57, ECF No. 17; *see also* Bridgepoint MTD Mem. 16, ECF No. 28-1.) "When restatements have been considered evidence of scienter, the restatements were

of considerably greater magnitude than those here." *See In re Aspeon, Inc. Sec. Litig.*, 168 F. App'x 836, 839 (9th Cir. 2006) (affirming district court's dismissal of § 10(b) claim where restatement "only demonstrated a revenue reduction of 1.57%" and therefore failed to "give rise to a strong inference the original statements were issued with deliberate or conscious recklessness").

Accordingly, Lead Plaintiffs' allegations concerning Defendants' GAAP violations and restatement of Defendant Bridgepoint's financials fail to establish a strong inference of scienter.

### b.   Tender Offer

The Bridgepoint Defendants contend that "the alleged amounts traded via the Individual Defendants' participation in Bridgepoint's self-tender offer—which was open to all shareholders on equal terms—are non-suspicious under a long line of Ninth Circuit case law." (Bridgepoint MTD Reply 15, ECF No. 41.)  Additionally, "two of the Individual Defendants retained an overwhelming percentage of their Bridgepoint stock holdings, and the other two Individual Defendants actually *increased* their Bridgepoint stock holdings during the class period, thereby affirmatively negating any strong inference of scienter." (*Id.* (emphasis in original).)  Regarding the timing of the tender offer, the Bridgepoint Defendants note that "under Plaintiffs' irrational fraud theory, Defendants intentionally and substantially *understated* net income and earnings per share in th[e] very quarter [that the self-tender was announced], as well as the two quarters immediately preceding the announcement." (*Id.* at 15–16 (emphasis in original).)  Moreover, "the tender offer price was set at an amount consistent with the Company's then-current stock prices" and "*none* of the Individual Defendants served on the special committee that determined the self-tender was a legitimate use of corporate resources." (*Id.* at 16 (emphasis in original).)

Lead Plaintiffs rejoin that "it is obvious that Defendants were the true beneficiaries of this transaction: it was anticipated that up to 8.6 million shares held by Warburg and up to 4.2 million shares held by Bridgepoint's officers and directors would be accepted in the self-tender – totaling 12.8 million shares – greater than the number of shares Bridgepoint

planned to even repurchase." (MTD Opp'n 25–26, ECF No. 36.)  Moreover, "the dollar amount that Defendants took home, over $141 million – almost one-third of the Company's cash at hand at the time and 24% of Bridgepoint's market-cap at the end of the Class Period – renders it suspicious." (*Id.* at 27 (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004)).)  Finally, "[t]he $19.50 price per share offered in the self-tender offer . . . was higher than average closing price for Bridgepoint's stock for the year." (*Id.* at 26 (citing AC ¶ 140, ECF No. 17).)  Consequently, "it makes no sense that Bridgepoint did not go to the open market to repurchase shares when the market price was below the $19.50 self-tender price." (*Id.*)

Under Ninth Circuit precedent, "insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Silicon Graphics*, 183 F.3d at 986 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)), *as amended* (Aug. 4, 1999), *abrogated on other grounds by S. Ferry*, 542 F.3d 776).  "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citing *Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996)).

None of these factors supports a strong inference of scienter.  With respect to the amount and percentage of shares sold, Lead Plaintiffs allege that Defendants each sold between 10% and 22% of their Bridgepoint shares in the tender offer.  (AC ¶ 142, ECF No. 17.)  "The Ninth Circuit has held, however, that to support scienter, sales amounts larger than 37% of a defendant's holdings ordinarily are required." *In re Immersion Corp. Sec. Litig.*, No. C 09-4073 MMC, 2011 WL 6303389, at *9 (N.D. Cal. Dec. 16, 2011) (citing *Metzler*, 540 F.3d at 1067), *aff'd*, 762 F.3d 880.  None of Defendants' sales approached this percentage, especially when transactions executed to satisfy tax withholding obligations are deducted.  (*See* Bridgepoint MTD Mem. 20 & n.16, ECF No. 28-1.)  Moreover, the Bridgepoint Defendants correctly note that—once total stock holdings for

the class period are analyzed—Defendants Clark and Devine retained approximately 94% and 87% of their holdings, respectively, while Defendants Hackett and Sarma each increased their stock holdings during the class period.  (*Id.* at 20 & nn. 16–18.)  That Defendants Hackett and Sarma increased their holdings "giv[es] rise to an inference of good faith," not scienter.  *See Zack v. Allied Waste Indus., Inc.*, No. CIV04-1640PHXMHM, 2005 WL 3501414, at *14 (D. Ariz. Dec. 15, 2005) (citing *In re Allergan Inc. Sec. Litig.*, No. SACV 89-643 AHS (RWR), 1993 WL 623321, at *23 (C.D. Cal. Nov. 29, 1993)), *aff'd*, 275 F. App'x 722 (9th Cir. 2008); *see also Aspeon*, 168 F. App'x at 840 ("[A] stock purchase may indicate that the corporate insider knew or believed that the issued statements were accurate.") (citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002)).

