1

**GLANCY PRONGAY & MURRAY LLP**

2

Lionel Z. Glancy (#134180)

Robert V. Prongay (#270796)

3

Leanne Heine Solish (#280297)

1925 Century Park East, Suite 2100

4

Los Angeles, California 90067

5

Telephone: (310) 201-9150

Facsimile: (310) 201-9160

6

Email:  info@glancylaw.com

7

8

***Co-Lead Counsel for Plaintiffs***

[Additional Counsel on Signature Page]

9

10

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

11

12

13

NELDA ZAMIR, Individually and on

Behalf of All Others Similarly

Situated,

14

15

                                        Plaintiff,

16

                        v.

17

18

BRIDGEPOINT EDUCATION, INC.,

ANDREW S. CLARK, DANIEL J.

19

DEVINE, PATRICK T. HACKETT;

20

ADARSH SARMA; WARBURG

PINCUS LLC; WARBURG PINCUS

21

& CO.; WARBURG PINCUS

22

PARTNERS LLC; WARBURG

PINCUS PRIVATE EQUITY VIII,

23

L.P.,

24

                                        Defendants.

25

26

27

28

Case No. 15-CV-408 JLS (DHB)

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

<u>**JURY TRIAL DEMANDED**</u>

## <u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT..................................................................... 1

II.  JURISDICTION AND VENUE ................................................................. 5

III. PARTIES ..................................................................................................... 5

IV.  BACKGROUND ......................................................................................... 8

V.   DEFENDANTS RESTATE REVENUES AND ADMIT TO
     RECOGNIZING REVENUE WHEN COLLECTIBILITY WAS NOT
     REASONABLY ASSURED.......................................................................... 9

VI.  SUMMARY OF DEFENDANTS' FRAUD .................................................. 12

     A.   Defendants Knew or Recklessly Disregarded That Bridgepoint Was
          Recognizing Revenue Based on the Government's Ability To Pay....... 12

     B.   Defendants Knew or Recklessly Disregarded that Collectibility of
          Revenues Should Be Based on Reasonable Assurance of Students'
          Ability to Pay Tuition ............................................................................ 13

     C.   Defendants Knew that the Government Would Not Be Paying
          Tuition for a Significant Number of Students and That These
          Students Were Less Likely to Pay Outstanding Tuition........................ 14

          1.   The Individual Defendants Knew That a Significant Number
               of Students Withdrew From Bridgepoint's Institutions Mid-
               Course ............................................................................................ 15

          2.   Defendants Knew That Internal Processing Issues Caused a
               Delay in Numerous Students' Receipt of Financial Aid Funds ... 17

          3.   Defendants Knew That a Student's Withdrawal Mid-Course
               Prior to Receipt of Financial Aid Would Render That Student
               Responsible for the Payment of Outstanding Tuition ................. 18

          4.   Defendants Knew That Independent Paying Students Were
               Less Likely to Pay Outstanding Tuition ....................................... 18

a.  Defendants Admitted to the SEC that Independent Paying Students Were Less Likely to Pay Tuition  ........... 18

b.  A Class Period Review of Accounts Receivable Provided Defendants with a "Deeper Understanding" of How the Behavior of Students Who Left Bridgepoint Affected the Company's Account Receivable Balances ... 18

c.  The Individual Defendants Were Seasoned For-Profit Education Industry Executives............................................ 20

VII.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ................................................ 22

A.  Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements ................................................................. 23

B.  Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results ......................................... 26

C.  Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results ............................................................. 28

D.  Materially False or Misleading Statements in the Company's Disclosure of 2Q 2013 Results ............................................................. 28

E.  Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results ............................................................. 29

F.  Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results ......................................... 30

G.  The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications ................................................................. 31

VIII.  LOSS CAUSATION ................................................................................. 33

IX.  ADDITIONAL SCIENTER ALLEGATIONS ................................................. 37

A.   The Multitude of Government Investigations Concerning Bridgepoint's Revenue Accounting and Administration of Financial Aid Programs Adds to the Inference of Scienter ....................................... 37

B.   Bridgepoint's Ineffective Internal Controls ............................................ 38

X.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ............................................................. 39

XI.   NO SAFE HARBOR ......................................................................... 41

XII.   CLASS ACTION ALLEGATIONS ............................................... 42

XIII.   COUNTS ....................................................................................... 44

XIV.   PRAYER FOR RELIEF .................................................................. 48

XV.   JURY TRIAL DEMANDED ............................................................ 48

1.     Lead Plaintiffs Nelda Zamir ("Zamir") and Thomas G. Prosch ("Prosch") (collectively "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") between March 12, 2013 and May 30, 2014, inclusive (the "Class Period").

2.     Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation of court-appointed Co-Lead Counsel Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. This investigation included, among other things, a review and analysis of: (i) Bridgepoint's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Bridgepoint's investor calls; (vi) review of information provided under the Freedom of Information Act ("FOIA"); (vii) interviews with former employees and other potential witnesses with relevant information; and (viii) other publicly available material and data identified herein.

## I.     PRELIMINARY STATEMENT

3.     Bridgepoint provides for-profit postsecondary education to students through its two wholly-owned institutions, Ashford University ("Ashford") and the University of the Rockies. The majority of Bridgepoint's revenue is derived from tuition charged to students attending these two institutions.

4.     During the Class Period, Defendants (defined below) engaged in securities fraud by disseminating numerous materially false financial statements that reported artificially inflated revenue and bad debt figures. On August 4, 2014, Bridgepoint issued a restatement of its financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as a revision of the

financial statements for the fiscal years ending December 31, 2012 and 2011 and the quarterly financial results for each of the three quarterly financial results during 2012 (the "Restatement").

5.      Pursuant to Generally Accepted Accounting Principles ("GAAP") and SEC guidance, revenue cannot be properly recognized if its collectibility is not reasonably assured. During the Class Period, Bridgepoint recognized tens of millions of dollars in revenue when Defendants knew or recklessly disregarded that the collectibility of this revenue was not reasonably assured.

6.      The Restatement corrected this fraudulent recognition of revenue as well as the corresponding artificial increase in the Company's bad debt expense.

7.      Importantly, the Restatement admitted that Bridgepoint did not properly assess the collectibility of revenue during the Class Period. Further, Plaintiffs herein allege numerous additional facts raising a strong inference that Defendants knowingly or recklessly misstated Bridgepoint's financial results in violation of GAAP by recognizing tens of millions in revenue when its collectibility was far from reasonably assured.

8.      During the Class Period, Bridgepoint did not base its collectibility assurance on their own customers' ability to pay their tuition; instead, Defendants determined whether revenue was reasonably collectible based on the ***government's*** ability to pay.

9.      Defendants acted with scienter in recognizing revenue based on the government's ability to pay. Both common sense and GAAP guidance dictate that the revenue collectibility determination should be based on a company's own customers' ability to pay, not a third party with no obligation to pay.

10.     Defendants' policy of revenue recognition was absurd given that Defendants knew, or were deliberately reckless in not knowing, that their students – and not the government – would be the ultimate source from which Bridgepoint would be collecting its revenue. The absurdity of such a policy is highlighted based on the following facts known by Defendants Daniel J. Devine ("Devine") and Andrew S. Clark ("Clark") during the Class Period: (1) numerous Bridgepoint students regularly withdrew

from Bridgepoint's institutions mid-course; (2) during the Class Period a significant number of students did not timely receive government financial aid and thus were not able to timely pay tuition; (3) if a student left one of Bridgepoint's institutions mid-course without previous receipt of government financial aid, the student would be responsible for paying any outstanding balances without such aid; and (4) "[i]ndependent payments from students have a lower collection rate than financial aid funding."

11.    Nevertheless, Defendants willfully, or with deliberate recklessness, continued to record revenue based on the government's ability to pay as of a course start date and, as a result, also reported increased bad debt expenses once a student with unpaid outstanding tuition and/or fees was considered delinquent in Bridgepoint's Class Period financial results.

12.    Defendants' intentional and/or deliberately reckless accounting eventually came to light over the first half of 2014. One measure followed by Bridgepoint's analysts was the percent of the Company's reported bad debt expense to revenue ("Bad Debt Percentage"). During the Class Period, the Bad Debt Percentage was artificially elevated as a result of Defendants' intentional or deliberately reckless recognition of revenue. Defendants explained that the higher Bad Debt Percentage was due to a backlog created as a result of an internal processing error relating to financial aid packaging for students, but assured investors and analysts that the higher Bad Debt Percentage would work its way back down to historical levels over the course of 2013. But on March 11, 2014, Bridgepoint reported an even higher Bad Debt Percentage for the fourth quarter of 2013. Given Bridgepoint's false assurances, investors and analysts were understandably concerned that the Bad Debt Percentage may not actually work its way back down to historic levels. As a result of this news, Bridgepoint's stock dropped almost 16% in one day.

