1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
Leanne Heine Solish (#280297)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

*Co-Lead Counsel for Plaintiffs*
[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELDA ZAMIR, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>          v.<br><br>BRIDGEPOINT EDUCATION, INC., ANDREW S. CLARK, and DANIEL J. DEVINE,<br><br>                              Defendants. | Case No. 15-CV-408 JLS (DHB)<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# **TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT.........................................................................1

II.     JURISDICTION AND VENUE .......................................................................5

III.    PARTIES.........................................................................................................6

IV.     BACKGROUND.............................................................................................8

V.      DEFENDANTS RESTATE REVENUES AND ACCOUNTS RECEIVABLE AND ADMIT TO RECOGNIZING REVENUE WHEN COLLECTIBILITY WAS NOT REASONABLY ASSURED..........................9

VI.     SUMMARY OF DEFENDANTS' FRAUD....................................................13

        A.    Defendants Recognized A Significant Amount of Revenue Without Regard as to Whether Actual Collection from Students Was Reasonably Assured.......................................................................13

        B.    Defendants Were, At Minimum, Deliberately Reckless in Not Separating Students With and Without Financial Aid in Bridgepoint's Accounts Receivable System...........................................16

              1.    Defendants' Failure to Separate Students by Funding Source in Bridgepoint's Accounts Receivable System Violated GAAP ........................................................................16

              2.    Defendants Were Able to Readily Identify those Students With and Without Financial Aid ..................................................17

              3.    Bridgepoint's Accounts Receivable System Was Purposely Designed to Ignore Students' Eligibility for Financial Aid .........18

              4.    Defendants Knew that Students Without Financial Aid Were Less Likely to Pay Tuition ..........................................................19

a)    Defendant Devine Admitted that Independent Paying Students Have Lower Collection Rates ............................. 19

b)    A Pre-Class Period Internal Processing Issue and Class Period Events Put Defendants On Notice of the Dramatically Different Collection Rates of Students With and Without Financial Aid ........................................ 20

(i)    Bridgepoint's Internal Financial Aid Processing Issue and Resulting Backlog.................................... 20

(ii)    A Class Period Review of Accounts Receivable Provided Defendants with a "Deeper Understanding" of How the Behavior of Students Who Left Bridgepoint Affected the Company's Account Receivable Balances .............. 21

5.    Defendant Devine's Letters to the SEC Reveal that During the Class Period Defendants Had Sufficient Facts to Determine that Collection of Revenue for Independently Paying Students Was Not Reasonably Assured ....................................... 23

C.    Defendants' Accounting for Revenue and Accounts Receivable Allowed Defendants to Manage Bridgepoint's Reported Revenue While Delaying the Reporting of Bad Debt Expenses ........................... 25

D.    Defendants' Concluded that Bridgepoint's Errors Relating to Its Previous Revenue Recognition Policy Were Material ........................... 28

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....................................................... 29

A.    Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements ................................................................................ 30

B.    Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results .......................................... 34

C.    Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results ............................................................... 36

D.     Materially False or Misleading Statements in the Company's Disclosure of 2Q 2013 Results ................................................................. 37

E.     Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results ................................................................. 38

F.     Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results ......................................... 39

G.     Defendant Devine's Materially False and Misleading Sarbanes-Oxley Certifications .............................................................................. 41

VIII.    LOSS CAUSATION ...................................................................................... 43

IX.      ADDITIONAL SCIENTER ALLEGATIONS ............................................. 46

A.     Bridgepoint's Competitors Similarly Contacted By the SEC Regarding Revenue Recognition Policies ................................................ 47

B.     The Multitude of Government Investigations Concerning Bridgepoint's Revenue Accounting and Administration of Financial Aid Programs Adds to the Inference of Scienter .................................... 49

C.     Bridgepoint's Ineffective Internal Controls ........................................... 50

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ...................................................................... 50

XI.      NO SAFE HARBOR ..................................................................................... 52

XII.     CLASS ACTION ALLEGATIONS ............................................................. 53

XIII.    COUNTS ...................................................................................................... 55

XIV.    PRAYER FOR RELIEF ............................................................................... 59

XV.     JURY TRIAL DEMANDED ......................................................................... 59

1.   Lead Plaintiffs Nelda Zamir ("Zamir") and Thomas G. Prosch ("Prosch") (collectively "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated purchasers of the securities of Bridgepoint Education, Inc. ("Bridgepoint" or the "Company") between March 12, 2013 and May 30, 2014, inclusive (the "Class Period").

2.   Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation of court-appointed Co-Lead Counsel Glancy Prongay & Murray LLP and The Rosen Law Firm, P.A. This investigation included, among other things, a review and analysis of: (i) Bridgepoint's public filings with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Bridgepoint's investor calls; (vi) review of information provided under the Freedom of Information Act ("FOIA"); (vii) interviews with former employees and other potential witnesses with relevant information; and (viii) other publicly available material and data identified herein.

## I.   PRELIMINARY STATEMENT

3.   Bridgepoint provides for-profit postsecondary education to students through its two wholly-owned institutions, Ashford University ("Ashford") and the University of the Rockies. The majority of Bridgepoint's revenue is derived from tuition charged to students attending these two institutions.

4.   During the Class Period, Defendants (defined below) engaged in securities fraud by disseminating numerous materially false financial statements that reported artificially inflated revenue and accounts receivables figures. On August 4, 2014, Bridgepoint issued a restatement of its financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as

well as a revision of the financial statements for the fiscal years ending December 31, 2012 and 2011 and the quarterly financial results for each of the three quarterly financial results during 2012 (the "Restatement").

5.    The Restatement stemmed from Defendants' deliberate assessment of the collectibility of revenue without regard to assessing whether Bridgepoint's actual students had the ability to pay what those students owed. Pursuant to Generally Accepted Accounting Principles ("GAAP") and SEC guidance, revenue cannot be properly recognized if its collectibility is not reasonably assured.

6.    Instead, during the Class Period, Defendants based Bridgepoint's collectibility assurance based on the government's ability to pay, reasoning that Bridgepoint students will most likely be eligible for federal student loans. Defendants continued to account for revenue in this manner despite admitting that not every student receives financial aid, and not all of Bridgepoint's revenue is actually collected from the government.

7.    At the same time, despite having full knowledge that not all of Bridgepoint's students received financial aid, Defendants designed and utilized a system of accounts receivable that made no distinction as to students with financial aid funding and those without. This glaring incongruence demonstrates that Defendants did so for the express purpose of remaining ignorant of the likelihood of payment from students without financial aid so that they could overstate revenues and accounts receivables. Indeed, Class Period revenues and accounts receivable figures were overstated by tens of millions of dollars.

8.    Not only was the design of such an accounts receivable system in violation of readily understood GAAP guidance, but the manner in which Bridgepoint's accounts receivable system was designed allowed Defendants to report higher revenues during the Class Period and delay reporting bad debt expenses by waiting to reserve for the estimate of uncollectible accounts receivable owed by 121 days from when revenue and gross accounts receivable was recorded.

9.    The failure to separate students with and without financial aid was, at minimum, deliberately reckless. Bridgepoint's accounts receivable system had the ability to separate students, and did so by their enrollment status (active or inactive) and by the age of the owed balances. Defendants also admitted that they were able to identify students with and without financial aid, and that students without financial aid were less likely to pay their owed tuition and fees. Defendants thus had readily available information to help make an informed estimate on an appropriate reserve for students without financial aid in its accounts receivable system. In fact, Defendants' actual reserve estimates for aging accounts was based on the fact that students who owed balances after 120 days were likely to not have financial aid funding to pay for the amount owed to Bridgepoint. Even if Defendants felt they could not reliably estimate an appropriate reserve, GAAP required Defendants to recognize revenue on a different basis – such as when cash was actually received.

10.    Defendants admitted that: (1) although an assessment of the appropriate reserve required judgment, such an assessment was capable of precise measurement; and (2) the cash basis method of accounting was an appropriate way to account for revenues when revenue was not reasonably collectible due to financial aid shortfalls for retakes of a class, and accounted for these revenues when cash received during the Class Period.

11.    Defendants' restated accounts receivable figures show Defendants assigned an extremely high reserve for students without financial aid—as much as 73% during the Class Period. But by deliberately ignoring numerous readily available facts and continuing to account for all students as if they would receive financial aid during the Class Period, Defendants were able to avoid the necessary reality – that revenues from students without financial aid was not reasonably assured to be collectible.

12.    It was only after the SEC prodded Defendants through a series of communications with the Company and its Chief Financial Officer, Defendant Devine, that Defendants took the necessary steps to properly account for revenues and accounts receivable on a student-by-student basis.

13.     Defendants' intentional and/or deliberately reckless accounting eventually came to light over the first half of 2014. One measure followed by Bridgepoint's analysts was the percent of the Company's reported bad debt expense to revenue ("Bad Debt Percentage"). During the Class Period, the Bad Debt Percentage was artificially elevated. Defendants explained that the higher Bad Debt Percentage was due to a backlog created as a result of an internal processing error relating to financial aid packaging for students, but assured investors and analysts that the higher Bad Debt Percentage would work its way back down to historical levels over the course of 2013. But on March 11, 2014, Bridgepoint reported an even higher Bad Debt Percentage for the fourth quarter of 2013. Given Bridgepoint's false assurances, investors and analysts were understandably concerned that the Bad Debt Percentage may not actually work its way back down to historic levels. As a result of this news, Bridgepoint's stock dropped almost 16% in one day.

14.     Two months later, Bridgepoint slowly revealed and admitted that it had been materially misstating revenue during the Class Period. On May 12, 2014, on an earnings conference call, Defendant Devine admitted that Bridgepoint had been recognizing revenues for students that subsequently lost financial aid eligibility, and that when that revenue was not collected – as was to be expected – it was later written off as a bad debt expense. On May 30, 2014, the Company further announced that it would restate the financial results for the fiscal 2013 year and for each quarter in 2013, as well as revise the financial results for the fiscal year ending December 31, 2012 and 2011 and for each quarter in 2012.

15.     As a result of the announcements on May 12, 2014 and May 30, 2014, Bridgepoint's stock fell even further, nearly 9%, or $1.41 per share, to close at $14.51 per share on May 12, 2014 and continued to fall over another 3%, or $0.46 per share, to close at $14.05 per share on May 13, 2014. On June 2, 2014, the first trading day after Bridgepoint announced the restatement on May 30, 2014 after the market's close,

1  Bridgepoint's stock declined 1.31% more, or $0.17 per share, to close at $12.82 per
2  share.

3       16.    When Bridgepoint ultimately restated its financial results to correct its
4  material revenue recognition errors, the restated revenue and accounts receivable figures
5  decreased by tens of millions of dollars; due to the de-recognition of accounts receivable,
6  bad debt expense also correspondingly decreased. Predictably, the Bad Debt Percentage
7  fell back in line with Bridgepoint's historical rates.

8       17.    Unsurprisingly, the SEC is conducting an investigation regarding the
9  circumstances surrounding Bridgepoint's restatement and its accounting practices. In
10 fact, the SEC is not the only federal agency investigating Bridgepoint concerning its
11 practices: both the U.S. Department of Education and U.S. Department of Justice are
12 currently investigating Bridgepoint's accounting and administration of federal financial
13 aid funds.

14      18.    Had it not been for Defendants' willful or reckless disregard in improperly
15 recognizing revenue, one of the most obvious accounting principles, based upon the
16 government's ability to pay, Plaintiffs and other Class members would not have suffered
17 significant losses and damages, and therefore are entitled to redress.

18 **II.    JURISDICTION AND VENUE**

19      19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the
20 Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder
21 by the SEC (17 C.F.R. § 240.10b-5).