Regarding the timing of the sales, Lead Plaintiffs argue that the "announcement [of the self-tender] was in the middle of the fourth quarter of 2013, the quarter with the highest reported Bad Debt Percentage . . . ."  (MTD Opp'n 25, ECF No. 36.)  Consequently, however, Defendants overstated their net loss for that quarter and understated their net profit for the two quarters prior.  (*See* Bridgepoint MTD Reply 15–16, ECF No. 41.)  Lead Plaintiffs' allegations concerning timing are therefore also insufficient to raise a strong inference of scienter.  *See Immersion Corp.*, 2011 WL 6303389, at *9 ("As defendants point out, however, the allegations in the ACC, once all relevant accounting adjustments are taken into consideration, show net income was understated . . . . Consequently, . . . the timing of defendants' stock sales . . . is [not] sufficient to raise a strong inference of scienter.").

None of Lead Plaintiffs' additional arguments compels a different conclusion.  The $19.50 per share tender offer price may have been "higher than average closing price for Bridgepoint's stock for the year" (*see* MTD Opp'n 26, ECF No. 36 (citing AC ¶ 140, ECF No. 17)), but it was also a 4.2% discount to the stock price two weeks prior to the announcement (*see* Bridgepoint MTD Mem. 21 n.20, ECF No. 28-1 (citing Manolova Decl. Ex. H at 21, ECF No. 28-2 at 56)).  Moreover, it is telling that none of the Individual

Defendants served on the special committee that approved the self-tender offer.  (*See id.* at 21 & n.21 (citing Manolova Decl. Ex. A at 7, ECF No. 28-2 at 10); *see also* Bridgepoint MTD Reply 16, ECF No. 41.)  Lead Plaintiffs' failure to allege that any of the Individual Defendants was connected to the authorization of the tender offer proves especially damning to Lead Plaintiff's insistence that Defendants were motivated to commit the alleged fraud "in order to undertake an enormous tender offer."  (*See, e.g.*, AC ¶ 14, ECF No. 17.)

Lead Plaintiffs' allegations concerning the tender offer therefore fail to establish a strong inference of scienter.

            **c.**      **Sarbanes-Oxley Certifications and Internal Control Deficiencies**

The Bridgepoint Defendants assert that Lead "Plaintiffs' allegations regarding ineffective internal controls . . . which supposedly rendered false Defendants' Sarbanes-Oxley certifications . . . also fail to state a 'cogent and compelling' set of facts establishing scienter." (Bridgepoint MTD Mem. 22, ECF No. 28-1 (citing AC ¶¶ 109–11, 137–38, ECF No. 17.)   The parties do not dispute that control deficiencies—standing alone—are insufficient to raise a strong inference of scienter.  (*Compare* MTD Opp'n 22, ECF No. 36, *with* Bridgepoint MTD Reply 18, ECF No. 41.)  Consequently, the Court considers those allegations as part of its holistic analysis.  *See infra* Part II.A.1.e.

With respect to the false Sarbanes-Oxley certifications, "Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Zucco Partners*, 552 F.3d at 1004 (quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747–48 (9th Cir. 2008)).  Moreover, "required certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus . . . and do not make . . . otherwise insufficient allegations more compelling by their presence in the same complaint."  *Id.* at 1003–04. The Court therefore gives no weight to Lead Plaintiffs' allegations concerning Defendants' false Sarbanes-Oxley certifications either individually or in the Court's holistic analysis. *See infra* Part II.A.1.e.

/ / /

#### d.   SEC Investigation

Lead Plaintiffs argue that "[t]he SEC's subpoena and regulatory position as to the Company's accounting practices . . . further bolster the allegations of scienter, as they are 'one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter.'" (Bridgepoint MTD Opp'n 27, ECF No. 36 (quoting *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).)  The Court therefore considers Lead Plaintiffs' allegations concerning the SEC investigation as part of the Court's holistic analysis.  *See infra* Part II.A.1.e.