13.    Two months later, Bridgepoint slowly revealed and admitted that it had been materially misstating revenue during the Class Period. On May 12, 2014, on an

earnings conference call, Defendant Devine admitted that Bridgepoint had been recognizing revenues for students that subsequently lost financial aid eligibility, and that when that revenue was not collected – as was to be expected – it was written off as a bad debt expense. On May 30, 2014, the Company further announced that it would restate the financial results for the fiscal 2013 year and for each quarter in 2013, as well as revise the financial results for the fiscal year ending December 31, 2012 and 2011 and for each quarter in 2012 to correct this material revenue recognition error.

14.     As a result of the announcements on May 12, 2014 and May 30, 2014, Bridgepoint's stock fell even further, nearly 9%, or $1.41 per share, to close at $14.51 per share on May 12, 2014 and continued to fall over another 3%, or $0.46 per share, to close at $14.05 per share on May 13, 2014. On June 2, 2014, the first trading day after Bridgepoint announced the restatement on May 30, 2014 after the market's close, Bridgepoint's stock declined 1.31% more, or $0.17 per share, to close at $12.82 per share.

15.     When Bridgepoint ultimately restated its financial results to correct its material revenue recognition errors, the restated revenue decreased by tens of millions of dollars and the corresponding bad debt expense also decreased by tens of millions. Predictably, the Bad Debt Percentage fell back in line with Bridgepoint's historic rates.

16.     Unsurprisingly, the SEC is conducting an investigation regarding the circumstances surrounding Bridgepoint's restatement and its accounting practices. In fact, the SEC is not the only federal agency investigating Bridgepoint concerning its practices: both the U.S. Department of Education and U.S. Department of Justice are currently investigating Bridgepoint's accounting and administration of federal financial aid funds.

17.     Had it not been for Defendants' willful or reckless disregard in improperly recognizing revenue, one of the most obvious accounting principles, based upon the government's ability to pay, Plaintiffs and other Class members would not have suffered significant losses and damages, and therefore are entitled to redress.

## II.   JURISDICTION AND VENUE

18.   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

20.   Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. Additionally, Bridgepoint's principal executive offices are located within this Judicial District.

21.   In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.   PARTIES

22.   Lead Plaintiff Zamir, as set forth in a previously-filed certification (Dkt. No. 1 at 45-46), incorporated by reference herein, purchased Bridgepoint common stock and options during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

23.   Lead Plaintiff Prosch, as set forth in a previously-filed certification (Dkt. No. 3-4 at 3-4), incorporated by reference herein, purchased Bridgepoint common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Defendant Bridgepoint is a Delaware corporation with its principal executive offices located at 13500 Evening Creek Drive North, Suite 600, San Diego, California 92128. Bridgepoint is a provider of postsecondary education services. Its wholly-owned subsidiaries, Ashford and the University of the Rockies, are regionally accredited academic institutions that offer associate's, bachelor's, master's and doctoral programs online, as well as at their traditional campuses located in Clinton, Iowa, and Denver, Colorado. Bridgepoint's common stock trades under the ticker symbol "BPI" on the New York Stock Exchange (the "NYSE"), which is an efficient market.

25.     Defendant Clark, a co-founder of Bridgepoint, is, and at all relevant times was, Chief Executive Officer ("CEO"), President, and a director of Bridgepoint. Prior to launching Bridgepoint in November 2003, Defendant Clark consulted with several private equity firms examining the postsecondary education sector. Defendant Clark worked for Career Education Corporation as Divisional Vice President of Operations and Chief Operating Officer for American InterContinental University in 2002. From 1992 to 2001, Defendant Clark worked for Apollo Group, Inc., where he served in various management roles, culminating in his position as Regional Vice President for the Mid-West region from 1999 to 2001. Defendant Clark earned an M.B.A. from the University of Phoenix and a B.A. from Pacific Lutheran University.

26.     Throughout the Class Period, Defendant Clark spoke frequently to investors at industry conferences and on quarterly earnings calls. Defendant Clark possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012, Form 10-K for the fiscal year ended December 31, 2013, and certified the accuracy of Bridgepoint's Forms 10-Q for each quarterly period from March 31, 2013 through September 30, 2013.

27.     Defendant Devine served as the Chief Financial Officer ("CFO") of Bridgepoint from January 2004 through the end of the Class Period. From November 2008 to December 2010, Defendant Devine also served as a Senior Vice President of

1    Bridgepoint. In January 2011, Defendant Devine was also promoted to Executive Vice
2    President. Defendant Devine resigned as the Company's Executive Vice President and
3    CFO on October 1, 2015, and served in a non-executive role for Bridgepoint through the
4    end of 2015. He has over 20 years of managerial financial experience. From March 2002
5    to December 2003, Defendant Devine served as the CFO of A-Life Medical. From 1994
6    to 2000, Defendant Devine served in various management roles for Mitchell
7    International Inc. culminating in serving as CFO from 1998 to 2000. From 1987 to 1993,
8    Defendant Devine served in various management roles for Foster Wheeler Corporation,
9    rising to divisional CFO from 1990 to 1993. Defendant Devine earned a B.A. from
10   Drexel University and is a certified public accountant.

11        28.    Throughout the Class Period, Defendant Devine spoke frequently to
12   investors at industry conferences and on quarterly earnings calls. Defendant Devine
13   possessed the power and authority to control the contents of the Company's public
14   filings with the SEC. He signed and certified the accuracy of Bridgepoint's Forms 10-K
15   and 10-K/A for the fiscal year ended December 31, 2012, Form 10-K for the fiscal year
16   ended December 31, 2013, and Forms 10-Q for each quarterly period from March 31,
17   2013 through September 30, 2013.

18        29.    Defendants Clark and Devine are collectively referred to as the "Individual
19   Defendants."

20        30.    Defendant Bridgepoint and the Individual Defendants are collectively
21   referred to as "Defendants."

22        31.    The Individual Defendants, because of their positions with the Company,
23   possessed the power and authority to control the contents of Bridgepoint's reports to the
24   SEC, press releases and presentations to securities analysts, money and portfolio
25   managers and institutional investors, *i.e.*, the market. Each defendant was provided with
26   copies of the Company's reports and press releases alleged herein to be misleading prior
27   to, or shortly after, their issuance and had the ability and opportunity to prevent their
28   issuance or cause them to be corrected. Because of their positions and access to material

1  non-public information available to them, each of these defendants knew that the adverse

2  facts specified herein had not been disclosed to, and were being concealed from, the

3  public, and that the positive representations which were being made were then materially

4  false and/or misleading. The Individual Defendants are liable for the false statements

5  pleaded herein, as those statements were each "group-published" information, the result

6  of the collective actions of the Individual Defendants.

7  **IV.    BACKGROUND**

8       32.    Bridgepoint provides postsecondary education to students through its two

9  wholly-owned institutions, Ashford and the University of the Rockies. Unlike most

10 traditional postsecondary institutions, as a publically traded company Bridgepoint and its

11 institutions' primary focus is profit, not education.

12      33.    Bridgepoint charges high tuitions to its students to generate large revenues

13 and returns. These high tuition costs are vital to Bridgepoint's business model, and the

14 majority of Bridgepoint's revenue comes from tuition.

15      34.    In order to meet revenue and profit expectations, for-profit colleges recruit

16 as many students as possible. According to a 2012 Senate HELP[1] Committee Report,

17 "Bridgepoint has experienced some of the most dramatic increases in student enrollment,

18 Federal funds, and profit of any company examined. Along with this rapid growth, have

19 come rapid increases in student withdrawal rates . . . . These outcomes call into question

20 whether Bridgepoint's students are receiving an education that affords them to the ability

21 to repay the loan debt they incurred."

22      35.    Without federal financial aid assistance, many of Bridgepoint's students

23 would not choose to attend Bridgepoint's institutions, nor could they pay the tuition

24 these institutions charge. For example, on an August 4, 2015 earnings conference call, in

25 explaining a decline in Bridgepoint's year-over-year new enrollments, Defendant Clark

26 cited issues applicants had with receiving financial aid assistance: "during the quarter we

27 _____

28 [1] The U.S. Senate Committee on Health, Education, Labor, and Pensions.

experienced challenges in starting all of the applicants as our potential students base increased verification scrutiny during their financial aid processing[.]"

## V.   DEFENDANTS RESTATE REVENUES AND ADMIT TO RECOGNIZING REVENUE WHEN COLLECTIBILITY WAS NOT REASONABLY ASSURED

36.   On May 12, 2014, Defendants stated that the Company would be unable to timely file its Form 10-Q for the first quarter of 2014 due to its efforts to quantify the impact of a change in Bridgepoint's revenue recognition policy, explaining:

> Specifically, the Company has historically not determined it necessary to reassess whether collectibility is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions.
>
> . . . [S]uch a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.

Defendants also noted that they were evaluating whether to restate Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 due to the lack of student-by-student reassessment.

37.   Defendant Devine further explained on a May 12, 2014 earnings conference call that:

> Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

38.   At first Defendant Devine described this change as prospective in nature. However, a couple of weeks later, on May 30, 2014, Defendants announced that they were restating Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as a revision of the financial statements for the fiscal years ending December 31, 2012 and 2011 and the quarterly financial results for each of the three quarterly financial results during 2012, to reflect Bridgepoint's now proper revenue recognition policy. On August 4, 2014, the Company issued the restated and revised financials on an amended Form 10-

1  K for the fiscal year ending December 31, 2013 and on amended Form 10-Qs for the

2  three fiscal quarters for 2013.