22      20.    This Court has jurisdiction over the subject matter of this action pursuant to
23 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

24      21.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and
25 Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of
26 the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many
27 of the acts charged herein, including the preparation and dissemination of materially
28 false and/or misleading information, occurred in substantial part in this Judicial District.

1  Additionally, Bridgepoint's principal executive offices are located within this Judicial
2  District.

3      22.    In connection with the acts, transactions, and conduct alleged herein,
4  Defendants directly and indirectly used the means and instrumentalities of interstate
5  commerce, including the United States mail, interstate telephone communications, and
6  the facilities of a national securities exchange.

7  **III.   PARTIES**

8      23.    Lead Plaintiff Zamir, as set forth in a previously-filed certification (Dkt.
9  No. 1 at 45-46), incorporated by reference herein, purchased Bridgepoint common stock
10 and options during the Class Period, and suffered damages as a result of the federal
11 securities law violations and false and/or misleading statements and/or material
12 omissions alleged herein.

13     24.    Lead Plaintiff Prosch, as set forth in a previously-filed certification (Dkt.
14 No. 3-4 at 3-4), incorporated by reference herein, purchased Bridgepoint common stock
15 during the Class Period, and suffered damages as a result of the federal securities law
16 violations and false and/or misleading statements and/or material omissions alleged
17 herein.

18     25.    Defendant Bridgepoint is a Delaware corporation with its principal
19 executive offices located at 13500 Evening Creek Drive North, Suite 600, San Diego,
20 California 92128. Bridgepoint is a provider of postsecondary education services. Its
21 wholly-owned subsidiaries, Ashford and the University of the Rockies, are regionally
22 accredited academic institutions that offer associate's, bachelor's, master's and doctoral
23 programs online, as well as at their traditional campuses located in Clinton, Iowa, and
24 Denver, Colorado. Bridgepoint's common stock trades under the ticker symbol "BPI" on
25 the New York Stock Exchange (the "NYSE"), which is an efficient market.

26     26.    Defendant Devine served as the Chief Financial Officer ("CFO") of
27 Bridgepoint from January 2004 through the end of the Class Period. From November
28 2008 to December 2010, Defendant Devine also served as a Senior Vice President of

Bridgepoint. In January 2011, Defendant Devine was also promoted to Executive Vice President. Defendant Devine resigned as the Company's Executive Vice President and CFO on October 1, 2015, and served in a non-executive role for Bridgepoint through the end of 2015. He has over 20 years of managerial financial experience. From March 2002 to December 2003, Defendant Devine served as the CFO of A-Life Medical. From 1994 to 2000, Defendant Devine served in various management roles for Mitchell International Inc. culminating in serving as CFO from 1998 to 2000. From 1987 to 1993, Defendant Devine served in various management roles for Foster Wheeler Corporation, rising to divisional CFO from 1990 to 1993. Defendant Devine earned a B.A. from Drexel University and is a certified public accountant.

27.     Throughout the Class Period, Defendant Devine spoke frequently to investors at industry conferences and on quarterly earnings calls. Defendant Devine possessed the power and authority to control the contents of the Company's public filings with the SEC. He signed and certified the accuracy of Bridgepoint's Forms 10-K and 10-K/A for the fiscal year ended December 31, 2012, Form 10-K for the fiscal year ended December 31, 2013, and Forms 10-Q for each quarterly period from March 31, 2013 through September 30, 2013.

28.     Defendant Bridgepoint and Defendant Devine are collectively referred to as "Defendants."

29.     Defendant Devine, because of his position with the Company, possessed the power and authority to control the contents of Bridgepoint's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Defendant Devine was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his position and access to material non-public information available to them, Defendant Devine knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the

positive representations which were being made were then materially false and/or misleading. Defendant Devine is liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of Defendant Devine.

## IV.  BACKGROUND

30.    Bridgepoint provides postsecondary education to students through its two wholly-owned institutions, Ashford and the University of the Rockies. Unlike most traditional postsecondary institutions, as a publically traded company Bridgepoint and its institutions' primary focus is profit, not education.

31.    Bridgepoint charges high tuitions to its students to generate large revenues and returns. These high tuition costs are vital to Bridgepoint's business model, and the majority of Bridgepoint's revenue comes from tuition.

32.    In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible. According to a 2012 Senate HELP[1] Committee Report, "Bridgepoint has experienced some of the most dramatic increases in student enrollment, Federal funds, and profit of any company examined. Along with this rapid growth, have come rapid increases in student withdrawal rates . . . . These outcomes call into question whether Bridgepoint's students are receiving an education that affords them to the ability to repay the loan debt they incurred."

33.    Without federal financial aid assistance, many of Bridgepoint's students would not choose to attend Bridgepoint's institutions, nor could they pay the tuition these institutions charge. For example, on an August 4, 2015 earnings conference call, in explaining a decline in Bridgepoint's year-over-year new enrollments, Bridgepoint's CEO cited issues applicants had with receiving financial aid assistance: "during the quarter we experienced challenges in starting all of the applicants as our potential students base increased verification scrutiny during their financial aid processing[.]"

---

[1] The U.S. Senate Committee on Health, Education, Labor, and Pensions.

## V. DEFENDANTS RESTATE REVENUES AND ACCOUNTS RECEIVABLE AND ADMIT TO RECOGNIZING REVENUE WHEN COLLECTIBILITY WAS NOT REASONABLY ASSURED

34. On May 12, 2014, Defendants stated that the Company would be unable to timely file its Form 10-Q for the first quarter of 2014 due to its efforts to quantify the impact of a change in Bridgepoint's revenue recognition policy, explaining:

> Specifically, the Company has historically not determined it necessary to reassess whether collectibility is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions.
>
> . . . [S]uch a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.

Defendants also noted that they were evaluating whether to also restate Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 due to the lack of student-by-student reassessment of revenue.

35. Defendant Devine further explained on a May 12, 2014 earnings conference call that:

> Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

36. At first Defendant Devine described this change as prospective in nature. However, a couple of weeks later, on May 30, 2014, Defendants announced that they were restating Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as a revision of the financial statements for the fiscal years ending December 31, 2012 and 2011 and the quarterly financial results for each of the three quarterly financial results during 2012, to reflect Bridgepoint's now proper revenue recognition policy. On August 4, 2014, the Company issued the restated and revised financials on an amended Form 10-K for the fiscal year ending December 31, 2013 and on amended Form 10-Qs for the three fiscal quarters for 2013.

37.     In a June 3, 2014 letter to the SEC, Defendant Devine explained that the Company now believes "that reassessment of the collectibility criteria should be performed when the Company has new information that would affect the student's ability to pay (e.g., the student is no longer eligible for FSA). If the reassessment does not support a conclusion that collectibility is reasonably assured, no new revenue should be recognized after the date of reassessment." The letter explained that certain actions by a student, such as leaving or dropping from one of Bridgepoint's institutions or attempting/failing a course that is not one of the first four courses in a payment period warrant reassessment because a student, for example, may become ineligible for financial aid.

38.     The Restatement corrected Bridgepoint's materially misstated revenue and accounts receivable figures, due to Defendants' previous "misapplication of GAAP as it related to the accounting of revenue recognition." As a result of the Restatement, Bridgepoint saw a decrease in revenue and accounts receivable:

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Difference in Revenue | Original Net Accounts Receivable[2,3] (millions) | Restated Net Accounts Receivable (millions) | Difference in Net Accounts Receivable |
|---|---|---|---|---|---|---|
| 4Q 2012 | $209.4 | $206.5 | (1.5%) | $83.1 | $69.5 | (19.6%) |
| FY 2012[4] | $968.2 | $943.4 | (2.6%) | $83.1 | $69.5 | (19.6%) |
| 1Q 2013 | $222.0 | $213.0 | (4.1%) | $83.9 | $66.5 | (26.2%) |
| 2Q 2013 | $197.6 | $193.5 | (2.1%) | $73.2 | $57.7 | (26.9%) |
| 3Q 2013 | $185.6 | $182.8 | (1.5%) | $63.1 | $55.5 | (13.7%) |
| 4Q 2013 | $163.5 | $162.2 | (0.8%) | $41.4 | $35.8 | (15.6%) |
| FY 2013 | $768.6 | $751.4 | (2.2%) | $41.4 | $35.8 | (15.6%) |

[2] Net accounts receivable includes the small amount of net student loans receivables as the change in bad debt expense reported in the Restatement reflects both receivables figures and because the Company reclassified certain accounts receivable to student loans receivable as reflected in the Restatement.

[3] Because accounts receivable figures are reported on the balance sheet, which represents a snapshot of a company's assets and liabilities on a certain date, the amounts reported for the last quarter of a fiscal year and the fiscal year will be the same.

[4] The 4Q 2012 and FY 2012 "original" figures are as reported in Bridgepoint's Form 10-K/A for the year ended December 31, 2012 filed on May 17, 2013.

39.     As part of the process of de-recognizing revenue and receivables that never should have been recorded, the Company correspondingly had to de-recognize the portion of the reported bad debt expense that was previously improperly recognized. Likewise, in correcting Bridgepoint's net accounts receivable figures, Bridgepoint had to both de-recognize the gross accounts receivable that never should have been recorded and de-recognize the related allowance to arrive at the restated net accounts receivable reported. Defendant Devine explained this as well as part of an attachment to his June 3, 2014 letter to the SEC:

> In calculating the revenue errors . . . , a corresponding bad debt expense error was also identified, as bad debt was recorded on the revenue previously recognized. As a result there is an impact to net income resulting from the **timing difference between when the Company recognizes revenue and when it would record bad debt expense or collect cash on outstanding receivables**. . . . Revenue in 2013 decreased to $752 million, which resulted in a larger prior year bad debt lag recorded in 2013 as compared to the 2013 revenue decrease. (Ex. B at 14).

40.     When a company increases its allowance for doubtful accounts, it is also recorded as a bad debt expense on a company's income statement. Thus by de-recognizing increases in Bridgepoint's allowances for doubtful accounts (relating to gross receivables that were eliminated in the Restatement), it also had to de-recognize the corresponding bad debt.

41.     During the Class Period, Bridgepoint was slow to increase its allowance for doubtful accounts and delayed the recognition of bad debt expenses for students that were assumed to have lost financial aid, even when Defendants knew, or were deliberately reckless in not knowing, that receivables stemming from revenue related to these students were not likely to be collected. As a result of the Restatement, the Bad Debt Percentage decreased back in line with Bridgepoint's historical rates, and thus the impact of the Restatement also affected net income.[5]

---

[5] The Restatement also reclassified certain of the Company's reported cash on its balance sheet as restricted cash to account for federal financial aid funds held by Bridgepoint for students that result in credit balances on a student's account.

42.     Significantly, in the Restatement Defendants admitted that:

> on the revenue recognition, the process for analyzing the collectibility assertion was not designed to reassess collectibility on a student-by-student basis throughout the period revenue was recognized by the Company's institutions. As a result, the Company has changed its revenue recognition policy and has identified adjustments, relating to revenue, provision for bad debts, accounts receivable, which should have been recognized during the prior periods[.]

43.     As explained in more detail in §VII.A, *infra*, pursuant to SEC guidance and GAAP, revenue should not be recognized until all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) *collectibility is reasonably assured*.