#### e.   Holistic Analysis

Although none of Lead Plaintiffs' individual allegations concerning Defendants' scienter is availing, the Court must also "review 'all the allegations holistically.'"  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (citing *Tellabs*, 551 U.S. at 326).  "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23 (emphasis in original).

Even viewed holistically, however, Lead Plaintiffs' allegations do not give rise to a strong inference of scienter that is at least as compelling as an inference of nonfraudulent conduct.  Simply put, the AC does not support an inference of scienter "that is greater than the sum of its parts." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1165 (9th Cir. 2009) (citing *S. Ferry*, 542 F.3d at 784; *Metzler*, 540 F.3d at 1049).   The Court therefore **GRANTS** the Bridgepoint MTD (ECF No. 28) and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' first cause of action.

### 2.   *Loss Causation*

To demonstrate loss causation, a plaintiff must allege "a causal connection between the material misrepresentation and the loss." 15 U.S.C. § 78u-4(b) (4); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  In other words, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler,* 540 F.3d at 1061.  A corrective disclosure must reveal some aspect of the alleged fraud to the market. *See Lentell v. Merrill Lynch & Co.*, 396 F.3d

161, 175 (2d Cir. 2005).   Additionally, a plaintiff's allegations must reveal that "the defendant's 'share price fell significantly after the truth became known.'"   *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm.*, 544 U.S. at 347).   The Ninth Circuit has recently clarified that the plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008), "suggesting that loss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage," *Rudolph v. UTStarcom*, No. C 07-04578 SI, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) (citing *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3rd Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).   Rule 9(b)'s heightened pleading standard applies to allegations of loss causation.   *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

Lead Plaintiffs point to the following partial corrective disclosures to argue that the alleged fraud was revealed to the market: (1) the March 11, 2014 press release preliminarily announcing Defendant Bridgepoint's fourth quarter and 2013 fiscal year results and subsequent earnings call (AC ¶¶ 116–19, ECF No. 17); (2) the May 12, 2014 press release disclosing, among other things, the SEC's inquiry and Defendant Bridgepoint's evaluation of whether a restatement of its 2011 through 2013 financial results was necessary, as well as the earnings conference call held that same day (*id.* at ¶¶ 120–23); and (3) the May 30, 2014 8-K revealing Defendant Bridgepoint's conclusion that there were material misstatements of revenue and bad debt expense as well as material weaknesses over financial reporting, and also providing an estimate of the restated revenue and expenses for the 2013 fiscal year (*id.* at ¶¶ 124–26).   The Bridgepoint Defendants contend that none of these three partial disclosures "constitutes a corrective disclosure sufficient to plead loss causation under Ninth Circuit law." (Bridgepoint MTD Mem. 25, ECF No. 28-1.)

Upon review of these corrective disclosures, the Court concludes that Lead Plaintiffs' allegations could plausibly establish loss causation.   *See Gilead Scis.*, 536 F.3d at 1057; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (reversing

district court's holding that plaintiff had not adequately pled loss causation where defendant's stock price dropped over 20% following announcement of SEC subpoena but "the market reacted hardly at all" to later disclosure revealing falsity of previous representations).  Accordingly, the Court declines to grant the Bridgepoint Defendants' MTD on this alternative ground at this time.

### B.   Section 20(a)

"Section 20(a) of the Act makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990.  Specifically, Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco Partners*, 552 F.3d at 990 (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003)) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)).  "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Id.* (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003)).

Because the Court has dismissed Lead Plaintiffs' cause of action predicated upon violations of Section 10(b), *see supra* Part II.A, the Court **GRANTS** both the Bridgepoint

(ECF No. 28) and Warburg (ECF No. 30) MTDs and **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' second cause of action against the Individual Defendants and the Warburg Defendants for violations of Section 20(a).

## CONCLUSION

In light of the foregoing, the Court **GRANTS** the Bridgepoint Defendants' RJN (ECF No. 28-3), **DENIES** Lead Plaintiffs' Motion to Strike (ECF No. 37), **GRANTS** the Bridgepoint MTD (ECF No. 28), and **GRANTS** the Warburg MTD (ECF No. 30). Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Lead Plaintiffs' AC. (ECF No. 17.)  Lead Plaintiffs **MAY FILE** a second amended complaint (SAC) within thirty (30) days of the date on which this Order is electronically docketed.  *Failure to file a SAC by this date may result in dismissal of this action with prejudice*.

**IT IS SO ORDERED.**

Dated:  July 25, 2016

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

15-CV-408 JLS (DHB)