3       39.    The Restatement corrected Bridgepoint's materially misstated revenue

4  figures, which correspondingly caused the Bad Debt Percentage to decrease back in line

5  with Bridgepoint's historical rates. The Restatement also reclassified certain of the

6  Company's reported cash on its balance sheet as restricted cash to account for federal

7  financial aid funds held by Bridgepoint for students that result in credit balances on a

8  student's account.

9       40.    Significantly, in the Restatement Defendants admitted that:

10      on the revenue recognition, the **process for analyzing the collectibility
        assertion was not designed to reassess collectibility on a student-by-**
11      **student basis throughout the period revenue was recognized by the**
        **Company's institutions. As a result, the Company has changed its**
12      **revenue recognition policy and has identified adjustments, relating to**
        **revenue, provision for bad debts,** accounts receivable, which should have
13      been recognized during the prior periods, and restricted cash balances,
        which should have been presented differently during the prior periods.

14      41.    As explained in more detail in §VII.A, *infra*, pursuant to SEC guidance and

15 GAAP, revenue should not be recognized until all of the following criteria are met: (1)

16 persuasive evidence of an arrangement exists; (2) delivery has occurred or services have

17 been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4)

18 *collectibility is reasonably assured*. During the Class Period, Defendants recognized tens

19 of millions in revenue for students without financial aid eligibility, and thus were less

20 likely to pay any owed tuition and/or fees. As a result, Defendants were recognizing

21 revenue when the likelihood of the Company actually receiving payment from these

22 students was not reasonably assured.

23      42.    Prior to the Restatement, Bridgepoint's revenue recognition policy callously

24 failed to address whether it met any of the SEC's criteria for revenue recognition. In the

25 Restatement, Defendants published Bridgepoint's updated revenue recognition policy,

26 adding additional language (highlighted in bold below) to address the assessment of the

27

28

collectibility criterion based on the Company's analysis of revenue to account for a student's ability to pay in certain circumstances:

> **The Company recognizes revenue when persuasive evidence of an arrangement exists, services have been rendered or delivery has occurred, our fees or price is fixed or determinable, and collectibility is reasonably assured.** The Company's revenue consists of tuition, technology fees, course digital materials and other miscellaneous fees. Tuition revenue is deferred and recognized on a straight-line basis over the applicable period of instruction net of scholarships and expected refunds[.]
>
> * * *
>
> The Company's institutions' online students generally enroll in a program that encompasses a series of five to six-week courses which are taken consecutively over the length of the program. With the exception of those students under conditional admission, the online students are billed on a payment period basis on the first day of class. The Company's institutions' campus-based students enroll in a program that encompasses a series of nine-week or 16-week courses. Campus-based students are billed at the beginning of each term. **The Company assesses collectibility at the start of a student's payment period (generally five courses for undergraduates and four courses for graduates) for the courses in that payment period.**
>
> * * *
>
> For those students under conditional admission, the student is not obligated for payment until after their conditional admission period has lapsed, so there is no required refund. For all subsequent courses, the Company records a provision for expected refunds and reduces revenue for the amount that is expected to be subsequently refunded. Provisions for expected refunds have not been material to any period presented. If a student withdraws from a program prior to a specified date, a portion of such student's tuition is refunded, subject to certain state requirements which require a pro rata refund. **The Company reassess collectibility throughout the period revenue is recognized by the Company's institutions, on a student-by-student basis. The Company reassess collectibility based upon new information and changes in facts and circumstances relevant to a student's ability to pay. For example, the Company reassesses collectibility when a student drops from the institution (i.e., is no longer enrolled) and when a student attends a course that was not included in the initial assessment at the start of a student's payment period.**

43.    As reflected in the table below, the consistent decline in restated revenue and bad debt expense numbers from the original reported figures is evidence reflecting Defendants' fraudulent recording of revenue – revenue that should have never been reported, and was not actually a bad debt expense.

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Original Bad Debt Expense[2] (millions) | Restated Bad Debt Expense (millions) | Original Bad Debt/ Revenue | Restated Bad Debt/ Revenue |
|---|---|---|---|---|---|---|
| 4Q 2012 | $209.4 | $206.5 | $21.3 | $16.2 | 10.2% | 7.8% |
| FY 2012 | $968.2 | $943.4 | $73.7 | $52.8 | 7.6% | 5.6% |
| 1Q 2013 | $222.0 | $213.0 | $18.3 | $13.0 | 8.2% | 6.1% |
| 2Q 2013 | $197.6 | $193.5 | $18.6 | $11.4 | 9.4% | 5.9% |
| 3Q 2013 | $185.6 | $182.8 | $16.8 | $7.3 | 9.0% | 4.0% |
| 4Q 2013 | $163.5 | $162.2 | $18.7 | $15.4 | 11.4% | 9.5% |
| FY 2013 | $768.6 | $751.4 | $72.3 | $47.1 | 9.4% | 6.3% |

## VI.   SUMMARY OF DEFENDANTS' FRAUD

### A.   Defendants Knew or Recklessly Disregarded That Bridgepoint Was Recognizing Revenue Based on the Government's Ability To Pay

44.    In the Restatement, Defendants revised their revenue recognition policy as detailed in ¶42. Defendants explained that the Restatement was necessary because Bridgepoint did not reassess revenue throughout the revenue recognition period. However, Defendants did not publically explain that Bridgepoint previously based its entire revenue collectibility criterion upon a non-customer's ability to pay.

45.    But in a January 10, 2014 letter to the SEC Defendant Devine expounded on Bridgepoint's then-current revenue recognition policy: "as of a course start date, **we conclude our collectability assessment based on the government's ability to pay as opposed to a student's ability to pay**." Defendant Devine's letter further divulged that: "Similar to government funding sources, we conclude our collectability assessment based on the corporation or military branch's ability to pay and the student's eligibility, **as opposed to the individual student's ability to pay**."

46.    Defendant Devine's letter admitted that Bridgepoint assessed the collectibility of all of its revenue based on the government's (or some other third party's) ability to pay not only the portion of revenue that is typically covered by federal financial aid funding or other third-party source of funding, but *all* revenue.

---

[2] As reported in Bridgepoint's Form 10-K/A for the year ended December 31, 2012 filed on May 17, 2013.

47.     Defendant Devine's January 2014 letter responded to a December 11, 2013 letter from the SEC with numerous comments and questions for Defendants concerning Bridgepoint's perplexing decline in enrollments but reported increase in revenue for the 2012 fiscal year and the Company's elevated Bad Debt Percentage. In this letter, the SEC specifically requested that Defendant Devine explain how Bridgepoint determined the collectibility of revenues that were not typically covered by a third-party funding source:

> We note that the majority of your revenue is derived from Title IV programs[3] administered by the Department of Education and that the remainder is received from students through other funding sources such as cash, private loans, state grants, corporate reimbursement, military benefits and institutional loans. **In addition, you allow students to charge remaining amounts due for tuition, technology fees and other fees on account. Please tell us if the amounts charged on account are recognized as revenue over the course period or deferred until cash is collected. If these amounts are not deferred, addressing your history of collecting payments for accounts receivable, please tell us how you determined that collectability is reasonably assured** and the price is fixed and determinable per SAB Topic 13:A1 and 13:A4.

48.     As evidenced by the SEC's subsequent February 12, 2014 letter responding to Defendant Devine's January 2014 letter, the SEC was perplexed that Defendants determined the collectibility of revenue to be paid by students was based on the government's, and not the student's, ability to pay:

> Considering that your bad debt expense for the nine months ended September 30, 2013 approximated 9% of total revenue and appears to relate mostly to former students, **please explain to us why it is appropriate to base your collectability assessment on the government's ability to pay.** In this regard, please tell us why you believe that collection is reasonably assured.

**B.     Defendants Knew or Recklessly Disregarded that Collectibility of Revenues Should Be Based on Reasonable Assurance of Students' Ability to Pay Tuition**

49.     Defendants willfully or recklessly recognized revenue based off of the ability of the government (or other third-party source) to pay for Bridgepoint's tuition,

---

[3] Title IV of the Higher Education Act of 1965 ("Title IV") federal student loan programs.

even when Defendants knew that this tuition would ultimately not be derived from the government. Indeed, it openly admitted that it did not derive 100% of its revenues from the government, corporations, or the military, but assessed the assurance of collectibility entirely based on the ability of these parties to pay Bridgepoint's tuition.

50.   Yet it is common sense that the assurance that revenue will be collected should be determined based upon the ability of the party obligated to pay. Instead, Bridgepoint entirely based its collectibility assurance on certain third-parties' ability to pay when these parties had no ultimate obligation to pay Bridgepoint for that revenue.

51.   New GAAP authority codifies this common sense understanding. Accounting Standards Codification 606-10-25-1(e) specifically states that an entity shall account for revenue only when it is probable that the revenue will be collectible. It continues: "[i]n evaluating whether collectibility of an amount of consideration is probable, an entity shall consider *only the customer*'s ability and intention to pay that amount of consideration when it is due."