44.     Prior to the Restatement, Bridgepoint's revenue recognition policy failed to address whether it met any of the SEC's criteria for revenue recognition. In the Restatement, Defendants published Bridgepoint's updated revenue recognition policy, adding additional language (highlighted in bold below) to address the assessment of the collectibility criterion based on the Company's analysis of revenue to account for a student's ability to pay in certain circumstances:

> **The Company recognizes revenue when persuasive evidence of an arrangement exists, services have been rendered or delivery has occurred, our fees or price is fixed or determinable, and collectibility is reasonably assured.** The Company's revenue consists of tuition, technology fees, course digital materials and other miscellaneous fees. Tuition revenue is deferred and recognized on a straight-line basis over the applicable period of instruction net of scholarships and expected refunds[.]
>
> * * *
>
> The Company's institutions' online students generally enroll in a program that encompasses a series of five to six-week courses which are taken consecutively over the length of the program. With the exception of those students under conditional admission, the online students are billed on a payment period basis on the first day of class. The Company's institutions' campus-based students enroll in a program that encompasses a series of nine-week or 16-week courses. Campus-based students are billed at the beginning of each term. **The Company assesses collectibility at the start of a student's payment period (generally five courses for undergraduates and four courses for graduates) for the courses in that payment period.**
>
> * * *

For those students under conditional admission, the student is not obligated for payment until after their conditional admission period has lapsed, so there is no required refund. For all subsequent courses, the Company records a provision for expected refunds and reduces revenue for the amount that is expected to be subsequently refunded. Provisions for expected refunds have not been material to any period presented. If a student withdraws from a program prior to a specified date, a portion of such student's tuition is refunded, subject to certain state requirements which require a pro rata refund. **The Company reassess collectibility throughout the period revenue is recognized by the Company's institutions, on a student-by-student basis. The Company reassess collectibility based upon new information and changes in facts and circumstances relevant to a student's ability to pay. For example, the Company reassesses collectibility when a student drops from the institution (i.e., is no longer enrolled) and when a student attends a course that was not included in the initial assessment at the start of a student's payment period.**

## VI.   SUMMARY OF DEFENDANTS' FRAUD

### A.   Defendants Recognized A Significant Amount of Revenue Without Regard to Whether Actual Collection from Students Was Reasonably Assured

45.   In the Restatement, Defendants revised their revenue recognition policy as detailed in ¶44. Defendants explained that the Restatement was necessary because Bridgepoint did not reassess collectibility throughout the Class Period. However, Defendants did not publically explain that Defendants previously failed to make *any* real assessment to determine if the collectibility of Bridgepoint's revenue, on a student-by-student basis, was reasonably assured.

46.   In a February 28, 2014 letter to the SEC,[6] Defendant Devine detailed Bridgepoint's revenue process to assist the SEC in "understanding of the operations and accounting policies of the Company:"

When a student decides to attend one of the Company's institutions, the Company enters into an agreement with the student to provide educational services. The student is the responsible party under such agreement. The

---

[6] As part of Plaintiffs' continuing investigation, Co-Lead Counsel received two letters dated February 28, 2014 and June 3, 2014, well after the filing of Plaintiffs' Second Amended Class Action Complaint (Dkt. No. 57). These letters were previously withheld from Co-Lead Counsel's initial FOIA request to the SEC as part of the Company's request for confidential treatment. The letters, attached hereto as Exhibits A and B, were provided to Co-Lead Counsel in redacted form.

student has the ability to seek other sources of funding (e.g., Title IV loans,[7] military benefits, or corporate funding) for the student's payment obligations under the agreement, but the ultimate responsibility for payment remains with the student. The Company believes that it is important to emphasize that the contractual relationship is between the Company and the student. The Company records revenue by student and the accounts receivable is with each student in the Company's student management system.

47.     Despite emphasizing both the importance of the student's responsibility for payment, and Bridgepoint's admission that it accounted for revenue and accounts receivable on an individual student basis, Bridgepoint deliberately failed to assess whether the collectibility of its revenue was reasonably assured in a similar fashion.

48.     Instead, as explained by Defendant Devine in a January 2014 letter to the SEC, during the Class Period, Bridgepoint based its collectibility assessment on other sources of funding *potentially* available to students, rather than based on a student's ability to pay – the admittedly responsible party:

> [A]s of a course start date, we conclude our collectability assessment based on the government's ability to pay as opposed to a student's ability to pay. Other material funding sources include military benefits and corporate reimbursement. Similar to government funding sources, we conclude our collectability assessment based on the corporation or military branch's ability to pay and the student's eligibility, as opposed to the individual student's ability to pay

49.     Defendant Devine's letter admitted that Bridgepoint assessed the collectibility of all of its revenue based on the government's (or some other third party's) ability to pay not only the portion of revenue that is typically covered by federal financial aid funding or other third-party source of funding, but *all* revenue.

---

[7] Title IV of the Higher Education Act of 1965 ("Title IV") federal student loan programs.

50.     As evidenced by the SEC's subsequent February 12, 2014 letter responding to Defendant Devine's January 2014 letter, the SEC was perplexed that Defendants determined the collectibility of revenue to be paid by students was based on the government's, and not the student's, ability to pay:

> Considering that your bad debt expense for the nine months ended September 30, 2013 approximated 9% of total revenue and appears to relate mostly to former students, **please explain to us why it is appropriate to base your collectability assessment on the government's ability to pay.** In this regard, please tell us why you believe that collection is reasonably assured.

51.     Defendant Devine's February 28, 2014 letter explained that because Bridgepoint "historically collected approximately 93% of revenue in cash each year since 2010[, that it was] sufficient for us to assert that collectability is reasonably assured."

52.     However, Defendant Devine also admitted that the "Company has not done a formal analysis to separate collection rates of students with and without financial aid funding[, and that the] Company's accounts receivable system does not separate or categorize students with and without financial aid funding."[8]

53.     Thus, despite the fact that Defendant Devine admitted that the student was "the responsible party," that "it [was] important to emphasize that the contractual relationship is between the Company and the student," and that Bridgepoint accounted for revenue and accounts receivable on a student-by-student basis, Defendants intentionally assessed whether the collectibility of its revenue was reasonably assured in a remarkably dissonant fashion.

---

[8] Even though he earlier implied in his January 10, 2014 letter that Defendants did have some sort of way to separate out those students with and without financial aid funding: "the majority of our accounts receivable relates to students who are qualified for but have not yet obtained their Title IV funding as of their respective course start date. The remaining accounts receivable relate to non-Title IV students who receive tuition assistance from military and corporate employers or utilize personal funds."

**B.    Defendants Were, At Minimum, Deliberately Reckless in Not Separating Students With and Without Financial Aid in Bridgepoint's Accounts Receivable System**

54.    Defendant Devine explained to the SEC in the February 28, 2014 letter that basing its collectibility assurance on the government's ability to pay, and thus purposely designing an accounts receivable system that "does not separate or categorize students with or without financial aid funding," was appropriate because a "student who enters one of the Company's institutions will most likely be eligible for Title IV loans."

55.    However, Defendant Devine admitted to the SEC that only "[a]pproximately 85% of the Company's revenues are derived from students utilizing [federal financial aid] as the primary funding source for their tuition and fees, with the remaining sources of funding coming from sources such as . . . individual student payments[.]"

**1.    Defendants' Failure to Separate Students by Funding Source in Bridgepoint's Accounts Receivable System Violated GAAP**

56.    Bridgepoint's accounts receivable represents revenue due to the Company from currently enrolled and former students. Bridgepoint considers a payment to be due as of the course start date. The Company presents its accounts receivable on a net basis, *i.e.*, "at the amount management expects to collect from outstanding balances."

57.    To determine net accounts receivable, Bridgepoint's allowance for doubtful accounts reduces the Company's gross accounts receivable, *i.e.*, all outstanding balances owed. As Defendant Devine explained in his February 28, 2014 letter to the SEC, "the Company has evaluated allowance for doubtful accounts needs using a breakdown of students as active, currently attending class, or inactive, meaning no longer enrolled in courses or graduated, and their relative aging bucket."

58.    An increase in the allowance for doubtful accounts is recorded as a bad debt expense in Bridgepoint's income statement. As explained in more detail in §VII.A, *infra*, the SEC and GAAP provides guidance on estimating a company's allowance for doubtful accounts under ASC 310-10-35, which provides that a company apply its

judgment and accrue the amount of bad debt expense on groups of smaller balance homogenous loans, such as students without financial aid funding, when information is available indicating the probability of impairment (*i.e.*, that the receivable will not be paid), and that the amount is reasonably estimable.

59. Thus, under GAAP, Defendants were required to consider whether amounts due to Bridgepoint from other sources, such as from independently paying students, were reasonably likely to be paid. This necessarily required Bridgepoint to separate students with and without financial aid in its accounts receivable system.

### 2. Defendants Were Able to Readily Identify those Students With and Without Financial Aid

60. Defendant Devine admitted numerous times during his correspondence with the SEC that Bridgepoint was able to determine – at the point in time it assessed revenue recognition – which students did and did not have financial aid funding, and was even able to identify those students who only had financial aid funding for a portion of their tuition and fees; for example:

- "As of a course start date, the majority of students are eligible for financial aid, which is validated by the Company." (1/10/14 letter)

- "The Company does determine initial financial aid eligibility (e.g., Title IV loans, military benefits, or corporate funding)" (2/28/14 letter)

- "The Company's institutions take the responsibility for contacting students coming up for renewal and ensuring that they are re-qualified for the current academic years loans and PELL grants." (2/28/14 letter)

- "As of mid-2012, we employ a SEEE system for online student enrollments and financial aid packaging in which each student is assigned an advisor to support academic and financial needs throughout their enrollment. . . . Students are billed for all the courses in their current payment period, which will correspond to Title IV financial aid disbursements. This will allow a student to identify at the beginning of a payment period the total amount

needed to pay for current and future institutional charges and allow the advisor to assist with establishing any special payment arrangements that may be needed." (2/28/14 letter)

- "The Company assists in the student's application and submission for aid from the government and verifies eligibility." (6/3/14 letter)

### 3. Bridgepoint's Accounts Receivable System Was Purposely Designed to Ignore Students' Eligibility for Financial Aid

61. In the February 28, 2014 letter, Defendant Devine explained to the SEC that "the Company has evaluated allowance for doubtful accounts needs using a breakdown of students as active, currently attending class, or inactive, meaning no longer enrolled in courses or graduated, and their relative aging bucket[,]" *i.e.*, by how many days a student's account was outstanding.

62. Defendant Devine also copied Ashford's memos analyzing its accounts receivable and related allowance for doubtful accounts at December 31, 2012 and September 30, 2013. Defendant Devine explained that Ashford's accounts receivable and allowance for doubtful accounts represented 98% and 95%, respectively, of the Company's total balances for these accounts.

63. The December 2012 memo detailed the review of the reserve model (*i.e.*, how much of the total accounts receivable should be reserved in the allowance for doubtful accounts):

> We stratify student receivables by enrollment status (i.e., active and inactive) given the non-payment risk levels are different based on status. An active student is participating in their education and is interested in completing their education. . . . Inactive students who have left the institution before graduating may be no longer interested in completing their education or we may lose contact with the student, therefore hindering our ability to ensure payment.

> We also stratify student receivables by aging category. The categories are based on the disbursement and packaging. It generally takes 45 to 60 days for a student to complete the packaging process and for us to receive the first disbursement. If there are issues (such as missing documents), the student has another 60 days to resolve. Therefore, the student accounts receivable balance less than 120 days is considered to be waiting for Title IV disbursement. However, students with a receivable balance greater than 120 days are likely to have not qualified for student financing and the risk

of payment is primarily on the students' ability to pay within their existing means. In this case, the collection risk profile increases and we reserve appropriately. . . . Inherent in the model utilized is a lag until day 121 (due to 3% reserve at < 120 days and 60% (Active) or 85% (Inactive) reserve at day 121) and with the current volatility in bad debt a specific reserve should be considered. Management believes that our reserves compensate for this lag appropriately and, in turn, that aggregate reserves are reasonable to within a material amount.