### C.   Defendants Knew that the Government Would Not Be Paying Tuition for a Significant Number of Students and That These Students Were Less Likely to Pay Outstanding Tuition

52.   The absurdity of Bridgepoint's collectibility assessment is highlighted by the following additional facts known by Defendants during the Class Period: (1) that numerous Bridgepoint students regularly withdrew from Bridgepoint's institutions mid-course; (2) that a significant number of students did not timely receive government financial aid and thus were not able to timely pay their tuition; (3) that if a student left one of Bridgepoint's institutions mid-course and had not yet received government financial aid, the student would be responsible for paying any outstanding balances without the help of this aid; and (4) "[i]ndependent payments from students have a lower collection rate than financial aid funding."

### 1. The Individual Defendants Knew That a Significant Number of Students Withdrew From Bridgepoint's Institutions Mid-Course

53. During the Class Period, the Individual Defendants carefully tracked various enrollment related numbers, such as student persistence and retention. Although these numbers directly measure how many students have stayed at Bridgepoint's institutions, by virtue of having total enrollment, as well as persistence and retention numbers, Defendants Clark and Devine also had access to the number of students who dropped out of Bridgepoint's institutions.

54. On Class Period earnings conference calls the Individual Defendants frequently displayed their knowledge of the Company's persistence and enrollment numbers and trends, as well as when and why students leave Bridgepoint's institutions. For example, during the May 6, 2013 earning conference call, Defendant Clark fielded a request from an analyst asking for the retention and persistence numbers for the quarter and explained that "student persistence was down a little bit more than what we expected internally, but that was due to the tuition assistance disruption for the military primarily."

55. In response to a follow-up question from a different analyst asking for Bridgepoint's persistence rates, Defendant Clark responded:

> I mean we don't give the exact percentage numbers out, but it would have been slightly lower and not materially lower. In other words, **we see that -- those fluctuations occur from quarter to quarter.** And what's important more is the overall trend. You know, I think, publicly, we've indicated that the initiatives – the admissions criteria that we've put in place has **led to better persisting students in their second and third courses or their fourth course and beyond.**

56. During the August 6, 2013 earnings conference call, Defendant Devine responded to a question asking what percent of bad debt comes from students dropping out in their first quarter:

> I would say approximately **a third of students who are enrolled in the institution, who leave the institution either prior to receiving their eligibility for Title IV funds** or leave the institution after, effectively somebody in their second class, because in their first class there's very little financial exposure.

57.     On the March 11, 2014 and May 12, 2014 earnings conference calls, the Individual Defendants divulged retention-based statistics as well as how these statistics helped Defendants reach the Company's goals. On the March 11, 2014 call, in his opening remarks, Defendant Clark stated:

> One tool that will track our future progress is an annual measure of Ashford's cohort-based retention. This metric compares the total number of students who are active on a census date in early September, to the next census date on the following September, adjusted to account for students who have graduated. From September of 2012 to September of 2013, this statistic was 60%, a number that has been consistent for Ashford over the past four years.

Later in this call, Defendant Devine reported that "[a]s of December 31, 2013, total student enrollment decreased to 63,624 from 81,810 at December 31, 2012. Persistence in the quarter was 77.9% after accounting for higher graduates, and was essentially flat as compared to the fourth quarter of 2012." And in Defendant Clark's opening remarks on the May 12, 2014 call, he explained in more detail one of the ways Defendants measure student persistence:

> Turning to enrollment, I would like to describe how we measure the success of our efforts to help students persist and complete their academic studies. Historically on our fourth-quarter earnings call, we have provided our annual student cohort retention statistic. Going forward, we will now provide a 12-month retention of active students from the end of every quarter. We then compare that to the 12-month retention for students who are actively enrolled at the end of the year-ago quarter.

58.     Additionally, Confidential Witness 1 ("CW1"), an Associate Vice President of Data Analytics for Bridgepoint from February 2009 through January 2015 who reported to the Vice President ("VP"), Business Intelligence & Data Analytics, Francois Laurent, said that Defendants Clark and Devine were right on top of the enrollment and drop numbers.

59.     CW1 explained that Bridgepoint used a lot of analytics to understand when a student was likely to leave the school, and that retention was tracked on a very granular level, on a monthly basis, which was referred to as "progression" by Bridgepoint, and that when one mentioned "retention" within the Company, it meant retention over one

1  year. CW1 said that tracking month-by-month retention, or "progression," began around

2  2013, and when they saw the numbers, "we were surprised."

3      60.    CW1 also said that senior management had access to this data through

4  "dashboards" with "pull downs" which allowed them to see the retention and drop rates

5  on a month to month basis. CW1 was able to see who in Bridgepoint's management was

6  viewing the dashboards through visual software named Tableau, which not only

7  displayed the data tracked, but who was viewing the data and how often they were

8  viewing it by recording the name, date and time, and length of session of the user. CW1

9  was able to see this data, and was specifically aware that Defendants Clark and Devine,

10  as well as other senior management were viewing the data provided in the "dashboards."

11  CW1 also commented that it felt kind of cool to know that the CEO and CFO were

12  looking at the numbers you provided.

13      61.    CW1 focused on retention based metrics or "coroner" reports, but there was

14  another department, Advanced Analytics headed by Dr. Michelle Keim, that provided

15  predictive metrics that attempted to identify students likely to drop out. The metrics

16  collected by the Advanced Analytics department included students who were not logging

17  in or not posting their assignments. This group created a stop light indicator on the

18  dashboard to show students that might be leaving.

19      **2.**    **Defendants Knew That Internal Processing Issues Caused a Delay in Numerous Students' Receipt of Financial Aid Funds**

20

21      62.    On the first day of the Class Period, March 12, 2013, during an earnings

22  conference call, the Individual Defendants explained to investors and analysts that in the

23  middle of 2012, Bridgepoint faced "internal processing issues involving existing

24  students and the timeliness of their financial aid packaging for their new academic

25  years." In his January 2014 letter to the SEC, Defendant Devine elaborated on the

26  "internal processing issue:"

27      In the middle of each calendar year, a material number of our continuing
    students are required to be packaged to qualify for Title IV financial aid as
    they cross over award years as defined by the Department of Education.

28      Our student management system is an integral piece of the financial aid

qualification process. . . . In 2012, we experienced technical issues with the annual upgrade of our student management system, which caused delays in packaging students.

63.     On the March 12, 2013 earnings conference call, Defendant Devine assured investors that "[t]he Company has addressed this process and issues and expects that it will not repeat in 2013." But, as Defendant Devine admitted to the SEC in his January 2014 letter, "as a result of . . . the prior financial aid packaging issues, a backlog of work resulted for our financial aid and collections departments. Due to this backlog, the ability to package . . . throughout 2013 was reduced."

### 3. Defendants Knew That a Student's Withdrawal Mid-Course Prior to Receipt of Financial Aid Would Render That Student Responsible for the Payment of Outstanding Tuition

64.     In his January 2014 letter to the SEC, Defendant Devine admitted:

As the corrective actions took longer than anticipated, we were not able to package a significant number of students prior to the students departure from the institution and, at the time the students left the institution, they were no longer eligible for financial aid. **As a result, these students were required to pay their outstanding balance without financial aid assistance.**

### 4. Defendants Knew That Independent Paying Students Were Less Likely to Pay Outstanding Tuition

#### a) Defendants Admitted to the SEC that Independent Paying Students Were Less Likely to Pay Tuition

65.     Perplexed as to why the "internal processing issues with financial aid packages" affected Bridgepoint's Bad Debt Percentage, the SEC asked for more information in its December 11, 2013 letter. In response, Defendant Devine explained how the financial aid processing issue affected the Bad Debt Percentage in the January 2014 letter:

As the corrective actions [relating to the internal financial aid processing issue] took longer than anticipated, we were not able to package a significant number of students prior to the students departure from the institution and, at the time the students left the institution, they were no longer eligible for financial aid. As a result, these students were required to pay their outstanding balance without financial aid assistance. **Independent students have a lower collection rate than financial aid funding which results in greater bad debt expense.**

### b)  A Class Period Review of Accounts Receivable Provided Defendants with a "Deeper Understanding" of How the Behavior of Students Who Left Bridgepoint Affected the Company's Account Receivable Balances

66.   Also during the Class Period, Defendant Devine spearheaded a review of accounts receivable after a determination that Bridgepoint's accounts receivable aging was incorrect in 2012.

67.   On May 17, 2013, Bridgepoint issued an amended Form 10-K for the 2012 fiscal year (the "2012 Restatement") in order to reissue the financial statements as a result of the revision for bad debt expense. A week earlier, in a Form 8-K and Form 12b-25 (or "NT 10-Q") filed on May 10, 2013 and signed by Defendant Devine, Defendants explained that the financial results for the first quarter of 2013 the Company had earlier announced included $5.6 million in bad debt expenses that should have been reflected in 2012.