64.     Thus, Defendant Devine admitted to the SEC critical failures of Bridgepoint's accounts receivable system, despite the ability of the system to stratify students. First, the accounts receivable did not even consider students without any source of financial aid funding, despite Bridgepoint's ability to easily identify these students (*see* §VI.B.2, *supra*), and thus, did not consider that students without financial aid funding are less likely to pay outstanding tuition and fees owed (*see* §VI.B.4, *infra*). Second, Bridgepoint's accounts receivable system was admittedly designed to consider receivables aged less than 121 days to have a 97% probability to be paid, despite Defendants' knowledge that the probability of collection diminishes both as time goes by and when financial aid funding is not available.

### 4.     Defendants Knew that Students Without Financial Aid Were Less Likely to Pay Tuition

#### (a)     Defendant Devine Admitted that Independent Paying Students Have Lower Collection Rates

65.     In his January 10, 2014 letter to the SEC, Defendant Devine admitted that due to an internal financial aid processing issue, a significant number of students were no longer eligible for financial aid, and were thus required "to pay their outstanding balance without financial aid assistance. Independent students have a lower collection rate than financial aid funding[.]"

66.     However, in Defendant Devine's February 28, 2014 letter, he clarified that his statement was not based on any actual historical collection experience, assessment of individual accounts receivable, or consideration of the nature of the receivable accounts, but rather, was "reflective of the fact that students with financial aid funding have one extra source of funding."

**(b)** **A Pre-Class Period Internal Processing Issue and Class Period Events Put Defendants On Notice of the Dramatically Different Collection Rates of Students With and Without Financial Aid**

**(i)** **Bridgepoint's Internal Financial Aid Processing Issue and Resulting Backlog**

67. On the first day of the Class Period, March 12, 2013, during an earnings conference call, Defendant Devine explained to investors and analysts that in the middle of 2012, Bridgepoint faced "internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years." In his January 10, 2014 letter to the SEC, Defendant Devine elaborated on the "internal processing issue:"

> In the middle of each calendar year, a material number of our continuing students are required to be packaged to qualify for Title IV financial aid as they cross over award years as defined by the Department of Education. Our student management system is an integral piece of the financial aid qualification process. . . . In 2012, we experienced technical issues with the annual upgrade of our student management system, which caused delays in packaging students.

68. On the March 12, 2013 earnings conference call, Defendant Devine assured investors that "[t]he Company has addressed this process and issues and expects that it will not repeat in 2013." But, as Defendant Devine admitted to the SEC in his January 2014 letter, "as a result of . . . the prior financial aid packaging issues, a backlog of work resulted for our financial aid and collections departments. Due to this backlog, the ability to package . . . throughout 2013 was reduced."

69. In his January 2014 letter to the SEC, Defendant Devine admitted:

> As the corrective actions took longer than anticipated, we were not able to package a significant number of students prior to the students departure from the institution and, at the time the students left the institution, they were no longer eligible for financial aid. **As a result, these students were required to pay their outstanding balance without financial aid assistance.**

70. Per the SEC's request, Defendant Devine clarified in his February 28, 2014 letter that a "significant number of students" equated to "[a]pproximately 4,500 students [that] were impacted in the initial group," in addition to students in a subsequent group

1   also losing financial aid due to the "ripple effect of th[e] initial group on a subsequent

2   group causing backlog in 2013."

3            **(ii)    A Class Period Review of Accounts Receivable Provided Defendants with a "Deeper Understanding" of How the Behavior of Students Who Left Bridgepoint Affected the Company's Account Receivable Balances**

6        71.    Also during the Class Period, Defendant Devine spearheaded a review of

7   accounts receivable after a determination that Bridgepoint's accounts receivable aging

8   was incorrect in 2012.

9        72.    On May 17, 2013, Bridgepoint issued an amended Form 10-K for the 2012

10  fiscal year (the "2012 Restatement") in order to reissue the financial statements as a

11  result of the revision for bad debt expense. A week earlier, in a Form 8-K and Form 12b-

12  25 (or "NT 10-Q") filed on May 10, 2013 and signed by Defendant Devine, Defendants

13  explained that the financial results for the first quarter of 2013 the Company had earlier

14  announced included $5.6 million in bad debt expenses that should have been reflected in

15  2012.

16       73.    Although Defendants restated the 2012 financial results to revise

17  Bridgepoint's bad debt expense, they claimed that the increase in bad debt for the year

18  was immaterial. Defendants pointed to ineffective internal controls over accounts

19  receivable as a material weakness, explaining that (1) "the process for estimating the

20  allowance for doubtful accounts in 2012 was not designed to appropriately incorporate

21  all relevant qualitative factors" and that (2) "accounts receivable aging was not correct."

22       74.    In the 2012 Restatement, Defendants also announced a purported

23  remediation plan and that Defendant Devine was responsible for implementing these

24  remedial changes and improvements. Defendants explained that they were focusing on

25  "improvements in the accounting processes, including additional oversight and review,

26  and performing additional analytical procedures," to remediate Bridgepoint's control

27  deficiencies.

28

75.     As part of the remediation plan, Defendants reported specific actions taken to improve Bridgepoint's accounts receivable in each of the 2013 quarterly financial reports. In the 2013 10-K, filed on March 17, 2014, Defendants indicated that these actions had remediated the earlier reported deficiencies. Among the improvement actions taken, were:

- implementing additional oversight and review;

- gathering insights from operational personnel to ensure a better understanding of account balances and reasons for fluctuations; and

- monitoring the receivable sub-populations to ensure a deeper understanding of how student behavior at the institutions affects related receivable balances.

76.     Part of the "monitoring the receivable sub-population" action included an examination of those accounts receivable balances of students who had withdrawn from Bridgepoint's institutions. During the May 6, 2013 earnings conference call, when answering a question on the reasons behind the "spike" in the Bad Debt Percentage, Defendant Devine touted this specific action:

> **We did a deeper analysis.** The issue that kind of caused the spike so to speak is that, in our underlying data we use to build our models, those models that certain credits applied to them **from when a student would leave the institution** or receive a credit for another reason. That created one version of kind of our aging buckets, and then we made the decision that it may be more appropriate if we kind of suppressed those credits and that created another view of the aging buckets which we feel is more appropriate.

77.     Thus, Defendants apparent gaining of a "deeper understanding of how student behavior . . . affects related receivable balances," and specifically of student behavior for those that left Bridgepoint's institutions, as part of the 2012 Restatement remediation plan, should have alerted Defendants to the fact that students without financial aid were not as likely to pay any outstanding tuition and/or fees.

**5.     Defendant Devine's Letters to the SEC Reveal that During the Class Period Defendants Had Sufficient Facts to Determine that Collection of Revenue for Independently Paying Students Was Not Reasonably Assured**

78.     The December 31, 2012 allowance analysis memo (*see* §VI.B.3, *supra*), explained that Defendants stratified student receivables by age: reserving accounts less than 120 days old at 3%, and accounts aged 121 days at either 60% or 85%, depending on whether the student was active or inactive at Bridgepoint's universities. These high percentages represent the Defendants' judgment of the probability that the Company will not be collecting the outstanding balances from these students. As the memo explained, this is because "students with a receivable balance greater than 120 days are likely to have not qualified for student financing and the risk of payment is primarily on the students' ability to pay within their existing means. In this case, the collection risk profile increases[.]" Defendant Devine also explained elsewhere in his February 28, 2014 letter that "[f]inancial aid is rarely received subsequent to 120 days."

79.     Defendants waited 120 days to account for this estimation, because "the student accounts receivable balance less than 120 days is considered to be waiting for Title IV disbursement." But Defendant Devine also explained elsewhere throughout his February 28, 2014 letter to the SEC that "the Company does determine initial financial aid eligibility[.]" (*See also* §VI.B.2, *supra*).

80.     Thus Defendants were armed with information needed with respect to a student-by-student determination of the probability of collection as of a course start date. Although the extremely high allowance estimation was for students with accounts outstanding greater than 120 days, Defendants' assigned probabilities of the likelihood of not collecting amounts owed from these students – 60% and 85% – was based upon the conclusion that the responsibility of payment most likely fell with the student. This explanation is a between-the-lines admission that Defendants knew, or were deliberately reckless in not knowing, that the probability of collection from a student without

financial aid was far from reasonably assured, even at the time when revenue was recognized.

81.   Lack of a precise estimate of the collection probability to assign to independent paying students is likewise no excuse. Indeed, Defendants admitted as such in Bridgepoint's SAB 99 analysis on the selection and application of GAAP,[9] written by Defendant Devine along with Bridgepoint's chief accounting officer, attached to Defendant Devine's June 3, 2014 letter to the SEC: "While judgment is involved in such assessment, the measurement of the revenue that should have been recognized is capable of precise measurement." (Ex. B. at 25).

82.   The 60% and 85% reserves, although also taking into account age of the receivables, served as proxies for the risk that a student would be not paying amounts owed without aid. However, if in Defendants' judgment, the collection for students without financial aid at the start of a course was not able to be reasonably estimated, then GAAP guidance provides that if collection is significantly uncertain—which the 60% and 85% proxy estimates suggests is likely so—some other method of revenue recognition, such as the cash-basis method should be used over the accrual method Bridgepoint used during the Class Period. (*See also* §VII, *infra*).

83.   Indeed, the reserve memo for September 30, 2013, included as part of Defendant Devine's February 28, 2014 letter to the SEC evidences Defendants' understanding of this GAAP guidance. One of the positive factors listed as "leading to [the] current receivable portfolio being more collectible than historical portfolio[s,]" was:

> In Q2 2013 it was determined that the tuition related to the second or greater retake of a course ***is not reasonably collectible due to financial aid shortfalls and, therefore, revenue is recognized on a cash basis*** (~$0.8 million reversed, and not recognized as revenue, in Q3 2013, $2.5 million 2013 YTD). As such, related bad debt will not exist going forward.

---

[9] The SEC's Staff Accounting Bulletin No. 99 ("SAB 99") provides guidance on materiality, and makes clear that materiality is more than a simple quantitative threshold.

**C. Defendants' Accounting for Revenue and Accounts Receivable Allowed Defendants to Manage Bridgepoint's Reported Revenue While Delaying the Reporting of Bad Debt Expenses**

84. The purpose behind separating out different types of customers (here, students) in a company's accounts receivable balances is to provide a more accurate estimate of the appropriate reserve to take for its accounts receivable, via its allowance for doubtful accounts. As the proportion of the type of customer and the conditions affecting each type of customer changes over time, this allows a company to properly estimate its allowance for doubtful accounts based on the actual mix of customers and based on the company's recent collection experience with each type of customer.

85. Defendant Devine's February 28, 2014 letter explained to the SEC that when determining the appropriate reserve to apply to its accounts receivable as of December 31, 2012 (and reported as net accounts receivable in Bridgepoint's FY 2012 10-K) Bridgepoint used its historical rates. Defendant Devine explained, however, that "management may elect to increase or decrease the reserve based on factors that may not be considered in the model (e.g., changes in the business or economic environment)." To determine if the Company should change its reserve, it performed a six-month look back analysis, which showed that the Company was at the low end of the reserve range due to internal financial aid processing issue and resulting backlog, which caused a significant number of students to not be qualified for financial aid at the time they withdrew from Bridgepoint's institutions. Rather than update the reserve percentage rate due to these events, the Company chose to keep its historical reserve percentage.

86. A similar six-month look back was performed at the end of the first quarter of 2013, which showed similar results. However, the Company again chose not to update its reserve percentages. It was not until the second quarter of 2013 during the six-month look back that the Company decided to "record its reserve based upon the most recent look back period as the best estimate of realizable value." The Company experienced similar results in the third quarter of 2013.