68.   Although Defendants restated the 2012 financial results to revise Bridgepoint's bad debt expense, they claimed that the increase in bad debt for the year was immaterial. Defendants pointed to ineffective internal controls over accounts receivable as a material weakness, explaining that (1) "the process for estimating the allowance for doubtful accounts in 2012 was not designed to appropriately incorporate all relevant qualitative factors" and that (2) "accounts receivable aging was not correct."

69.   In the 2012 Restatement, Defendants also announced a purported remediation plan and that Defendant Devine was responsible for implementing these remedial changes and improvements. Defendants explained that they were focusing on "improvements in the accounting processes, including additional oversight and review, and performing additional analytical procedures," to remediate Bridgepoint's control deficiencies.

70.   As part of the remediation plan, Defendants reported specific actions taken to improve Bridgepoint's accounts receivable in each of the 2013 quarterly financial reports. In the 2013 10-K, filed on March 17, 2014, Defendants indicated that these

actions had remediated the earlier reported deficiencies. Among the improvement actions taken, were:

- implementing additional oversight and review;

- gathering insights from operational personnel to ensure a better understanding of account balances and reasons for fluctuations; and

- monitoring the receivable sub-populations to ensure a deeper understanding of how student behavior at the institutions affects related receivable balances.

71.     Part of the "monitoring the receivable sub-population" action included an examination of those accounts receivable balances of students who had withdrawn from Bridgepoint's institutions. During the May 6, 2013 earnings conference call, when answering a question on the reasons behind the "spike" in the Bad Debt Percentage, Defendant Devine touted this specific action:

> **We did a deeper analysis.** The issue that kind of caused the spike so to speak is that, in our underlying data we use to build our models, those models that certain credits applied to them **from when a student would leave the institution** or receive a credit for another reason. That created one version of kind of our aging buckets, and then we made the decision that it may be more appropriate if we kind of suppressed those credits and that created another view of the aging buckets which we feel is more appropriate.

72.     Thus, Defendants apparent gaining of a "deeper understanding of how student behavior . . . affects related receivable balances," and specifically of student behavior for those that left Bridgepoint's institutions, as part of the 2012 Restatement remediation plan, should have alerted Defendants to the fact that independent paying students were not as likely to pay any outstanding tuition and/or fees.

### c)     The Individual Defendants Were Seasoned For-Profit Education Industry Executives

73.     As detailed above in §III, the Individual Defendants had years of professional experience in the for-profit education industry. Defendant Clark began his career in the for-profit education section in 1992 with Apollo Group, Inc., which owns the University of Phoenix. After Apollo, Defendant Clark was a divisional VP at Career

Education Corporation and the Chief Operating Officer for American InterContinental University. Additionally, prior to launching Bridgepoint in November 2003, Defendant Clark was a postsecondary education sector consultant for several private equity firms. Similarly, Defendant Devine served as Bridgepoint's CFO for more than a decade.

74.     With such a wealth of experience in the for-profit education industry, it is extremely unlikely that the Individual Defendants were ignorant of the difficulties facing students in paying tuition without the assistance of financial aid. In fact, this was one of the key takeaways from the Senate HELP Committee's two-year, in-depth, oversight investigation of the for-profit higher education sector:

> • But for-profit colleges also ask students with modest financial resources to take a big risk by enrolling in high-tuition schools. As a result of high tuition, students must take on significant student loan debt to attend school. When students withdraw, as hundreds of thousands do each year, they are left with high monthly payments but without a commensurate increase in earning power from new training and skills.

> \* \* \*

> • The vast majority of the students left with student loan debt that may follow them throughout their lives, and can create a financial burden that is extremely difficult, and sometimes impossible, to escape.

75.     Defendants were at a minimum deliberately reckless in basing the assurance of collectibility of its revenues on the government, military, or corporations when Bridgepoint did not ultimately derive 100% of its revenue from these parties. Additionally, during the Class Period, when Defendants knew key facts indicating that significant amount of revenue due from students was not reasonably assured to be collectible, it was at minimum, extremely reckless for Defendants to continue to base their revenue recognition collectibility assurance off of the government's ability to pay.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

76.     During the Class Period, Bridgepoint filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. The following chart identifies the date, signatories, and period covered by each report:

| BRIDGEPOINT'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | | |
|---|---|---|---|---|
| FORM | PERIOD | DATE FILED | SIGNATORIES | REFERRED TO BELOW AS |
| 10-K | 2012 Fiscal Year | 3/12/2013 | Defendants Clark and Devine | FY 2012 10-K |
| 10-Q | 2013 Fiscal 1st Quarter | 5/15/2013 | Defendant Devine | 1Q 2013 10-Q |
| 10-K/A | 2012 Fiscal Year | 5/17/2013 | Defendants Clark and Devine | FY 2012 10-K/A |
| 10-Q | 2013 Fiscal 2nd Quarter | 8/6/2013 | Defendant Devine | 2Q 2013 10-Q |
| 10-Q | 2013 Fiscal 3rd Quarter | 11/5/2013 | Defendant Devine | 3Q 2013 10-Q |
| 10-K | 2013 Fiscal Year | 3/17/2014 | Defendants Clark and Devine | FY 2013 10-K |

77.     As reflected by the chart below, during the Class Period, Bridgepoint issued the following press releases announcing its financial and operating results, which were attached to Form 8-Ks filed with the SEC by the Company and were signed by Defendant Devine. These press releases contained financial statements as was included in the Company's periodic reports:

| PRESS RELEASES ISSUED BY BRIDGEPOINT DURING THE CLASS PERIOD ANNOUNCING THE COMPANY'S FINANCIAL RESULTS | | |
|---|---|---|
| PERIOD | DATE | REFERRED TO BELOW AS |
| 2012 Fiscal 4th Quarter and Year | 3/12/2013 | FY 2012 PR |
| 2013 Fiscal 1st Quarter | 5/6/2013 | 1Q 2013 PR |
| 2013 Fiscal 2nd Quarter | 8/6/2013 | 2Q 2013 PR |
| 2013 Fiscal 3rd Quarter | 11/5/2013 | 3Q 2013 PR |
| 2013 Fiscal 4th Quarter and Year | 3/11/2014 | FY 2013 PR |

78.     During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Bridgepoint's SEC filings and during its investor conference calls. These actionable statements and omissions fall into three categories: (1) misstated historical financial results in the Company's quarterly and annual earnings press releases, and quarterly and annual SEC filings; (2) false and misleading statements concerning the Company's revenue recognition policies in annual SEC filings; and (3) false and misleading statements concerning the Company's financial results made during investor earnings conference calls.

**A.     Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements**

79.     Each of Bridgepoint's financial statements issued during the Class Period, as well as the financial results that were derived from those financial statements discussed in the quarterly and annual SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

80.     Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Bridgepoint to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4- 01(a)(1).

81.     During the Class Period, certain of Bridgepoint's financial statements violated GAAP, rendering them materially false and misleading. The FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K financial statements, as well as the financial results that were derived from those

financial statements discussed in these SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were rendered false and misleading due to Defendants' failure to comply with SEC rules and GAAP.

82.     Furthermore, the fact that Bridgepoint restated its financial statements and disclosed that its financial statements issued during the Class Period should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion No. 20 at ¶¶7-13; Financial Accounting Standards Board Statement No. 154 at ¶25).

83.     The financial statements and financial results listed above in ¶81 violated GAAP, rendering them materially false and misleading because Bridgepoint failed to properly recognize revenue in these financial statements.

84.     Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. (ASC 105-10-05-1).

85.     Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual financial statements. (17 C.F.R. §210.10-01(a)).

86.     The SEC prohibits the management of earnings. On September 28, 1998, in response to growing concerns about registrants' managing earnings to achieve earnings estimates, then-SEC Chairman Arthur Levitt gave a speech titled "The Numbers Game." One earnings management gimmick that SEC Chairman Levitt addressed in his speech was abusive revenue recognition practices. In response to Chairman Levitt's comments regarding abusive earnings management, the SEC issued two staff accounting bulletins relevant to this case to address earnings management problems: Staff Accounting Bulletin No. 99 ("SAB 99"); and Staff Accounting Bulletin No. 101, Topic 13, Revenue Recognition ("SAB 101, Topic 13").

87.     SAB 99 provides that misstatements of a financial statement item for the purpose of managing earnings to mask a change in earnings or other trends or to hide a failure to meet analyst consensus expectations for the enterprise are material under GAAP. "It is unlikely that it is ever 'reasonable' for registrants to record misstatements or not to correct known misstatements – even immaterial ones – as a part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings." SAB 99.

88.     SAB 101, Topic 13, provides that revenue generally is realized or realizable and earned when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectibility is reasonably assured.

89.     ASC Topic 605-10, Revenue Recognition ("ASC 605-10"), provides that revenues are not recognized until realized or realizable and earned.

90.     Further, each registrant with securities registered pursuant to Section 12 of the Exchange Act must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the registrant and must maintain internal accounting controls that are sufficient to

provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

91.     For the reasons set forth in §VI, *supra*, due to Defendants' failure to apply these basic accounting principles and properly recognize revenue in violation of GAAP, its publicly disclosed financial statements during the Class Period were prepared in violation of GAAP rules SAB 99; SAB 101, Topic 13; and ASC 605-10.