87.     Also in the third quarter of 2013, "the Company updated its assessment of its reserve model rates[,] . . . which "showed further deterioration from those utilized previously in the Company's allowance calculation, largely indicated by the experience over the past twelve months. With more accurate model rates and a continued lack of significant impact from the 2012 initiatives, the rates were accepted as representative of current collection behavior and the Company utilized the updated rates to record its best estimate of reserve." Defendant Devine also explained that Bridgepoint applied the increased percentages "to reserve for not only those students whose financial aid disbursement or other cash source has not been received prior to leaving the institution, but also for those active students who are expected to migrate to inactive status and leave without a financial aid disbursement or other cash source." It was only then that Defendants concluded that it would continue to "update reserve percentages on a quarterly basis[.]"

88.     By both designing its methodology for estimating allowance for doubtful accounts to not directly stratify the type of student by financial aid status (*i.e.*, those students with financial aid and those students who would be paying independently) and by applying outdated historical rates, Defendants created a mechanism that (i) recognizes revenues without consideration of the actual likelihood of Bridgepoint collecting revenue from students without financial aid, and (ii) delays the recognition of bad debt expense. As Defendant Devine admitted to the SEC, the delay in reporting of the reserves for its accounts receivable balances had the added benefit during the Class Period of allowing Bridgepoint's "operational initiatives implemented in late 2012 aimed at reducing bad debt" to hopefully kick in.

89.     When Bridgepoint restated its financial statements to eliminate revenue recognized and de-recognize net account receivables owed from students upon a change in circumstances, such as when a student withdraws from a Bridgepoint university or attends a course not in the Company's initial assessment (also both situations in which a

student is less likely to have financial aid funding due to the change in circumstances), the numbers are telling:

| Original (as Reported as part of, and after, the 2012 Restatement) (thousands) | | 12/31/12 | 3/31/13 | 6/30/13 | 9/30/13 | 12/31/13 |
|---|---|---|---|---|---|---|
| | Gross A/R[10] | $132,085 | $134,948 | $128,364 | $116,378 | $85,641 |
| | Allowance | $49,105 | $51,072 | $55,140 | $53,319 | $44,248 |
| | A/R Net | $83,070 | $83,876 | $73,224 | $63,059 | $41,393 |
| | Default Rate | 37% | 38% | 43% | 46% | 52% |
| As Restated (thousands) | Gross A/R | $102,820 | $103,026 | $95,590 | $88,269 | $64,826 |
| | Allowance | $33,361 | $36,523 | $37,868 | $32,809 | $29,045 |
| | A/R Net | $69,459 | $66,503 | $57,722 | $55,460 | $35,781 |
| | Default Rate | 32% | 35% | 40% | 37% | 45% |
| Eliminated[11] (thousands) | Gross A/R | $29,265 | $31,922 | $32,744 | $28,109 | $20,815 |
| | Allowance | $15,654 | $14549 | $17,272 | $20,510 | $15,203 |
| | A/R Net | $13,611 | $17,373 | $15,502 | $7,599 | $4,569 |
| | Default Rate | **53%** | **46%** | **53%** | **73%** | **73%** |

90.    The default rate is the allowance amount over the gross accounts receivable, and shows the probability Defendants assigned for non-collection. However, the restated default rates represent the rates for students Defendants still considered likely to be able to pay with a financial aid funding source (restated figures) and the eliminated default rates represent the students who, based on Defendants' analysis, were unlikely to have financial aid funding due to a change in the students' circumstances.

91.    The difference between the two groups of students was both consistent and dramatic: 37% vs. 73% in third quarter of 2013. Defendants had the tools and knowledge to design and implement an accounts receivable system that would stratify students with or without financial aid. Had they done so, the unusually large estimated default rate for students without financial aid funding, 73% as of September 30 and December 31, 2013, respectively, would have been readily apparent – causing both Defendants and their auditors to question whether collectibility of these accounts was reasonably assured in the first instance. Defendants' design and implementation of an "accounts receivable

---

[10] Inclusive of student loans receivable. *See* n.2, *supra*.

[11] This represents the difference in the original and restated receivable and allowance figures, *i.e.*, the portion of accounts receivable from revenue that never should have been reported.

system [that] does not separate or categorize students with and without financial aid funding" amounts, at the very least, to the turning a blind eye to critical information that was readily available to Defendants and was required to be considered in order to properly implement the Company's revenue recognition and accounts receivable policies in accordance with GAAP.

**D.    Defendants' Concluded that Bridgepoint's Errors Relating to Its Previous Revenue Recognition Policy Were Material**

92.    Defendant Devine's June 3, 2014 letter summarized that "the Company has determined that the failure to reassess collectibility upon certain changes in circumstances [when recognizing revenue] has caused its financial statements for prior periods to be materially misstated." The letter then attached the Company's SAB 99 analysis, written by Defendant Devine and Bridgepoint's chief accounting officer, which determined whether the Company's misapplication of GAAP, by previously failing to reassess the collectibility of revenue on a student-by-student basis through the period revenue was recognized, was material to the financial statements for the 2011-2013 fiscal years and individual quarterly periods within those years. The memo also admitted that: "While judgment is involved in such assessment, the measurement of the revenue that should have been recognized is capable of precise measurement."

93.    The SAB 99 memo stated: "We conclude that these adjustments are material to 2013" and that "[t]he revenue recognition errors in FY 2013 were quantitatively significant and required a restatement of the annual and interim periods. In addition, the memo further stated under the quarterly materiality conclusion that: "We conclude that the revenue recognition errors are quantitatively significant to each quarter in 2013." Defendants also noted that it would not have met revenue consensus in the first quarter of 2013 or for the 2013 fiscal year. Although for the 2012 fiscal year Bridgepoint still would not have met analysts' consensus according to the SAB 99 memo, it would have missed revenue consensus estimates by almost $44 million dollars– more than doubling the amount by which the Company missed consensus in its reported results.

94.     Although net accounts receivable decreased by more than 19% in 2012 and 2013 due to the correction of Defendants' previous failure to assess collectibility with regards to financial aid, Defendants concluded that because the total change to current assets for the 2012 balance sheet was only $8.1 million, below the materiality "rule of thumb" amount of $9.1 million, its corrections were not material – despite the fact that the adjustments to net accounts receivable and student loans receivable was $13.6 million and well above the quantitative materiality "rule of thumb" amount. Defendants also concluded that the "adjustments to current assets for the first three quarters of 2012 exceeded the "rule of thumb" threshold for that year of $9.9 million[,]" and were thus quantitatively material. However, because Defendants' qualitative assessment of materiality solely focused on its reclassification of a certain amount of cash as restricted cash, they concluded the adjustments in 2012 were not material, and that a restatement was thus not necessary.

## VII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

95.     During the Class Period, Bridgepoint filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and Annual Reports on Form 10-K, containing the Company's reported financial statements. Each of these periodic financial statements were signed by Defendant Devine. The following chart identifies the date and period covered by each report:

| BRIDGEPOINT'S QUARTERLY AND ANNUAL REPORTS FILED WITH THE SEC DURING THE CLASS PERIOD | | | |
|---|---|---|---|
| FORM | PERIOD | DATE FILED | REFERRED TO BELOW AS |
| 10-K | 2012 Fiscal Year | 3/12/2013 | FY 2012 10-K |
| 10-Q | 2013 Fiscal 1st Quarter | 5/15/2013 | 1Q 2013 10-Q |
| 10-K/A | 2012 Fiscal Year | 5/17/2013 | FY 2012 10-K/A |
| 10-Q | 2013 Fiscal 2nd Quarter | 8/6/2013 | 2Q 2013 10-Q |
| 10-Q | 2013 Fiscal 3rd Quarter | 11/5/2013 | 3Q 2013 10-Q |
| 10-K | 2013 Fiscal Year | 3/17/2014 | FY 2013 10-K |

96.     As reflected by the chart below, during the Class Period, Bridgepoint issued the following press releases announcing its financial and operating results, which were attached to Form 8-Ks filed with the SEC by the Company and were signed by Defendant Devine. These press releases contained financial statements as was included in the Company's periodic reports:

| PRESS RELEASES ISSUED BY BRIDGEPOINT DURING THE CLASS PERIOD ANNOUNCING THE COMPANY'S FINANCIAL RESULTS | | |
|---|---|---|
| *PERIOD* | *DATE* | *REFERRED TO BELOW AS* |
| 2012 Fiscal 4th Quarter and Year | 3/12/2013 | FY 2012 PR |
| 2013 Fiscal 1st Quarter | 5/6/2013 | 1Q 2013 PR |
| 2013 Fiscal 2nd Quarter | 8/6/2013 | 2Q 2013 PR |
| 2013 Fiscal 3rd Quarter | 11/5/2013 | 3Q 2013 PR |
| 2013 Fiscal 4th Quarter and Year | 3/11/2014 | FY 2013 PR |

97.     During the Class Period, Defendants made numerous materially false and misleading statements and omissions in Bridgepoint's SEC filings and during its investor conference calls. These actionable statements and omissions fall into three categories: (1) misstated historical financial results in the Company's quarterly and annual earnings press releases, and quarterly and annual SEC filings; (2) false and misleading statements concerning the Company's revenue recognition policies in annual SEC filings; and (3) false and misleading statements concerning the Company's financial results made during investor earnings conference calls.

**A.     Defendants' Violation of GAAP Resulted in False and Misleading Financial Statements**

98.     Each of Bridgepoint's financial statements issued during the Class Period, as well as the financial results that were derived from those financial statements discussed in the quarterly and annual SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP.

99.    Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Bridgepoint to comply with GAAP, which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. Specifically, SEC Regulation S-X requires that interim financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4- 01(a)(1).

100.    During the Class Period, certain of Bridgepoint's financial statements violated GAAP, rendering them materially false and misleading. The FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K financial statements, as well as the financial results that were derived from those financial statements discussed in these SEC filings and in the Company's press releases, including the FY 2012 PR, 1Q 2013 PR, 2Q 2013 PR, 3Q 2013 PR, and FY 2013 PR, were rendered false and misleading due to Defendants' failure to comply with SEC rules and GAAP.

101.    Furthermore, the fact that Bridgepoint restated its financial statements and disclosed that its financial statements issued during the Class Period should not be relied upon is an admission that they were false and misleading when originally issued. (Accounting Principles Board Opinion No. 20 at ¶¶7-13; Financial Accounting Standards Board Statement No. 154 at ¶25).

102.    The financial statements and financial results listed above in ¶100 violated GAAP, rendering them materially false and misleading because Bridgepoint failed to properly recognize revenue in these financial statements.

103.    Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases of the

1   SEC under authority of the federal securities laws are also sources of authoritative

2   GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues

3   Staff Accounting Bulletins that represent practices followed by the staff in administering

4   SEC disclosure requirements, and Staff Announcements and Observer comments at

5   Emerging Issues Task Force meetings to publicly announce its views on certain

6   accounting issues for SEC registrants. (ASC 105-10-05-1).

7       104.   Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements

8   filed with the SEC which are not prepared in compliance with GAAP are presumed to be

9   misleading and inaccurate. Regulation S-X requires that interim financial statements

10   must also comply with GAAP, with the exception that interim financial statements need

11   not include disclosures that would be duplicative of disclosures accompanying annual

12   financial statements. (17 C.F.R. §210.10-01(a)).

13       105.   The SEC prohibits the management of earnings. On September 28, 1998, in

14   response to growing concerns about registrants' managing earnings to achieve earnings

15   estimates, then-SEC Chairman Arthur Levitt gave a speech titled "The Numbers Game."