**B.     Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results**

92.     On March 12, 2013, Bridgepoint issued its FY 2012 PR and FY 2012 10-K in which the Company reported revenue of $209.4 million for the fourth quarter of 2012 and $968.2 million in revenue for the 2012 fiscal year. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. Later, on May 17, 2013, Bridgepoint filed an amended report of Bridgepoint's 4Q and FY 2012 financial results on the FY 2012 10-K/A. The FY 2012 10-K/A repeated the earlier reported revenue of $209.4 million for the fourth quarter of 2012 and $968.2 million in revenue for the 2012 fiscal year.

93.     As disclosed in the Restatement, Defendants materially misstated Bridgepoint's 2012 fourth quarter and fiscal year reported revenue in Bridgepoint's FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call by overstating fourth quarter of 2012 revenue by $2.9 million from $209.4 million to revised revenue of $206.5 million, and overstating revenue for the 2012 fiscal year by $24.8 million dollars from $968.2 million to revised revenue of $943.4 million.

94.     The materially false and misleading statements regarding Bridgepoint's revenue in the FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

95.     In the "Critical Accounting Policies and Use of Estimates" section, under the heading "Revenue Recognition," the FY 2012 10-K and FY 2012 10-K/A described Bridgepoint's revenue recognition policies in pertinent part as follows:

> The majority of our revenue comes from tuition revenue and is shown net of scholarships and refunds. Tuition revenue is recognized on a straight-line basis over the applicable period of instruction[.]
>
> * * *
>
> If a student withdraws from a program prior to certain dates, the student is entitled to a refund of a portion of tuition, depending on the date the student last attended a class. . . . [I]f an online student drops a class and the student's last date of attendance was in the first week of class, the student receives a full refund of the tuition for that class. If an online student drops a class and the last date of attendance was in the second week of the class, the student receives a refund of 50% of the tuition for that class. If an online student drops a class and the student's last date of attendance was after the second week of the class, the student is not entitled to a refund. We monitor student attendance in online courses through activity in the online program associated with that course. After two weeks have passed without attendance in a class by the student, the student is presumed to have dropped the course as of the last date of attendance, and the student's tuition is automatically refunded to the extent the student is entitled to a refund based on the refund policy above. We estimate expected refunds based on historical refund rates and record a provision to reduce revenue for the amount that is expected to be refunded. Refunds issued by us for services that have been provided in a prior period have not historically been material. Future changes in the rate of student withdrawals may result in a change to expected refunds and would be accounted for prospectively as a change in estimate.

96.     As disclosed in the Restatement, Defendants omitted to state material facts necessary to make the statements in the preceding paragraph not misleading by omitting the highlighted language in ¶42. These material omissions were also made with scienter for the reasons set forth in §VI, *supra*.

97.     Additionally, on the March 12, 2013 earnings conference call, Defendant Devine, in his opening remarks, stated:

> In the fourth quarter, the increase in bad debt was related to internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years. ***The Company has addressed this process and issue and expects that it will not repeat in 2013.***

98.     The highlighted statement in the preceding paragraph was materially false and misleading and made with scienter because at this time Defendant Devine knew, or

was deliberately reckless in not knowing, that the internal processing issue was not a one-time issue and had not been resolved. Rather, the problem was getting worse because as Defendants subsequently admitted to the SEC, the internal financial aid processing issue continued to create a backlog in Bridgepoint's ability to package students throughout 2013, which resulted in the higher Bad Debt Percentage throughout 2013 (§§VI.C.2, VI.C.4.a).[4]

**C.  Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results**

99.   On May 6, 2013, Bridgepoint issued the 1Q 2013 PR announcing its quarterly results for the first quarter of 2013. For the quarter, the Company reported revenue of $222 million, beating the analyst consensus for revenue expectation. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. On May 15, 2013, Bridgepoint filed its 1Q 2013 10-Q, in which the reported revenue number from the 1Q 2013 PR was repeated.

100.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's first quarter of 2013 reported revenue in Bridgepoint's 1Q 2013 PR, 1Q 2013 10-Q, and on the May 6, 2013 earnings conference call by overstating revenue by $7 million from $222 million to revised revenue of $213.0 million.

101.   The materially false and misleading statements regarding Bridgepoint's revenue in the 1Q 2013 PR, 1Q 2013 10-Q, and on the May 6, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**D.  Materially False or Misleading Statements in the Company's Disclosure of 2Q 2013 Results**

102.   On August 6, 2013, Bridgepoint issued the 2Q 2013 PR announcing its financial results for the second quarter of 2013. The Company reported revenue of

---

[4] As explained throughout, the increased "bad debt" was really revenue that never should have been recorded.

$197.6 million for the quarter, in line with management's and analyst consensus. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. Lastly, on this same day, August 6, 2013, Bridgepoint filed its 2Q 2013 10-Q, in which the reported revenue number from the 2Q 2013 PR was repeated.

103.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's second quarter of 2013 reported revenue in Bridgepoint's 2Q 2013 PR, 2Q 2013 10-Q, and on the August 6, 2013 earnings conference call by overstating revenue by $4.1 million from $197.6 million to revised revenue of $193.5 million.

104.   The materially false and misleading statements regarding Bridgepoint's revenue in the 2Q 2013 PR, 2Q 2013 10-Q, and on the August 6, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**E.   Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results**

105.   On November 5, 2013, Bridgepoint issued the 3Q 2013 PR announcing its financial results for the third quarter of 2013. The Company reported revenue of $185.6 million for the quarter. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. Lastly, on this same day, November 5, 2013, Bridgepoint filed its 3Q 2013 10-Q, in which the reported revenue number from the 3Q 2013 PR was repeated.

106.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's third quarter of 2013 reported revenue in Bridgepoint's 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call by overstating revenue by $2.8 million from $185.6 million to revised revenue of $182.8 million.

107.   The materially false and misleading statements regarding Bridgepoint's revenue in the 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**F.  Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results**

108.  On March 11, 2014, Bridgepoint issued its FY 2013 PR in which the Company reported revenue of $163.5 million for the fourth quarter of 2013 and $768.6 million in revenue for the 2013 fiscal year, both in line with analyst consensus. Also on that day, Defendants Clark and Devine held a quarterly conference call with analysts, during which they reiterated the financial results reported in the press release. On March 17, 2014, Bridgepoint filed its FY 2013 10-K, in which the reported revenue number from the FY 2013 PR was repeated.

109.  As disclosed in the Restatement, Defendants materially misstated Bridgepoint's fourth quarter and 2013 fiscal year reported revenue in Bridgepoint's FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call by overstating fourth quarter of 2013 revenue by $1.3 million from $163.5 million to revised revenue of $162.2 million, and overstating revenue for the 2013 fiscal year by $17.2 million dollars from $768.6 million to revised revenue of $751.4 million.

110.  The materially false and misleading statements regarding Bridgepoint's revenue in the FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

111.  In the "Critical Accounting Policies and Use of Estimates" section, under the heading "Revenue Recognition," the FY 2013 10-K described Bridgepoint's revenue recognition policies in pertinent part as follows:

> The majority of our revenue comes from tuition revenue and is shown net of scholarships and refunds. Tuition revenue is recognized on a straight-line basis over the applicable period of instruction[.]
>
> *        *        *
>
> If a student withdraws from a program prior to certain dates, the student is entitled to a refund of a portion of tuition, depending on the date the student last attended a class. . . . [I]f an online student drops a class and the student's last date of attendance was in the first week of class, the student receives a full refund of the tuition for that class. If an online student drops a class and the last date of attendance was in the second week of the class, the student receives a refund of 50% of the tuition for that class. If an online student drops a class and the student's last date of attendance was

after the second week of the class, the student is not entitled to a refund. We monitor student attendance in online courses through activity in the online program associated with that course. After two weeks have passed without attendance in a class by the student, the student is presumed to have dropped the course as of the last date of attendance, and the student's tuition is automatically refunded to the extent the student is entitled to a refund based on the refund policy above. We estimate expected refunds based on historical refund rates and record a provision to reduce revenue for the amount that is expected to be refunded. Refunds issued by us for services that have been provided in a prior period have not historically been material. Future changes in the rate of student withdrawals may result in a change to expected refunds and would be accounted for prospectively as a change in estimate.

112.   As disclosed in the Restatement, Defendants omitted to state material facts necessary to make the statements in the preceding paragraph not misleading by omitting the highlighted language in ¶42. These material omissions were also made with scienter for the reasons set forth in §VI, *supra*.