16   One earnings management gimmick that SEC Chairman Levitt addressed in his speech

17   was abusive revenue recognition practices. In response to Chairman Levitt's comments

18   regarding abusive earnings management, the SEC issued two staff accounting bulletins

19   relevant to this case to address earnings management problems: Staff Accounting

20   Bulletin No. 99 ("SAB 99"); and Staff Accounting Bulletin No. 101, Topic 13, Revenue

21   Recognition ("SAB 101, Topic 13").

22       106.   SAB 99 provides that misstatements of a financial statement item for the

23   purpose of managing earnings to mask a change in earnings or other trends or to hide a

24   failure to meet analyst consensus expectations for the enterprise are material under

25   GAAP. "It is unlikely that it is ever 'reasonable' for registrants to record misstatements

26   or not to correct known misstatements – even immaterial ones – as a part of an ongoing

27   effort directed by or known to senior management for the purposes of 'managing'

28   earnings." SAB 99.

107.   SAB 101, Topic 13, provides that revenue generally is realized or realizable and earned when all of the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the seller's price to the buyer is fixed or determinable; and (4) collectibility is reasonably assured.

108.   ASC Topic 605-10, Revenue Recognition ("ASC 605-10"), provides that revenues are not recognized until realized or realizable and earned.

109.   ASC Topic 310-10-35, Subsequent Measure of Receivables ("ASC 310-10-35") provides, under that ASC 310-10-35-6 that "[a] creditor needs to apply judgment based on individual facts and circumstances to determine what represents large groups of smaller-balance homogenous loans. Paragraphs 310-10-35-7 through 35-11 would apply to those groups of smaller-balance [receivables]."

110.   ASC 310-10-35-9 further provides that "[l]osses from uncollectible receivables shall be accrued when" available information "indicates that it is probable that an asset has been impaired" and the "amount of the loss is reasonably estimated." If those two conditions are met, "accrual **shall be made** even though the particular receivables that are uncollectible may not be identifiable."

111.   ASC 310-10-35-10 provides that "[w]hether a loss can be reasonably estimated … will normally depend on, among other things, the experience of the entity [and] information about the ability of the individual [students] to pay[.]"

112.   Finally, ASC 310-10-35-11 provides that if a company is unable to make a reasonable estimate of the amount of loss from uncollectible receivables but "there is a significant uncertainty as to collection, . . . some other method of revenue recognition [should] be used[,]" and future guidance soon to be enacted specifically suggests the cash-basis method.

113.   Further, each registrant with securities registered pursuant to Section 12 of the Exchange Act must make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets

of the registrant and must maintain internal accounting controls that are sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

114.   For the reasons set forth in §VI, *supra*, due to Defendants' failure to apply these basic accounting principles and properly recognize revenue and accounts receivable in violation of GAAP, Bridgepoint's publicly disclosed financial statements during the Class Period were prepared in violation of GAAP rules SAB 99; SAB 101, Topic 13; ASC 605-10, and ASC 310-10-35.

**B.   Materially False or Misleading Statements in the Company's Disclosure of 4Q 2012 and FY 2012 Results**

115.   On March 12, 2013, Bridgepoint issued its FY 2012 PR and FY 2012 10-K in which the Company reported revenue of $209.4 million for the fourth quarter of 2012 and $968.2 million in revenue for the 2012 fiscal year, and net accounts receivable of $75.2 million and net student loans receivable of $15.1 million as of December 31, 2012. Also on that day, Defendant Devine participated in a quarterly conference call with analysts, during which he reiterated the financial results reported in the press release. Later, on May 17, 2013, Bridgepoint filed an amended report of Bridgepoint's 4Q and FY 2012 financial results on the FY 2012 10-K/A. The FY 2012 10-K/A repeated the earlier reported revenue of $209.4 million for the fourth quarter of 2012, $968.2 million in revenue for the 2012 fiscal year, and net student loans receivable of $15.1 million as of December 31, 2012, but reported revised net accounts receivable of $67.9 million as of December 31, 2012.

116.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's 2012 fourth quarter and fiscal year reported revenue in Bridgepoint's FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call by overstating the fourth quarter of 2012 revenue by $2.9 million from $209.4 million to revised revenue of $206.5 million, and overstating revenue for the 2012 fiscal year by $24.8 million dollars from $968.2 million to revised revenue of

$943.4 million. Net accounts receivable was similarly revised downward to $54.5 million and student loans were revised downward to $14.97 million, combined net accounts and net student loans receivables as of December 31, 2012 were overstated by $13.6 million, from previously reported net accounts receivable of $67.9 million and net student loans receivable of $15.1 million as of December 31, 2012.

117.   The materially false and misleading statements regarding Bridgepoint's revenue and net accounts and student loans receivables in the FY 2012 PR, FY 2012 10-K, FY 2012 10-K/A, and on the March 12, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

118.   In the "Critical Accounting Policies and Use of Estimates" section, under the heading "Revenue Recognition," the FY 2012 10-K and FY 2012 10-K/A described Bridgepoint's revenue recognition policies in pertinent part as follows:

> The majority of our revenue comes from tuition revenue and is shown net of scholarships and refunds. Tuition revenue is recognized on a straight-line basis over the applicable period of instruction[.]
>
> * * *
>
> If a student withdraws from a program prior to certain dates, the student is entitled to a refund of a portion of tuition, depending on the date the student last attended a class. . . . [I]f an online student drops a class and the student's last date of attendance was in the first week of class, the student receives a full refund of the tuition for that class. If an online student drops a class and the last date of attendance was in the second week of the class, the student receives a refund of 50% of the tuition for that class. If an online student drops a class and the student's last date of attendance was after the second week of the class, the student is not entitled to a refund. We monitor student attendance in online courses through activity in the online program associated with that course. After two weeks have passed without attendance in a class by the student, the student is presumed to have dropped the course as of the last date of attendance, and the student's tuition is automatically refunded to the extent the student is entitled to a refund based on the refund policy above. We estimate expected refunds based on historical refund rates and record a provision to reduce revenue for the amount that is expected to be refunded. Refunds issued by us for services that have been provided in a prior period have not historically been material. Future changes in the rate of student withdrawals may result in a change to expected refunds and would be accounted for prospectively as a change in estimate.

119.   As disclosed in the Restatement, Defendants omitted to state material facts necessary to make the statements in the preceding paragraph not misleading by omitting

the highlighted language in ¶44. These material omissions were also made with scienter for the reasons set forth in §VI, *supra*.

120.   Additionally, on the March 12, 2013 earnings conference call, Defendant Devine, in his opening remarks, stated:

> In the fourth quarter, the increase in bad debt was related to internal processing issues involving existing students and the timeliness of their financial aid packaging for their new academic years. ***The Company has addressed this process and issue and expects that it will not repeat in 2013.***

121.   The highlighted statement in the preceding paragraph was materially false and misleading and made with scienter because at this time Defendant Devine knew, or was deliberately reckless in not knowing, that the internal processing issue was not a one-time issue and had not been resolved. Rather, the problem was getting worse because as Defendants subsequently admitted to the SEC, the internal financial aid processing issue continued to create a backlog in Bridgepoint's ability to package students throughout 2013, which resulted in the higher Bad Debt Percentage throughout 2013 (§VI.B.4.b).[12]

### C.   Materially False or Misleading Statements in the Company's Disclosure of 1Q 2013 Results

122.   On May 6, 2013, Bridgepoint issued the 1Q 2013 PR announcing its quarterly results for the first quarter of 2013. For the quarter, the Company reported revenue of $222 million, beating the analyst consensus for revenue expectation, net accounts receivable of $71 million, and net student loans receivable of $14.5 million, as of March 31, 2013. Also on that day, Defendant Devine participated in a quarterly conference call with analysts, during which he reiterated the financial results reported in the press release. On May 15, 2013, Bridgepoint filed its 1Q 2013 10-Q, in which the reported revenue and net student loans receivable numbers from the 1Q 2013 PR were repeated, and slightly revised net accounts receivable of $69.4 million was reported.

---

[12] As explained earlier, the increased "bad debt" was really revenue that never should have been recorded.

123.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's first quarter of 2013 reported revenue in Bridgepoint's 1Q 2013 PR, 1Q 2013 10-Q, and on the May 6, 2013 earnings conference call by overstating revenue by $7 million from $222 million to revised revenue of $213 million. Net accounts receivable was similarly revised downward to $51.8 million from $69.4 million. Though net student loans receivable slightly increased to $14.7 million, the combined net accounts and net student loans receivables as of June 30, 2013 were overstated by $17.4 million, from previously reported net accounts receivable of $69.4 million and net student loans receivable of $14.5 million.

124.   The materially false and misleading statements regarding Bridgepoint's revenue and net accounts and student loans receivables in the 1Q 2013 PR, 1Q 2013 10-Q, and on the May 6, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**D.   Materially False or Misleading Statements in the Company's Disclosure of 2Q 2013 Results**

125.   On August 6, 2013, Bridgepoint issued the 2Q 2013 PR announcing its financial results for the second quarter of 2013. The Company reported revenue of $197.6 million for the quarter, in line with management's and analyst consensus. The Company also reported net accounts receivable of $60.5 million and net student loans receivable of $12.7 million as of June 30, 2013. Also on that day, Defendant Devine participated in a quarterly conference call with analysts, during which he reiterated the financial results reported in the press release. Lastly, on this same day, August 6, 2013, Bridgepoint filed its 2Q 2013 10-Q, in which the reported revenue and net accounts and student loans receivable numbers from the 2Q 2013 PR were repeated.

126.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's second quarter of 2013 reported revenue in Bridgepoint's 2Q 2013 PR, 2Q 2013 10-Q, and on the August 6, 2013 earnings conference call by overstating revenue by $4.1 million from $197.6 million to revised revenue of $193.5 million. Similarly, net

accounts receivable was revised downward to $43.4 million. Although net student loans receivable slightly increased to $14.3 million, combined net accounts and net student loans receivables as of June 30, 2013 were overstated by $15.5 million, from previously reported net accounts receivable of $60.5 million and net student loans receivable of $12.7 million as of June 30, 2013.

127.   The materially false and misleading statements regarding Bridgepoint's revenue and net accounts and student loans receivables in the 2Q 2013 PR, 2Q 2013 10-Q, and on the August 6, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**E.   Materially False or Misleading Statements in the Company's Disclosure of 3Q 2013 Results**

128.   On November 5, 2013, Bridgepoint issued the 3Q 2013 PR announcing its financial results for the third quarter of 2013. The Company reported revenue of $185.6 million for the quarter, net accounts receivable of $51.1 million, and net student loans receivable of $11.9 million as of September 30, 2013. Also on that day, Defendant Devine participated in a quarterly conference call with analysts, during which he reiterated the financial results reported in the press release. Lastly, on this same day, November 5, 2013, Bridgepoint filed its 3Q 2013 10-Q, in which the reported revenue and net accounts and student loans receivable numbers from the 3Q 2013 PR were repeated.

129.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's third quarter of 2013 reported revenue in Bridgepoint's 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call by overstating revenue by $2.8 million from $185.6 million to revised revenue of $182.8 million. Similarly, net accounts receivable was revised downward to $41.8 million. Although net student loans receivable increased slightly to $13.6 million, combined net accounts and net student loans receivables as of September 30, 2013 were overstated by $7.6 million,

from previously reported net accounts receivable of $51.1 million, and net student loans receivable of $11.9 million as of September 30, 2013.

130.   The materially false and misleading statements regarding Bridgepoint's revenue and net accounts and student loans receivables in the 3Q 2013 PR, 3Q 2013 10-Q, and on the November 5, 2013 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

**F.     Materially False and Misleading Statements in the Company's Disclosure of 4Q 2013 and FY 2013 Results**

131.   On March 11, 2014, Bridgepoint issued its FY 2013 PR in which the Company reported revenue of $163.5 million for the fourth quarter of 2013 and $768.6 million in revenue for the 2013 fiscal year, both in line with analyst consensus. The Company also reported net accounts receivable of $28.6 million and net student loans of $12.8 million as of December 31, 2013. Also on that day, Defendant Devine participated in a quarterly conference call with analysts, during which he reiterated the financial results reported in the press release. On March 17, 2014, Bridgepoint filed its FY 2013 10-K, in which the reported revenue and net accounts and student loans receivable numbers from the FY 2013 PR were repeated.