### G.   The Individual Defendants' Materially False and Misleading Sarbanes-Oxley Certifications

113.   Each of Bridgepoint's FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K contained Sarbanes-Oxley required certifications, signed by Defendants Clark and Devine, who certified:

1.   I have reviewed this Quarterly Report on Form 10-Q of Bridgepoint Education. Inc.:

2.   ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report:***

3.   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report:***

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a15(f) and 15d-15(f)) for the registrant and have:

   a.   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant. including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;*

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. *The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):*

a. *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

b. *Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

114.   As admitted in the Restatement, the statements set forth in the preceding paragraph were materially false and misleading when issued. Contrary to the Individual Defendants' certifications that Bridgepoint's internal controls over financial reporting were "effective" and were designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," Bridgepoint's management, including the Individual Defendants, concluded in the

Restatement that the Company's disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013, and December 31, 2013:

> Our management has concluded that there are two material weaknesses in internal control over financial reporting, as **we did not maintain effective controls over the selection and application of GAAP related to revenue recognition** and restricted cash. Specifically, the members of our management team with the requisite level of accounting knowledge, experience and training commensurate with our financial reporting requirements did not analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances. **One control deficiency related to our failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions. This control deficiency resulted in the misstatement of our revenue, bad debt expense, and accounts receivables and related financial disclosures,** and resulted in the restatement of the Company's consolidated financial statements for the year 2013 and each of the quarters of 2013 and revision of the Company's consolidated financial statements for the years 2012 and 2011 and each of the quarters of 2012 and 2011.

115.   Each of the statements listed in ¶113 were also made with scienter for the reasons set forth in §VI, *supra*.

## VIII.  LOSS CAUSATION

116.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

117.   The truth regarding Bridgepoint's falsely reported revenue in violation of the collectibility criterion was partially revealed, and/or the concealed risks materialized, on or about: March 11, 2014; May 12, 2014; and May 30, 2014. As a direct result of these partial disclosures, the price of Bridgepoint's stock declined precipitously on heavy trading volume.

118.   During the Class Period, investors were focused on the Company's declining revenues and increasing Bad Debt Percentage.

119.   The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme in recognizing revenue that they knew, or were deliberately reckless in not knowing,  was not reasonably assured to be collectible

1  in Bridgepoint's financial statements and financial results, and the subsequent significant

2  decline in the value of Bridgepoint securities when the truth regarding Defendants'

3  fraudulent recognition of revenue in violation of the collectibility criterion was revealed.

4       120.   On March 11, 2014, Bridgepoint preliminarily announced its fourth quarter

5  and 2013 fiscal year financial results in its FY 2013 PR. In the press release Defendants

6  reported revenue of $163.5 million for the quarter and $768.6 million for the year and

7  bad debt expenses of $72.3 million for the year. Additionally, from the reported bad debt

8  expense for the year, investors and analysts were able to discern bad debt expenses for

9  the fourth quarter of 2013 of $18.7 million, or 11.4% of quarterly revenues.

10       121.   Later that day, Defendants held an earnings call in which they reiterated the

11  financial results and explained that the increase in operating costs (called instructional

12  costs and services) for Bridgepoint's 2013 fiscal year was due in great part to higher bad

13  debt expenses for the year. Also on this call, the Individual Defendants fielded questions

14  relating to the uptick in the Bad Debt Percentage for the quarter:

15/16       TIMO CONNOR: Okay, thanks. Then final one for me, bad debt expense ticked up in the quarter. What are the expectations for that for 2014? And what are more normalized levels for bad debt expense in the future?

17/18       DAN DEVINE: It did pick up in the quarter. We expect that going forward it should be at 7% or below for 2014, and our goal is to drive it below that number.

              * * *

19/20       JEFF SILBER, ANALYST, BMO CAPITAL MARKETS: Just to follow-up on the question, why did bad debt expense tick up so much?

21/22       ANDREW CLARK: Why did it spiked up so much? We discussed it last quarter. We're finishing basically our final completion of the adjustments we made to our model.

23       122.   On this news, the price of Bridgepoint's stock tumbled, falling 15.73% or

24  $2.99 per share, to close at $16.02 on March 11, 2014, on unusually heavy trading

25  volume.

26       123.   The disclosures on March 11, 2014, partially revealed or the concealed risks

27  partially materialized that the higher than historical Bad Debt Percentage was not

28  "work[ing] its way back down over several quarters" as Defendant Devine had earlier

explained. The bad debt expense reflected the eventual result of revenues fraudulently recorded during 2013 (and which never should have been recorded) being written off as uncollectable. Indeed, the March 11, 2014 disclosures indicated to investors and analysts that the higher Bad Debt Percentages the Company had been experiencing during the Class Period may not be due solely to Bridgepoint's (allegedly one-time and resolved) 2012 internal processing issues or Defendants' change in the accounts receivable model, and could be more indicative of a deeper seeded problem with Bridgepoint's operations. For example, on March 12, 2014, an analyst for Deutsche Bank noted that the weak financial results for the fourth quarter "suggest that to hit their start growth guidance in 4Q it came at a significant economic cost, with rising bad debt and weak persistence." The same analyst also commented that "[l]ingering concerns that Bridgepoint is sacrificing student quality for growth will likely persist until rising bad debt trends reverse and persistence improves YoY."

124.   On May 12, 2014, in a press release attached to a Form 8-K filed with the SEC, Defendants announced Bridgepoint's preliminary first quarter of 2014 financial and operating results. Also in this press release, Defendants explained that the Company would be unable to timely file its financial results for the first quarter of 2014 on Form 10-Q, stating:

> The Company is working to quantify the impact of an outstanding comment the Company received from the Securities and Exchange Commission. The comment was received in connection with the SEC's review of the Company's periodic reports, and **relates to the Company's revenue recognition policy and accounting for doubtful accounts. Specifically, the Company has historically not determined it necessary to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions.** On May 2, 2014, the SEC informed the Company that such a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.

Defendants also disclosed that they were evaluating whether a restatement of Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 was necessary due to the lack of student-by-student reassessment.

125.   Later that day, the Individual Defendants held an earnings conference call, and Defendant Devine admitted that the Company's prior revenue recognition policy was incorrect: "Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense."

126.   The following day Defendant Devine, on behalf of Bridgepoint, filed a notification of late filing for the first quarter of 2014 on Form 12b-25 with the SEC. The notice largely reiterated the previous day's announcement.

127.   On this news, shares of Bridgepoint declined an additional $1.41 per share, nearly 9%, to close on May 12, 2014 at $14.51 per share on unusually heavy trading volume. The following day, Bridgepoint's share price continued to fall another 3.17%, or $0.46 per share, to close on May 13, 2014 at $14.05 per share.

128.   On May 30, 2014, after the market closed, Bridgepoint announced in a Form 8-K filed with the SEC that one week earlier, Bridgepoint's management concluded that there were "material misstatements of revenue, bad debt expense and accounts receivable" for each of the reported financial results in the Class Period, fully revealing the extent of Defendants' reckless accounting errors in recognizing revenues during the Class Period and its effect on Bridgepoint's Bad Debt Percentage.

129.   The May 30, 2014 disclosure also revealed that there were material weaknesses over financial reporting, "[s]pecifically, the process for analyzing the collectibility criterion for revenue recognition was not designed appropriately to reassess collectibility of funds owed by students, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions." Defendants also provided an estimate of what restated revenue and expenses would be for the 2013 fiscal year: estimating a revenue decrease of around $15 to $20 million along with an even larger decrease in bad debt expense of $23.2 to $26.2 million.

130.  On this news, shares of Bridgepoint declined 1.31%, or $0.17 per share, to close on June 2, 2014 at $12.82 per share, the first trading day after the May 30, 2014 press release, on heavy trading volume.

## IX.  ADDITIONAL SCIENTER ALLEGATIONS

131.  The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the Company's improper revenue recognition; and/or (b) their failure to properly assess collectability of tuition upon the ultimate responsible party's ability to pay; and/or (c) their intentional issuance of materially false or misleading financial statements which improperly recognized revenue; and/or (d) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so. The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

132.  The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

133.  In addition to the foregoing allegations, the following facts support a strong inference that Bridgepoint and the Individual Defendants knew, or with deliberate recklessness disregarded, that the challenged statements alleged herein were materially false or misleading when made.

### A.  The Multitude of Government Investigations Concerning Bridgepoint's Revenue Accounting and Administration of Financial Aid Programs Adds to the Inference of Scienter

134.  On July 25, 2014, shortly after the end of this Class Period, Bridgepoint disclosed that the SEC was investigating its accounting practices, including revenue recognition and receivables, in addition to other matters relating to Bridgepoint's

forthcoming Restatement and the prior 2012 Restatement. Not only did the SEC issue this subpoena for the revised and restated time periods, but requested documents and information dating back to July 1, 2009 to the present.

135.   On May 18, 2016, the SEC expanded the investigation to include Bridgepoint's "scholarship and institutional loan programs and any other extensions of credit made by the Company to students, and student enrollment and retention at the Company's academic institutions" from as early as January 1, 2014.

136.   On August 25, 2014, the U.S. Department of Education commenced a review of Ashford's administration of federal student financial aid programs for the 2012-2013 and 2013-2014 financial aid years. On July 12, 2016, via a Form 8-K filed with the SEC, Bridgepoint announced that the Department of Education would shortly commence an off-site program review of Ashford's administration of federal student financial aid programs for certain students identified in the 2009-2012 calendar year.

137.   Lastly, in the July 12, 2016 Form 8-K, Bridgepoint also announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act." The Department of Justice's investigation relates to fiscal years 2011-2014, encompassing the entirety of this Class Period.