132.   As disclosed in the Restatement, Defendants materially misstated Bridgepoint's fourth quarter and 2013 fiscal year reported revenue in Bridgepoint's FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call by overstating fourth quarter of 2013 revenue by $1.3 million from $163.5 million to revised revenue of $162.2 million, and overstating revenue for the 2013 fiscal year by $17.2 million dollars from $768.6 million to revised revenue of $751.4 million. Similarly, net accounts receivable was revised downward to $23 million as of December 31, 2013. Though net student loans receivable was unchanged in the Restatement, combined net accounts and net student loans receivables as of December 31, 2013 were overstated by $5.6 million, from previously reported net accounts receivable of $28.6 million and net student loans receivable of $12.8 million as of December 31, 2013.

133.   The materially false and misleading statements regarding Bridgepoint's revenue and net accounts and student loans receivables in the FY 2013 PR, FY 2013 10-K, and on the March 11, 2014 earnings conference call were also made with scienter for the reasons set forth in §VI, *supra*.

134.   In the "Critical Accounting Policies and Use of Estimates" section, under the heading "Revenue Recognition," the FY 2013 10-K described Bridgepoint's revenue recognition policies in pertinent part as follows:

> The majority of our revenue comes from tuition revenue and is shown net of scholarships and refunds. Tuition revenue is recognized on a straight-line basis over the applicable period of instruction[.]
>
> * * *
>
> If a student withdraws from a program prior to certain dates, the student is entitled to a refund of a portion of tuition, depending on the date the student last attended a class. . . . [I]f an online student drops a class and the student's last date of attendance was in the first week of class, the student receives a full refund of the tuition for that class. If an online student drops a class and the last date of attendance was in the second week of the class, the student receives a refund of 50% of the tuition for that class. If an online student drops a class and the student's last date of attendance was after the second week of the class, the student is not entitled to a refund. We monitor student attendance in online courses through activity in the online program associated with that course. After two weeks have passed without attendance in a class by the student, the student is presumed to have dropped the course as of the last date of attendance, and the student's tuition is automatically refunded to the extent the student is entitled to a refund based on the refund policy above. We estimate expected refunds based on historical refund rates and record a provision to reduce revenue for the amount that is expected to be refunded. Refunds issued by us for services that have been provided in a prior period have not historically been material. Future changes in the rate of student withdrawals may result in a change to expected refunds and would be accounted for prospectively as a change in estimate.

135.   As disclosed in the Restatement, Defendants omitted to state material facts necessary to make the statements in the preceding paragraph not misleading by omitting the highlighted language in ¶44. These material omissions were also made with scienter for the reasons set forth in §VI, *supra*.

**G.    Defendant Devine's Materially False and Misleading Sarbanes-Oxley Certifications**

136.    Each of Bridgepoint's FY 2012 10-K, 1Q 2013 10-Q, FY 2012 10-K/A, 2Q 2013 10-Q, 3Q 2013 10-Q, and FY 2013 10-K contained Sarbanes-Oxley required certifications, signed by Defendants Devine, who certified:

1.    I have reviewed this Quarterly Report on Form 10-Q of Bridgepoint Education, Inc.:

2.    *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report:*

3.    *Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report:*

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared:

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, *to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles:*

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation: and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

    a.  ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information: and***

    b.  ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

137.    As admitted in the Restatement, the statements set forth in the preceding paragraph were materially false and misleading when issued. Contrary to Defendant Devine's certifications that Bridgepoint's internal controls over financial reporting were "effective" and were designed "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements," Bridgepoint's management, including Defendant Devine, concluded in the Restatement that the Company's disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013, and December 31, 2013:

> Our management has concluded that there are two material weaknesses in internal control over financial reporting, as **we did not maintain effective controls over the selection and application of GAAP related to revenue recognition** and restricted cash. Specifically, the members of our management team with the requisite level of accounting knowledge, experience and training commensurate with our financial reporting requirements did not analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances. **One control deficiency related to our failure to maintain effective internal controls over the accounting for revenue recognition. Specifically, the process for analyzing the collectibility criterion for revenue recognition was not designed to reassess collectibility, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions. This control deficiency resulted in the misstatement of our revenue, bad debt expense, and accounts receivables and related financial disclosures,** and resulted in the restatement of the Company's consolidated financial statements for the year 2013 and each of the quarters of 2013 and revision of the Company's consolidated financial statements for the years 2012 and 2011 and each of the quarters of 2012 and 2011.

138.   Each of the statements listed in ¶136 were also made with scienter for the reasons set forth in §VI, *supra*.

## VIII.  LOSS CAUSATION

139.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

140.   The truth regarding Bridgepoint's falsely reported revenue in violation of the collectibility criterion was partially revealed, and/or the concealed risks materialized, on or about: March 11, 2014; May 12, 2014; and May 30, 2014. As a direct result of these partial disclosures, the price of Bridgepoint's stock declined precipitously on heavy trading volume.

141.   During the Class Period, investors were focused on the Company's declining revenues and increasing Bad Debt Percentage.

142.   The damage suffered by Plaintiffs and other members of the Class was a direct result of Defendants' deliberate assessment of the collectibility of revenue without regard to assessing whether Bridgepoint's actual students had the ability to pay what those students owed, allowing Defendants to overstate Bridgepoint's revenues and accounts receivable during the Class Period in Bridgepoint's financial statements and financial results, and the subsequent significant decline in the value of Bridgepoint securities when the truth regarding Defendants' fraudulent recognition of revenue in violation of the collectibility criterion was revealed.

143.   On March 11, 2014, Bridgepoint preliminarily announced its fourth quarter and 2013 fiscal year financial results in its FY 2013 PR. In the press release, Defendants reported revenue of $163.5 million for the quarter and $768.6 million for the year and bad debt expenses of $72.3 million for the year. Additionally, from the reported bad debt expense for the year, investors and analysts were able to discern bad debt expenses for the fourth quarter of 2013 of $18.7 million, or 11.4% of quarterly revenues.

144.   Later that day, Defendants held an earnings call in which the financial results were reiterated and explained that the increase in operating costs (called

instructional costs and services) for Bridgepoint's 2013 fiscal year was due in great part to higher bad debt expenses for the year. Also on this call, Defendant Devine, along with Bridgepoint's CEO, fielded questions relating to the uptick in the Bad Debt Percentage for the quarter:

> TIMO CONNOR: Okay, thanks. Then final one for me, bad debt expense ticked up in the quarter. What are the expectations for that for 2014? And what are more normalized levels for bad debt expense in the future?

> DAN DEVINE: It did pick up in the quarter. We expect that going forward it should be at 7% or below for 2014, and our goal is to drive it below that number.

> \* \* \*

> JEFF SILBER, ANALYST, BMO CAPITAL MARKETS: Just to follow-up on the question, why did bad debt expense tick up so much?

> ANDREW CLARK: Why did it spiked up so much? We discussed it last quarter. We're finishing basically our final completion of the adjustments we made to our model.

145.   On this news, the price of Bridgepoint's stock tumbled, falling 15.73% or $2.99 per share, to close at $16.02 on March 11, 2014, on unusually heavy trading volume.

146.   The disclosures on March 11, 2014, partially revealed or the concealed risks partially materialized that the higher than historical Bad Debt Percentage was not "work[ing] its way back down over several quarters" as Defendant Devine had earlier explained. The bad debt expense reflected the eventual result of revenues and receivables fraudulently recorded during 2013 (and which never should have been recorded) being written off as uncollectable. Indeed, the March 11, 2014 disclosures indicated to investors and analysts that the higher Bad Debt Percentages the Company had been experiencing during the Class Period may not be due solely to Bridgepoint's (allegedly one-time and resolved) 2012 internal processing issues or Defendants' change in the accounts receivable model, and could be more indicative of a deeper seeded problem with Bridgepoint's operations. For example, on March 12, 2014, an analyst for Deutsche Bank noted that the weak financial results for the fourth quarter "suggest that to hit their start growth guidance in 4Q it came at a significant economic cost, with rising bad debt

and weak persistence." The same analyst also commented that "[l]ingering concerns that Bridgepoint is sacrificing student quality for growth will likely persist until rising bad debt trends reverse and persistence improves YoY."

147.   On May 12, 2014, in a press release attached to a Form 8-K filed with the SEC, Defendants announced Bridgepoint's preliminary first quarter of 2014 financial and operating results. Also in this press release, Defendants explained that the Company would be unable to timely file its financial results for the first quarter of 2014 on Form 10-Q, stating:

> The Company is working to quantify the impact of an outstanding comment the Company received from the Securities and Exchange Commission. The comment was received in connection with the SEC's review of the Company's periodic reports, and **relates to the Company's revenue recognition policy and accounting for doubtful accounts. Specifically, the Company has historically not determined it necessary to reassess whether collectability is reasonably assured on a student-by-student basis when recognizing revenue subsequent to a student's initial enrollment with the Company's institutions.** On May 2, 2014, the SEC informed the Company that such a reassessment is required under accounting principles generally accepted in the United States upon certain changes in circumstances, such as when a student loses financial aid eligibility.

Defendants also disclosed that they were evaluating whether a restatement of Bridgepoint's financial results for the periods from January 1, 2011 through December 31, 2013 was necessary due to the lack of student-by-student reassessment.

148.   Later that day, on an earnings conference call, and Defendant Devine admitted that the Company's prior revenue recognition policy was incorrect: "Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense."

149.   The following day Defendant Devine, on behalf of Bridgepoint, filed a notification of late filing for the first quarter of 2014 on Form 12b-25 with the SEC. The notice largely reiterated the previous day's announcement.

150.   On this news, shares of Bridgepoint declined an additional $1.41 per share,

nearly 9%, to close on May 12, 2014 at $14.51 per share on unusually heavy trading volume. The following day, Bridgepoint's share price continued to fall another 3.17%, or $0.46 per share, to close on May 13, 2014 at $14.05 per share.

151. On May 30, 2014, after the market closed, Bridgepoint announced in a Form 8-K filed with the SEC that one week earlier, Bridgepoint's management concluded that there were "material misstatements of revenue, bad debt expense and accounts receivable" for each of the reported financial results in the Class Period, fully revealing the extent of Defendants' reckless accounting errors in recognizing revenues during the Class Period and its effect on Bridgepoint's Bad Debt Percentage.

152. The May 30, 2014 disclosure also revealed that there were material weaknesses over financial reporting, "[s]pecifically, the process for analyzing the collectibility criterion for revenue recognition was not designed appropriately to reassess collectibility of funds owed by students, on a student-by-student basis, throughout the period revenue was recognized by the Company's institutions." Defendants also provided an estimate of what restated revenue and expenses would be for the 2013 fiscal year: estimating a revenue decrease of around $15 to $20 million along with an even larger decrease in bad debt expense of $23.2 to $26.2 million.

153. On this news, shares of Bridgepoint declined 1.31%, or $0.17 per share, to close on June 2, 2014 at $12.82 per share, the first trading day after the May 30, 2014 press release, on heavy trading volume.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

154. Defendant Devine acted with scienter by virtue of: (a) his receipt of information reflecting the Company's improper revenue recognition and accounting for accounts receivable; and/or (b) his failure to properly assess collectibility of revenues from the ultimate responsible party's ability to pay; and/or (c) his intentional issuance of materially false or misleading financial statements which improperly recognized revenue and accounts receivable; and/or (d) his ultimate responsibility to ensure the accuracy of such statements and his reckless failure to do so. Defendant Devine knew or was

deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

155.   Defendant Devine also knew or was deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. Defendant Devine acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiffs and the Class.