## B.   Bridgepoint's Ineffective Internal Controls

138.   The Individual Defendants' knowledge or recklessness is also evidenced by the fact that they personally reviewed the internal controls and Defendant Devine took ultimate authority over remediating Bridgepoint's internal controls as part of the purported 2012 Restatement remediation plan (*see* §VI.C.4.b). In the Restatement, Bridgepoint also disclosed that it had identified "material weaknesses" in its "internal control over financial reporting." These material weaknesses included the Company's failure to:

- analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances;
- maintain effective internal controls over the accounting for revenue recognition; and
- maintain effective internal controls over the presentation of certain funds as restricted cash.

139.  To remediate these material weaknesses, Bridgepoint represented that it planned to implement the following measures: "additional training efforts," "ensuring appropriate review of the related significant accounting policies by the members of management with the requisite level of knowledge, experience and training to appropriately apply GAAP," and undertaking "additional review processes to ensure the related significant accounting policies are implemented and applied properly on a consistent basis throughout the Company." However, as the Defendants later admitted in the Restatement, management was not appropriately applying GAAP as it relates to properly recognizing revenue.

## X.  APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

140.  The market for Bridgepoint's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Bridgepoint's securities traded at artificially inflated prices during the Class Period. On October 29, 2013, the Company's stock closed at a Class Period high of $20.16 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bridgepoint's securities and market information relating to Bridgepoint, and have been damaged thereby.

141.  During the Class Period, the artificial inflation of Bridgepoint's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a

series of materially false and/or misleading statements about Bridgepoint's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Bridgepoint and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

142. At all relevant times, the market for Bridgepoint's securities was an efficient market for the following reasons, among others:

a. Bridgepoint stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Bridgepoint filed periodic public reports with the SEC and/or the NYSE;

c. Bridgepoint regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Bridgepoint was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e. The average daily trading volume for Bridgepoint securities during the Class Period was approximately 363,248 shares, with almost 45 million shares of stock outstanding as of March 10, 2014, and a market capitalization reaching approximately $1.092 billion during the Class Period.

143. As a result of the foregoing, the market for Bridgepoint's securities promptly digested current information regarding Bridgepoint from all publicly available sources and reflected such information in Bridgepoint's stock price. Under these circumstances, all purchasers of Bridgepoint's securities during the Class Period suffered similar injury through their purchase of Bridgepoint's securities at artificially inflated prices and a presumption of reliance applies.

## XI.    NO SAFE HARBOR

144. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bridgepoint who knew that the statement was false when made.

145. As a result of the foregoing, the market for Bridgepoint's securities promptly digested current information regarding Bridgepoint from all publicly available sources and reflected such information in Bridgepoint's stock price. Under these circumstances, all purchasers of Bridgepoint's securities during the Class Period suffered similar injury through their purchase of Bridgepoint's securities at artificially inflated prices and a presumption of reliance applies.

146.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.   CLASS ACTION ALLEGATIONS

147.   Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Bridgepoint's securities between March 12, 2013 and May 30, 2014, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

148.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bridgepoint's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Bridgepoint shares were traded publicly during the Class Period on the NYSE. As of March 10, 2014, Bridgepoint had 44,979,199 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Bridgepoint or its transfer agent and may be notified of the pendency of

1  this action by mail, using the form of notice similar to that customarily used in securities

2  class actions.

3      149.   Plaintiffs' claims are typical of the claims of the members of the Class as all

4  members of the Class are similarly affected by Defendants' wrongful conduct in

5  violation of federal law that is complained of herein.

6      150.   Plaintiffs will fairly and adequately protect the interests of the members of

7  the Class and has retained counsel competent and experienced in class and securities

8  litigation.

9      151.   Common questions of law and fact exist as to all members of the Class and

10  predominate over any questions solely affecting individual members of the Class.

11  Among the questions of law and fact common to the Class are:

12          a.      whether the federal securities laws were violated by Defendants' acts

13  as alleged herein;

14          b.      whether statements made by Defendants to the investing public

15  during the Class Period omitted and/or misrepresented material facts about the business,

16  operations, and prospects of Bridgepoint;

17          c.      whether Defendants knew or deliberately disregarded that their

18  statements were false and misleading;

19          d.      whether the price of Bridgepoint securities were artificially inflated

20  because of Defendants' conduct complained of herein; and

21          e.      to what extent the members of the Class have sustained damages and

22  the proper measure of damages.

23      152.   A class action is superior to all other available methods for the fair and

24  efficient adjudication of this controversy since joinder of all members is impracticable.

25  Furthermore, as the damages suffered by individual Class members may be relatively

26  small, the expense and burden of individual litigation makes it impossible for members

27  of the Class to individually redress the wrongs done to them. There will be no difficulty

28  in the management of this action as a class action.

# XIII.  COUNTS

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendant Bridgepoint and the Individual**
**Defendants**

153.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

154.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Bridgepoint's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

155.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bridgepoint's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

156.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bridgepoint's financial well-being and prospects, as specified herein.

157.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bridgepoint's value and performance and continued substantial growth, which included the making of,

or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bridgepoint and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

158.   Each of the Individual Defendant's primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

159.   The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bridgepoint's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

1   actual knowledge of the misrepresentations and/or omissions alleged, were reckless in

2   failing to obtain such knowledge by deliberately refraining from taking those steps

3   necessary to discover whether those statements were false or misleading.

4          160.   As a result of the dissemination of the materially false and/or misleading

5   information and/or failure to disclose material facts, as set forth above, the market price

6   of Bridgepoint's securities was artificially inflated during the Class Period. In ignorance

7   of the fact that market prices of the Company's securities were artificially inflated, and

8   relying directly or indirectly on the false and misleading statements made by Defendants,

9   or upon the integrity of the market in which the securities trades, and/or in the absence of

10  material adverse information that was known to or recklessly disregarded by Defendants,

11  but not disclosed in public statements by Defendants during the Class Period, Plaintiffs

12  and the other members of the Class acquired Bridgepoint's securities during the Class

13  Period at artificially high prices and were damaged thereby.

14         161.   At the time of said misrepresentations and/or omissions, Plaintiffs and other

15  members of the Class were ignorant of their falsity, and believed them to be true. Had

16  Plaintiffs and the other members of the Class and the marketplace known the truth

17  regarding the problems that Bridgepoint was experiencing, which were not disclosed by

18  Defendants, Plaintiffs and other members of the Class would not have purchased or

19  otherwise acquired their Bridgepoint securities, or, if they had acquired such securities

20  during the Class Period, they would not have done so at the artificially inflated prices

21  which they paid.

22         162.   By virtue of the foregoing, Defendants have violated Section 10(b) of the

23  Exchange Act and Rule 10b-5 promulgated thereunder.

24         163.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

25  and the other members of the Class suffered damages in connection with their respective

26  purchases and sales of the Company's securities during the Class Period.

27

28

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

164.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

165.  The Individual Defendants acted as controlling persons of Bridgepoint within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

166.  In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

167.  As set forth above, Bridgepoint and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered

1  damages in connection with their purchases of the Company's securities during the Class
2  Period.

3  **XIV.  PRAYER FOR RELIEF**

4  WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

5         (a)     Determining that this action is a proper class action under Rule 23 of the
6  Federal Rules of Civil Procedure;

7         (b)     Awarding compensatory damages in favor of Plaintiff and the other Class
8  members against all defendants, jointly and severally, for all damages sustained as a
9  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest
10 thereon;

11        (c)     Awarding Plaintiff and the Class their reasonable costs and expenses
12 incurred in this action, including counsel fees and expert fees; and

13        (d)     Such other and further relief as the Court may deem just and proper.

14 **XV.  JURY TRIAL DEMANDED**

15        Plaintiffs hereby demand a trial by jury.

16 Dated:  September 9, 2016                  **GLANCY PRONGAY & MURRAY LLP**
17

18
19                                           By:  _s/ Robert V. Prongay_
                                            Lionel Z. Glancy
20                                          Robert V. Prongay
                                            Leanne Heine Solish
21                                          1925 Century Park East, Suite 2100
22                                          Los Angeles, CA 90067
                                            Telephone:  (310) 201-9150
23                                          Facsimile:   (310) 201-9160
24                                          Email: rprongay@glancylaw.com

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
Sara Fuks (*pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO SOUTHERN DISTRICT OF CALIFORNIA LOCAL RULES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action. My business address is 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On September 9, 2016, I caused to be served the following document:

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

By posting the document to the ECF Website of the United States District Court for the Southern District of California, for receipt electronically by the parties as listed on the Court's ECF Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 9, 2016, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:15-cv-00408-JLS-DHB Zamir v. Bridgepoint Education, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sameer Advani**
  sadvani@willkie.com,mao@willkie.com

- **John F Cannon**
  jcannon@sycr.com,ccheek@sycr.com,jklaeb@sycr.com

- **Sara Fuks**
  sfuks@rosenlegal.com

- **Lionel Z Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,lheine@glancylaw.com,bmurray@glancylaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,pkim@rosenlegal.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Daniel John Tyukody , Jr**
  TyukodyD@gtlaw.com,lalitdock@gtlaw.com,phieferd@gtlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)