156.   In addition to the foregoing allegations, the following facts support a strong inference that Bridgepoint and Defendant Devine knew, or with deliberate recklessness disregarded, that the challenged statements alleged herein were materially false or misleading when made**.**

**A.     Bridgepoint's Competitors Were Similarly Contacted By the SEC Regarding Revenue Recognition Policies**

157.   The SEC similarly contacted at least ten other companies in the for-profit post-secondary education sector concerning their revenue recognition policies. In these communications, the SEC requested the other companies to explain if they reassess whether collectability is reasonably assured when a student withdraws and becomes responsible for any unpaid balances, and to describe their historical collections experience with students who become responsible for owed balances due to withdrawal or loss of financial aid, and/or to explain their assessment of whether revenue was reasonably assured.

158.   Although the majority of these competitors similarly did not reassess collectibility of revenue upon a change in a students' circumstances prior to SEC correspondence, none of Bridgepoint's competitors were forced to restate their financial statements, unlike Bridgepoint.

159.   This is likely so because, based on their explanations to the SEC, these companies did not delay their assessment of collectibility, in contrast to Bridgepoint's

significant delay. For example, American Public Education, Inc. ("APE") explained that the "the [c]ompany believes that it is in compliance with GAAP because it properly accrues revenue and assesses the collectability of its accounts receivables at the time the receivables are created and records the appropriate reserve and bad debt expense." When asked to clarify how APE concluded that the collection of receivables from students outside of financial aid was reasonably assured, APE responded with a list of five detailed criteria, including review and verification of a student and further review of students with patterns suggesting potential credit abuse. APE further explained that it stratified its accounts receivable based upon students' various payment situations, including students who may be eligible for financial aid, students with deficits beyond provided financial aid, and students who have no financial aid, and that APE continually monitors all subcategories of its accounts receivable.

160.   In another example, SEC correspondence with Apollo Education Group, Inc. ("Apollo") detailed Apollo's evaluation of whether collectibility of revenue was reasonably assured prior to a student attending class. Apollo listed various factors it considered in its evaluation, including the fact that for students without federal financial aid, Apollo collected tuition ***prior*** to a student's attendance. Apollo further noted that "We continuously monitor our historical collections to identify potential trends that may impact our determination that collectability of revenue is reasonably assured. Our bad debt expense as a percentage of net revenue was 2.3% and 1.7% during fiscal year 2013 and the first six months of fiscal year 2014, respectively."

161.   Similarly, Capella Education Company ("Capella") explained to the SEC that it evaluates "whether collectability of revenue is reasonably assured prior to the time a learner begins a course[,]" and listed five factors, specifically noting that for "learners that do not elect Title IV funding as their primary payment option, the University reviews relevant funding materials specific to that individual." Capella also explained that it did reassess collectibility when a "learner" withdrew from a course, and that if the

learner was withdrawn or withdraws from the university, it reassessed collectibility of revenue at that time through its allowance for doubtful accounts process.

**B.    The Multitude of Government Investigations Concerning Bridgepoint's Revenue Accounting and Administration of Financial Aid Programs Adds to the Inference of Scienter**

162.   On July 25, 2014, shortly after the end of this Class Period, Bridgepoint disclosed that the SEC was investigating its accounting practices, including revenue recognition and receivables, in addition to other matters relating to Bridgepoint's forthcoming Restatement and the prior 2012 Restatement. Not only did the SEC issue this subpoena for the revised and restated time periods, but requested documents and information dating back to July 1, 2009 to the present.

163.   On May 18, 2016, the SEC expanded the investigation to include Bridgepoint's "scholarship and institutional loan programs and any other extensions of credit made by the Company to students, and student enrollment and retention at the Company's academic institutions" from as early as January 1, 2014.

164.   On August 25, 2014, the U.S. Department of Education commenced a review of Ashford's administration of federal student financial aid programs for the 2012-2013 and 2013-2014 financial aid years. On July 12, 2016, via a Form 8-K filed with the SEC, Bridgepoint announced that the Department of Education would shortly commence an off-site program review of Ashford's administration of federal student financial aid programs for certain students identified in the 2009-2012 calendar years.

165.   Lastly, in the July 12, 2016 Form 8-K, Bridgepoint also announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act." The Department of Justice's investigation relates to fiscal years 2011-2014, encompassing the entirety of this Class Period.

## C.     Bridgepoint's Ineffective Internal Controls

166.   Defendant Devine's knowledge or deliberate recklessness is also evidenced by the fact that he personally reviewed the internal controls and took ultimate authority over remediating Bridgepoint's internal controls as part of the purported 2012 Restatement remediation plan (*see* §VI.B.4.b)(ii), *supra*). In the Restatement, Bridgepoint also disclosed that it had identified "material weaknesses" in its "internal control over financial reporting." These material weaknesses included the Company's failure to:

- analyze certain accounting issues at the level of detail required to ensure the proper application of GAAP in certain circumstances;

- maintain effective internal controls over the accounting for revenue recognition; and

- maintain effective internal controls over the presentation of certain funds as restricted cash.

167.   To remediate these material weaknesses, Bridgepoint represented that it planned to implement the following measures: "additional training efforts," "ensuring appropriate review of the related significant accounting policies by the members of management with the requisite level of knowledge, experience and training to appropriately apply GAAP," and undertaking "additional review processes to ensure the related significant accounting policies are implemented and applied properly on a consistent basis throughout the Company." However, as the Defendants later admitted in the Restatement, management was not appropriately applying GAAP as it relates to properly recognizing revenue.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

168.   The market for Bridgepoint's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Bridgepoint's securities traded at artificially inflated prices during the Class Period. On October 29, 2013, the Company's stock

closed at a Class Period high of $20.16 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bridgepoint's securities and market information relating to Bridgepoint, and have been damaged thereby.

169.   During the Class Period, the artificial inflation of Bridgepoint's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bridgepoint's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Bridgepoint and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

170.   At all relevant times, the market for Bridgepoint's securities was an efficient market for the following reasons, among others:

  a.   Bridgepoint stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

  b.   As a regulated issuer, Bridgepoint filed periodic public reports with the SEC and/or the NYSE;

  c.   Bridgepoint regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d.     Bridgepoint was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and/or

e.     The average daily trading volume for Bridgepoint securities during the Class Period was approximately 363,248 shares with almost 45 million shares of stock outstanding as of March 10, 2014, and a market capitalization reaching approximately $1.092 billion during the Class Period.

171.   As a result of the foregoing, the market for Bridgepoint's securities promptly digested current information regarding Bridgepoint from all publicly available sources and reflected such information in Bridgepoint's stock price. Under these circumstances, all purchasers of Bridgepoint's securities during the Class Period suffered similar injury through their purchase of Bridgepoint's securities at artificially inflated prices and a presumption of reliance applies.

172.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   NO SAFE HARBOR

173.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in

this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bridgepoint who knew that the statement was false when made.

174. As a result of the foregoing, the market for Bridgepoint's securities promptly digested current information regarding Bridgepoint from all publicly available sources and reflected such information in Bridgepoint's stock price. Under these circumstances, all purchasers of Bridgepoint's securities during the Class Period suffered similar injury through their purchase of Bridgepoint's securities at artificially inflated prices and a presumption of reliance applies.

## XII.   CLASS ACTION ALLEGATIONS

175. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Bridgepoint's securities between March 12, 2013 and May 30, 2014, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

176. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bridgepoint's securities were actively

traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Bridgepoint shares were traded publicly during the Class Period on the NYSE. As of March 10, 2014, Bridgepoint had 44,979,199 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Bridgepoint or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

177.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

178.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

179.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bridgepoint;

c.   whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.   whether the price of Bridgepoint securities were artificially inflated because of Defendants' conduct complained of herein; and

e.     to what extent the members of the Class have sustained damages and the proper measure of damages.

180.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII.  COUNTS

**FIRST CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against Defendant Bridgepoint and Defendant Devine**

181.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

182.   During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Bridgepoint's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

183.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bridgepoint's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

184.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bridgepoint's financial well-being and prospects, as specified herein.

185.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bridgepoint's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bridgepoint and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

186.   Defendant Devine's primary liability, and controlling person liability, arises from the following facts: (i) Defendant Devine was a high-level executive at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) by virtue of his responsibilities and activities as a senior officer of the Company, Defendant Devine was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Defendant Devine enjoyed significant personal contact and familiarity with the other executives at the Company and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Defendant Devine was aware of the Company's dissemination of information to the investing public which he knew and/or recklessly disregarded was materially false and misleading.

187.   The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bridgepoint's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

188.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bridgepoint's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Bridgepoint's securities during the Class Period at artificially high prices and were damaged thereby.

189.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Bridgepoint was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Bridgepoint securities, or, if they had acquired such securities

1   during the Class Period, they would not have done so at the artificially inflated prices

2   which they paid.

3          190.   By virtue of the foregoing, Defendants have violated Section 10(b) of the

4   Exchange Act and Rule 10b-5 promulgated thereunder.

5          191.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs

6   and the other members of the Class suffered damages in connection with their respective

7   purchases and sales of the Company's securities during the Class Period.

8                          **SECOND CLAIM**
                     **Violation of Section 20(a) of**
9               **The Exchange Act Against Defendant Devine**

10         192.   Plaintiffs repeat and reallege each and every allegation contained above as

11  if fully set forth herein.

12         193.   Defendant Devine acted as a controlling person of Bridgepoint within the

13  meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-

14  level position, and ownership and contractual rights, participation in and/or awareness of

15  the Company's operations and/or intimate knowledge of the false financial statements

16  filed by the Company with the SEC and disseminated to the investing public, Defendant

17  Devine had the power to influence and control and did influence and control, directly or

18  indirectly, the decision-making of the Company, including the content and dissemination

19  of the various statements which Plaintiffs contend are false and misleading. Defendant

20  Devine was provided with or had unlimited access to copies of the Company's reports,

21  press releases, public filings and other statements alleged by Plaintiffs to be misleading

22  prior to and/or shortly after these statements were issued and had the ability to prevent

23  the issuance of the statements or cause the statements to be corrected.

24         194.   In particular, Defendant Devine had direct and supervisory involvement in

25  the day-to-day operations of the Company and, therefore, is presumed to have had the

26  power to control or influence the particular transactions giving rise to the securities

27  violations as alleged herein, and exercised the same.

28

195.   As set forth above, Bridgepoint and Defendant Devine each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of his position as a controlling person, Defendant Devine is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other and further relief as the Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  April 19, 2017

**GLANCY PRONGAY & MURRAY LLP**

By:  _s/ Robert V. Prongay_

Lionel Z. Glancy
Robert V. Prongay
Leanne Heine Solish
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: rprongay@glancylaw.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
Sara Fuks (*pro hac vice*)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On April 19, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 19, 2017, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 3:15-cv-00408-JLS-AGS Zamir v. Bridgepoint Education, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sameer Advani**
  sadvani@willkie.com,mao@willkie.com

- **John F Cannon**
  jcannon@sycr.com,ccheek@sycr.com,jklaeb@sycr.com

- **Sara Fuks**
  sfuks@rosenlegal.com

- **Lionel Z Glancy**
  info@glancylaw.com,lglancy@glancylaw.com

- **Tariq Mundiya**
  tmundiya@willkie.com,mao@willkie.com

- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,lsolish@glancylaw.com,bmurray@glancylaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com,pkim@rosenlegal.com

- **Casey Edwards Sadler**
  csadler@glancylaw.com,info@glancylaw.com

- **Daniel John Tyukody , Jr**
  TyukodyD@gtlaw.com,lalitdock@gtlaw.com,phieferd@gtlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`