UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NELDA ZAMIR, Individually and on Behalf of All Others Similarly Situated,<br><br>                                  Plaintiff,<br><br>v.<br><br>BRIDGEPOINT EDUCATION, INC., et al.,<br><br>                                Defendants. | Case No.: 15-CV-408 JLS (DHB)<br><br>**ORDER: (1) GRANTING DEFENDANTS' MOTION TO DISMISS; AND (2) DISMISSING WITH PREJUDICE PLAINTIFFS' THIRD AMENDED COMPLAINT**<br><br>(ECF No. 70) |

     Presently before the Court is Defendants Bridgepoint Education, Inc. and Daniel J. Devine's (collectively, "Defendants") Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint, ("MTD," ECF No. 70).  Also before the Court are Plaintiffs' Response in Opposition to, ("Opp'n," ECF No. 71), and Defendants' Reply in Support of, ("Reply," ECF No. 73), Defendants' Motion to Dismiss.  Additionally, Plaintiffs filed a Request for Judicial Notice, ("RJN," ECF No. 72), and Defendants' filed a Response to the Request for Judicial Notice, (ECF No. 74).  The Court vacated the hearing and took this matter under submission without oral argument pursuant to Civil Local Rule 7.1(d)(1).  (ECF No. 75.) Having considered the parties' arguments and the law, the Court **GRANTS** Defendants' Motion to Dismiss, (ECF No. 70).

/ / /

**BACKGROUND**

## I.    The Parties

Defendant Bridgepoint provides for-profit higher education through two wholly-owned subsidiaries, Ashford University and the University of the Rockies.  (Third Am. Class Action Compl. ("TAC"), ECF No. 66, ¶¶ 3, 24.)  Its common stock is publicly traded on the New York Stock Exchange.  (*Id.* ¶ 25.)

Defendant Devine served as Defendant Bridgepoint's Chief Financial Officer since January 2004 and its Executive Vice President since January 2011, resigning both positions on October 1, 2015.[1]  (*Id.* ¶ 26.)

Plaintiffs Nelda Zamir and Thomas G. Prosch both purchased Bridgepoint common stock and options during the proposed Class Period between March 12, 2013 and May 30, 2014.  (*Id.* ¶¶ 1, 23–24.)  Plaintiffs seek to bring a class action on behalf of all other similarly situated purchasers of Bridgepoint securities.  (*Id.* ¶ 1.)

## II.   Factual Background

Defendant Bridgepoint's primary source of revenue is tuition and related fees.  (*Id.* ¶ 3.)  Without federal financial aid, many of Defendant Bridgepoint's students would not choose to attend Bridgepoint's institutions, nor could they pay the tuition these institutions charge.  (*Id.* ¶ 33.)

In mid-2012, Bridgepoint experienced technical issues during an annual upgrade of its student management system.  (*Id.* ¶ 67.)  These technical issues resulted in delays in packaging students for financial aid qualification in between financial aid award years.  (*Id.*)  As a result, a significant number of students were not packaged prior to departing Bridgepoint's institutions and were consequently not eligible for financial aid funding.  (*Id.* ¶ 69.)  These students were therefore required to pay outstanding balances without the assistance of financial aid.  (*Id.*)

---

[1] The Parties filed a Joint Motion to dismiss, now former defendant, Defendant Andrew S. Clark from the action, which the Court granted, (ECF No. 65).

On March 12, 2013, Bridgepoint reported an increase in its bad debt expense for the fourth quarter of 2012 and the 2012 fiscal year. (*See id.* ¶ 115.) Defendant Devine explained to investors and analysts on an earnings conference call that Bridgepoint's technical issues were to blame, but that he did not expect the issue to repeat in 2013. (*Id.* ¶ 68.) On May 17, 2013, Bridgepoint issued an amended Form 10-K for the 2012 fiscal year to reissue its financial statements ("2012 Restatement"). (*Id.* ¶ 72.)

Despite Defendant Devine's assurances to the contrary, the 2012 technical issues caused a backlog in packaging financial aid throughout 2013. (*Id.* ¶ 70.) Consequently, Bridgepoint continued to report higher than normal bad debt expenses as a percentage of revenues. (*Id.* ¶ 13.)

On December 11, 2013, the United States Securities and Exchange Commission ("SEC") contacted Defendant Devine with comments and questions regarding Bridgepoint's declining enrollments but increased revenue for the 2012 fiscal year.[2] (*See* Second Am. Compl. ("SAC"), ECF No. 57, ¶¶ 47, 65.) The SEC also asked Defendant Devine how Bridgepoint's internal processing issues with financial aid packages had affected its bad debt percentage. (*Id.* ¶ 65.) Defendant Devine's January 10, 2014 response detailed Bridgepoint's 2012 technical issues and the backlog affecting financial aid packaging through 2013. (TAC ¶ 65.) In response to the SEC's inquiry regarding Bridgepoint's determination that collectability is reasonably assured, Defendant Devine noted that Bridgepoint "conclude[s its] collectability assessment based on the government's ability to pay as opposed to a student's ability to pay." (*Id.* ¶ 48.) Defendant Devine's response prompted the SEC to ask for additional information on February 12, 2014, including "why it is appropriate to base your collectability assessment on the government's ability to pay." (*Id.* ¶ 50 (emphasis omitted).)

On March 11, 2014, Bridgepoint announced its preliminary fourth quarter and 2013

---

[2] Plaintiffs appear to omit this factual allegation from their TAC, but the Court references their SAC for the purpose of providing full background context.

fiscal year financial results in a press release. (*Id.* ¶ 131.) Later that day, Defendants held an earnings call, during which Defendant Devine fielded questions relating to Bridgepoint's increased bad debt percentage for the quarter. (*Id.*) Following this news, the price of Bridgepoint's stock fell 15.73%, or $2.99 per share, closing at $16.02 per share following unusually heavy trading volume. (*Id.* ¶ 145.)

On May 12, 2014, Defendants announced in a press release attached to a Form 8-K that Bridgepoint would be unable to timely file its Form 10-Q for the first quarter of 2014 because "[t]he Company is working to quantify the impact of an outstanding comment the Company received from the [SEC]." (*Id.* ¶ 147.) Defendants also explained that Bridgepoint was evaluating whether to restate its financial results for the periods from January 1, 2011 through December 31, 2013. (*Id.*) Defendant Devine held an earnings conference call later that day, during which Defendant Devine admitted that Bridgepoint's prior revenue recognition policy was incorrect. (*Id.* ¶ 148.) Specifically, Defendant Devine explained that

> [u]nder previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

(*Id.*) Consequently, the price of Bridgepoint's shares declined nearly 9%, closing at $14.51 per share after unusually heavy trading volume. (*Id.* ¶ 150.)

The following day, Defendant Devine filed a notification of late filing for the first quarter of 2014 on Form 12b-25 with the SEC. (*Id.* ¶ 149.) This resulted in an additional decline of 3.17% in Bridgepoint's share price, which closed at $14.05 per share. (*Id.* ¶ 150.)

On May 30, 2014, Defendants announced that they were restating Bridgepoint's financial results for the fiscal year ending December 31, 2013 and each of the three quarterly financial results during the year, as well as revising the financial statements for the fiscal years ending in December 31, 2012 and 2011. (*Id.* ¶ 152.) On June 2, 2014, the first trading day following the press release, the price of Bridgepoint's shares declined by

1.31%, or $0.17 per share, closing at $12.82. (*Id.* ¶ 153.) Bridgepoint issued its restated 2013 financials on August 4, 2014 ("2014 Restatement"). (*Id.* ¶¶ 4, 36.)

As a result of the 2014 Restatement, Bridgepoint saw a decrease in revenues, but a corresponding increase in net income and decrease in its bad debt expense:

| Financial Period | Original Revenue (millions) | Restated Revenue (millions) | Difference in Revenue | Original Net Accounts Receivable (millions) | Restated Net Accounts Receivable (millions) | Difference in Net Accounts Receivable |
|---|---|---|---|---|---|---|
| 4Q 2012 | $209.4 | $206.5 | (1.5%) | $83.1 | $69.5 | (19.6%) |
| FY 2012 | $968.2 | $943.4 | (2.6%) | $83.1 | $69.5 | (19.6%) |
| 1Q 2013 | $222.0 | $213.0 | (4.1%) | $83.9 | $66.5 | (26.2%) |
| 2Q 2013 | $197.6 | $193.4 | (2.1%) | $73.2 | $57.7 | (26.9%) |
| 3Q 2013 | $185.6 | $182.8 | (1.5%) | $63.1 | $55.5 | (13.7%) |
| 4Q 2013 | $163.5 | $162.2 | (0.8%) | $41.4 | $35.8 | (15.6%) |
| FY 2013 | $768.6 | $751.4 | (2.2%) | $41.4 | $35.8 | (15.6%) |

(*Id.* ¶ 38.)

On July 25, 2014, Bridgepoint disclosed that the SEC was investigating its accounting practices, including revenue recognition and receivables. (*Id.* ¶ 162.) The SEC also issued a subpoena for the revised and restated time periods, and documents and information dating back to July 1, 2009 to the present. (*Id.*) On July 12, 2016, via a Form 8-K filed with the SEC, Bridgepoint announced that the Department of Education would commence a review of Ashford's administration of federal student financial aid programs for certain students identified in the 2009–2012 calendar year. (*Id.* ¶ 164.) In this same Form 8-K, Bridgepoint also announced that the U.S. Department of Justice was conducting an "investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act." (*Id.* ¶ 165.)

Since their Second Amended Complaint, Plaintiffs state that the SEC released to them, pursuant to a Freedom of Information Act request, two letters not previously available. (*See id.* ¶ 46 n.6.) The first letter, dated February 28, 2014, from Defendant Devine to the SEC, detailed Bridgepoint's revenue process. This letter was sent before

Defendants' 2014 Restatement. Defendant Devine stated:

> When a student decides to attend one of the Company's institutions, the Company enters into an agreement with the student to provide educational services. The student is the responsible party under such agreement. The student has the ability to seek other sources of funding (e.g., Title IV loans, military benefits, or corporate funding) for the student's payment obligations under the agreement, but the ultimate responsibility for payment remains with the student. The Company believes that it is important to emphasize that the contractual relationship is between the Company and the student. The Company records revenue by student and the accounts receivable is with each student in the Company's student management system.

(*Id.* at 46 (footnote omitted); *see also id.*, Ex. A, ECF No. 66-1.) The second letter, dated June 3, 2014, again from Defendant Devine to the SEC, summarized that "the Company has determined that the failure to reassess collectibility upon certain changes in circumstances [when recognizing revenue] has caused its financial statements for prior periods to be materially misstated." (TAC ¶ 92; *see also* Ex. B., ECF No. 66-2.) In a memo attached to the letter, Defendants admitted, "[w]hile judgment is involved in such assessment, the measurement of the revenue that should have been recognized is capable of precise measurement." (TAC ¶ 92.)

## III.    Procedural Background

Plaintiff Zamir filed an initial complaint on February 24, 2015, alleging two causes of action for violation of Section 10(b) of the Exchange Act and Rule 10b-5 and violation of Section 20(a) of the Exchange Act. (*See generally* ECF No. 1.) Plaintiffs moved for appointment as lead plaintiffs and approval of choice of counsel on April 27, 2015. (*See* ECF No. 3.) Because the motion was unopposed, (*see* ECF No. 13), the Court granted Plaintiffs' motion, (*see* ECF No. 14).

On September 18, 2015, Plaintiffs filed the First Amended Complaint, asserting the same causes of action as in the original complaint. (*See* ECF No. 17.) Several Defendants filed motions to dismiss on November 24, 2015, (*see* ECF Nos. 28, 30), and on January 11,

2016, Plaintiffs filed a Motion to Strike, (*see* ECF No. 37). The Court granted Defendants' motions to dismiss, and denied Plaintiffs' Motion to Strike. ("First MTD Order," ECF No. 53.) Thereafter Plaintiffs dismissed several named Defendants. (ECF Nos. 56, 59.) Plaintiffs filed their Second Amended Complaint on September 9, 2016. (ECF No. 57.) Defendants filed a motion to dismiss on October 24, 2016. (ECF No. 58.) The Court again granted Defendants' motion to dismiss. ("Second MTD Order," ECF No. 64.) Plaintiffs' Third Amended Complaint and Defendants' Motion to Dismiss are now pending before the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at

556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

Where a complaint does not survive 12(b)(6) analysis, the Court will grant leave to amend unless it determines that no modified contention "consistent with the challenged pleading . . . [will] cure the deficiency." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)).

"Claims brought under Rule 10b-5 . . . must meet Federal Rule of Civil Procedure 9(b)'s particularity requirement that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1016 (S.D. Cal. 2006) (alteration in original) (quoting Fed. R. Civ. P. 9(b); and citing *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1014 (9th Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006); and *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999)). "In addition, in 1995, Congress enacted the Private Securities Litigation Record Act of 1995 ("PSLRA") and altered the pleading requirements in private securities fraud litigation by requiring a complaint plead with particularity both falsity and scienter." *Id.* at 1016–17 (internal quotation marks omitted) (quoting *Daou Sys.*, 411 F.3d at 1014).

## ANALYSIS

As before, Plaintiffs assert two causes of action: (1) violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all Defendants, and (2) violation of Section 20(a) of

the Exchange Act against Defendant Devine.  (*See* TAC ¶¶ 181–95.)  Defendants ask the Court to dismiss Plaintiffs' Third Amended Complaint with prejudice.  (*See* MTD 10.)

## I.    Section 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the 'use or employ[ment] . . . of any . . . deceptive device,' (2) 'in connection with the purchase or sale of any security,' and (3) 'in contravention of' Securities and Exchange Commission 'rules and regulations.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005) (quoting 15 U.S.C. § 78j(b)).  "Commission Rule 10b-5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'"  *Id.* (quoting 17 CFR § 240.10b-5 (2004)).  "The basic elements of a Rule 10b-5 claim, therefore, are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Daou Sys.*, 411 F.3d at 1014 (citing *Dura Pharms.*, 544 U.S. at 341–42).  Defendants challenge the adequacy of Plaintiffs' allegations concerning only the second element—scienter.  (*See* MTD 5 n.1, 11; *see also* Opp'n 11.)

### A. Scienter

A private securities plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  The "required state of mind" is "scienter," i.e., "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 975 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *In re Peerless Sys., Corp. Sec. Litig.*, 182 F. Supp. 2d 982, 987–88 (S.D. Cal. 2002).  "[T]he PSLRA requires plaintiffs to plead, at a minimum, particular facts giving rise to a strong inference of deliberate or conscious recklessness."  *Silicon Graphics*, 183 F.3d at 979; *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007).  Recklessness amounts to "'an extreme departure from the standards of ordinary care, and . . . presents a

danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir. 2002) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)). To satisfy this pleading requirement, "the complaint must contain allegations of specific 'contemporaneous statements or conditions' that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001); *In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 988 (N.D. Cal. 2007). The Court must consider competing inferences that could be drawn in favor of plaintiffs or defendants and determine whether plaintiffs have pled a "strong inference" of scienter which is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Defendants argue that Plaintiffs fail to adequately plead scienter. (MTD 11–25.) Plaintiffs' Opposition brief advances three primary arguments to address the scienter requirement. First, Bridgepoint's collectability assessment was unreasonable; second, Bridgepoint's competitor's assessed collectability at the time it was recorded; and third, additional scienter allegations support Plaintiffs' argument. The Court addresses each in turn.[3]

### *1. Whether Defendants' GAAP[4] Violation Was Unreasonable*

Plaintiffs begin by arguing that Defendants knew Bridgepoint's collectability assessment violated GAAP. (Opp'n 13.) This argument remains unchanged from the Second Amended Complaint. In its prior Order, the Court agreed with Plaintiffs'

---

[3] Although the Court addresses Plaintiffs' three primary allegations individually, "it is cognizant of the duty to conduct a holistic analysis of Plaintiffs' scienter allegations. The flaws of the various allegations must be exposed as part of the Court's holistic analysis." *Westley v. Oclaro, Inc.*, No. C-11-2448 EMC, 2013 WL 2384244, at *5 (N.D. Cal. May 30, 2013). Therefore, the Court also discusses the holistic analysis at the conclusion of the Scienter section.
[4] Generally Accepted Accounting Principles ("GAAP"). *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1056 (9th Cir. 2008).

awareness argument.  Specifically, the Court concluded that

> [a]t the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted.  The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing.

(First MTD Order 13–14 (quoting *In re Medicis Pharm. Corp. Sec. Litig.*, No. CV-08-1821-PHX-GMS, 2010 WL 3154863, at \*5 (D. Ariz. Aug. 9, 2010) ("*Medicis Pharm.*"); and citing *In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1204 (D. Ariz. 2009)); *see also* Second MTD Order 10 (same).)  In its prior order, this Court determined that Plaintiffs plausibly demonstrated that "Defendant Devine was 'aware of the relevant GAAP principle and that this defendant knew how that princip[le] was being interpreted." (Second MTD Order 11 (quoting *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at \*5).)

The Court then found that Plaintiffs failed to plead sufficient factual allegations, as to the second element in *Medicis*, explaining how Defendants' "incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing." (*Id.* at 12 (quoting *Medicis Pharm.*, 2010 WL 3154863, at \*5).  Specifically, Plaintiffs allegations in both their First and Second Amended Complaints were based on "obviousness of the violations" rather than external auditors counseling against the practice or that Defendants admitted or were aware the practice was improper. (*Id.* at 14 (citations omitted).)  This Court found such allegations insufficient because Plaintiffs only identified a GAAP violation and argued that a "correct interpretation was simple or obvious." (*Id.* (quoting *Medicis Pharm.*, 2010 WL 3154863, at \*5).)

Plaintiffs argue the two previously unavailable letters from Defendants to the SEC, attached as exhibits to their Third Amended Complaint, meet the Court's previous concern that Defendants' GAAP violation was so unreasonable or obviously wrong. (Opp'n 14.) According to Plaintiffs, the new allegations satisfy the second prong of *Medicis*

*Pharmaceutical*: that Defendants' interpretation of its revenue collectability assessment, in which they assumed that all revenue would be paid by the government, rather than actually performing a collectability assessment, is on its face both unreasonable and obviously wrong, and thus rises to an inference of deliberate wrongdoing. (*Id.*) Plaintiffs advance four arguments in support of their thesis: (1) Defendants admitted there was no actual revenue collectability assessment at the time revenue was recorded, (*id.*); (2) Defendant Bridgepoint violated its professed accounting policies, (*id.* at 16); (3) Defendant Bridgepoint's design of its accounts receivable system violated additional GAAP guidance, (*id.* at 17); and (4) Defendants knew that students without financial aid had lower collectability rates, (*id.* at 18). The Court discusses each in turn.

> a. Whether Defendants Conducted a Revenue Collectability Assessment

Plaintiffs argue that Defendant Devine admitted to the SEC that Bridgepoint made no revenue collectability assessment at the time revenue was recorded. (*Id.* at 14 (citing, e.g., TAC ¶ 52 ("[T]he Company has not done a formal analysis to separate collection rates of students with and without financial aid funding.").) Instead, Plaintiffs suggest that Defendants "immediately recognized . . . as revenue" tuition owed but not paid; "increased accounts receivable; waited 121 days to 'assess' revenue collectibility; and, at 121 days, robotically reserved any revenue still owed at rates of 60% and 85%. (*Id.* at 14–15 (citing TAC ¶¶ 63–64).)

Defendants argue that Plaintiffs' Third Amended Complaint and the two new letters undermine Plaintiff's argument because the cited paragraphs reveal, at most, that Defendants had a revenue collectability assessment, but could have designed a better accounts receivable system. (MTD 13.) For example, Plaintiffs describe a stratification of accounts receivable into different "age" categories: accounts open 120 days or less and accounts open more than 120 days. (Reply 7.) Plaintiffs also describe further stratification of those accounts "older" than 120 days between two types: active—reserved at 60%—and inactive—reserved at 85%. (*Id.* (citing Opp'n 14).) Thus, Defendants argue it was not the case that they did nothing when it came to assessing revenue collectability; instead, they

suggest that their assessment system was a "convenient proxy" for whether tuition would be collected. (*Id.* (quoting Opp'n 19).)

The parties also debate the significance of the Ninth Circuit's decision in *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Defendants contend the facts in *Align* support their position. In *Align*, the plaintiffs alleged that defendants knowingly misreported the company's goodwill in violation of GAAP principles. (MTD 17.) Not only did the plaintiffs in *Align* allege the misreporting of goodwill, but they could also point to statement of confidential witnesses and considerable insider selling as evidence of the defendants' scienter. (*Id.*) The Ninth Circuit rejected the plaintiffs' arguments and held that, at most, the defendants failed to follow GAAP, but did not have requisite scienter. (*Id.*) Defendants here suggest that Plaintiffs' argument is even farther afield because Plaintiffs' lack confidential witnesses and insider selling. (*Id.*)

Plaintiffs believe Defendants' reliance on *Align* is misplaced. Plaintiffs cite *Align* for the proposition that "[t]o plead an inference of scienter in th[e] context of [GAAP violations], a plaintiff must allege additional facts that call into question the manner in which the corporation conducted its [collectability] analysis." (Opp'n 15 (alterations in original) (quoting *Align Tech.*, 856 F.3d at 621).) Plaintiffs contend that their allegations go beyond the manner in which Bridgepoint conducted its analysis and show that Bridgepoint's "collectibility analysis at the time revenue is recorded was actually a falsehood." (*Id.* (citing *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1213 (S.D. Cal. 2005)).)

The Court cited the following standards in its prior order, but these principles describe what GAAP requires in the scienter context. The "GAAP is not the lucid or encyclopedic set of pre-existing rules that [Plaintiffs] might perceive it to be." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995). "There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." *Id.* (citing Robert S. Kay & D. Gerald Searfoss, Handbook of Accounting and

Auditing: 1994 Update With Cumulative Index, ch. 5, at 6–7 (2d ed. 1993)). Consequently, GAAP "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r of Internal Revenue*, 439 U.S. 522, 544 (1979). The Ninth Circuit therefore recognizes that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *DSAM*, 288 F.3d at 390 (quoting *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994)). Violations of GAAP, "even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state." *In re Int'l Rectifier Corp. Sec. Litig.*, No. CV07-02544-JFWVBKX, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (collecting cases).

Plaintiffs allege that Bridgepoint conducted no revenue collectability assessment at the time revenue was recorded. (Opp'n 14 (citing TAC ¶¶ 52, 63–64).) This statement sweeps too broadly. Bridgepoint's February 28, 2014 letter to the SEC is instructive as to its revenue collectability assessment. Bridgepoint disclosed:

> The Company has not done a formal analysis to separate collection rates of students with and without financial aid funding. The Company's accounts receivable system does not separate or categorize students with and without financial aid funding. The Company has historically collected approximately 93% of revenue in cash each year since 2010. The Company's historical collection rates from students have been sufficient for us to assert that collectability is reasonably assured.

(TAC, Ex. A, at 11.) The letter went on to state:

> Historically, the Company has evaluated allowance for doubtful accounts needs using a breakdown of students as active, currently attending class, or inactive, meaning no longer enrolled in courses or graduated, and their relative aging bucket. The company monitors its accounts receivable aging by 30-day aging buckets, however, for ease of presentation, the Company has summarized its accounts receivable analysis into categories of active and inactive, as well as agings of less than and greater than 120 days, which is the date at which the collection risk profile increases as financial aid funding should have been received

14

> prior to this time and, in turn, the Company considers an account
> receivable to be delinquent.

(*Id.* at 12.)  The import of Defendants' revenue collectability assessment is that Bridgepoint did not have a formal assessment to separate students with and without financial aid. Instead, Bridgepoint used a proxy assessment: the company assessed the age of its accounts receivable at the 120-day mark because, historically, the company knew that 120 days was the latest point in time the federal government granted financial aid.

Far from presenting a situation where Defendants' prior collectability assessment was a falsehood or so unreasonable, this situation represents a "misapplication of accounting principles." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994).  Both parties rely on *Align Technology* to support their positions.  The *Align* court reaffirmed the Ninth Circuit's holding that "a failure to follow GAAP, without more, does not establish scienter."  856 F.3d at 621 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d at 1426).  The parties' positions on *Align* are not mutually exclusive: both agree that Plaintiffs need something more than a GAAP violation.  The only issue is whether Plaintiffs allege sufficient additional facts to show something more.  *See id.* ("To plead an inference of scienter . . . , a plaintiff must allege additional facts that call into question the manner in which the corporation conducted its [collectability assessment].").

Here, Plaintiffs demonstrate that Bridgepoint's collectability analysis violated GAAP, but the factual allegations in the Third Amended Complaint are not as "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.   Instead, the more compelling inference from Plaintiffs' allegations is that Defendants made a good faith but mistaken attempt to account for students with and without financial aid.  Bridgepoint did so by using the 120-day mark as a proxy for students with or without federal financial aid.   The Court finds that Defendants' revenue collectability assessment was not so unreasonable as required to support an inference of scienter.

/ / /

15

b.  Whether Defendant Bridgepoint Violated Its Professed Accounting
       Policies

Plaintiffs argues that Bridgepoint's policy was that each student was responsible for tuition payment. (Opp'n 16.) Defendant Devine's February 28, 2014 letter to the SEC confirmed the policy. (*Id.* (quoting TAC ¶ 46 ("The student is the responsible party under such an agreement.").) According to Plaintiffs, Bridgepoint considered the individual student as the unit of account. (*Id.*) From this premise, Plaintiffs contend Bridgepoint violated its internal policies when it came time assess revenue collectability. (*Id.* (citing *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996) (GAAP errors that violate an internal accounting policy also raise an inference of scienter); and *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) ("[D]efendants' asserted actions contrary to expressed policy. . . . can form the basis for proof of recklessness.")).) The violation occurred because "Bridgepoint's accounts receivable system was premised on the unrealistic assumption that every student who owned tuition and fees . . . was just waiting for federal financial aid." (*Id.* (citing TAC ¶¶ 54, 63–64, 79).)

Defendants counter that Plaintiffs are factually incorrect; the Third Amended Complaint does not allege that Bridgepoint violated its own accounting policies, but rather that Bridgepoint followed its policies and those policies turned out to be incorrect under GAAP. (Reply 7 (citing TAC ¶¶ 50–54, 57–59, 61–66, 78–80).) Defendants also contend that Plaintiffs' cited legal precedent, *Provenz*, is not on point because it is both pre-PSLRA pleading standard and reviewing a summary judgment as opposed to a motion to dismiss. To wit, a motion to dismiss pleading has a higher scienter requirement than summary judgment, (*id.* at 7–8 (citing, e.g., *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1011 (S.D. Cal. 2000))), and the Ninth Circuit has indicated that *Provenz*'s "reasonable inference" standard has been statutorily overruled, (*id.* (citing, e.g., *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999)).)

The Court agrees with Defendants that the Third Amended Complaint does not allege Bridgepoint violated its own policies, but only alleges that those policies were

incorrect. For example, Plaintiffs allege that Defendant Devine admitted the "Company has not done a formal analysis to separate collection rates of students with and without financial aid funding[, and the] Company's accounts receivable system does not separate or categorize students with and without financial aid funding." (TAC ¶ 52.) That quote summarizes the error in Bridgepoint's accounting policy. There was no *formal* analysis of students with or without financial aid. But, Bridgepoint did assess student collectability using a proxy assessment. Further, students could provide other sources of funding besides federal financial aid. Thus, Bridgepoint followed its policy, and admitted as much to the SEC; however, the policy was incorrect.

Additionally, there is misalignment between the internal policy and the GAAP violation. Plaintiffs suggest that the accounting policy was that the "student is the responsible party" and that "the ultimate responsibility for payment remains with the student." (Opp'n 16 (quoting TAC ¶ 46).) Yet, this policy does not provide specific accounting guidance. Plaintiffs conflate Bridgepoint's general policy emphasizing its contractual relationship with its students with the specific accounting policy at issue. Thus, even if Defendants did not follow the spirit of holding the students as the responsible party this does not lead to the inevitable conclusion that they should have assessed revenue collectability on a student-by-student basis.

The Court finds that *Provenz* is not directly on point here. The precise concern motivating the *Provenz* court could support an inference of scienter in similar cases, i.e., whether Bridgepoint violated its own internal policy for recognizing revenue. *See* 102 F.3d at 1490 (citation omitted). Yet, an internal policy violation did not occur here and *Provenz* is not controlling. Defendants faithfully followed their internal accounting policy until an internal processing error occurred, the SEC inquired into Defendants' policies, Defendants recognized their error, issued two restatements, and modified their policy to conform to GAAP. Therefore, the Court finds that Defendants did not violate an internal accounting policy.

/ / /

c. Whether Defendant Bridgepoint's Design of Its Accounts Receivable
    System Violated GAAP Guidance

Next, Plaintiffs point out that GAAP guides companies on how to conduct a collectability assurance assessment. (Opp'n 17.) GAAP requires companies to keep track of smaller groups of homogeneous customers when information is available to reasonably estimate collectability. When information is not available or uncertain, GAAP provides that some other method of recognizing revenue, like cash basis, should be used. (*See id.*) Plaintiffs contend that Defendants are liable because they knew of the GAAP principles and failed to separate students by financial aid status. (*Id.*) Further, when Defendants first reviewed their accounts receivable and came up with a remediation plan to improve internal controls relating to accounts receivable they were no longer ignorant of their failure to separate students by financial aid funding source. (*Id.* at 17–18 (citing *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *6–7; and *Reese v. Malone*, 747 F.3d 557, 571 (9th Cir. 2014), *overruled on other grounds by Align Tech.*, 856 F.3d at 616; and *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15–16 (D. Mass. 2000)).)

Defendants counter that they never were ignorant of GAAP principles; instead, Defendants admit that they applied those principles incorrectly as those principles pertained to student collectability assessments. (Reply 8.) Defendants also contend that Plaintiffs' precedent is lacking. *Gelfer* is an out-of-circuit, pre-*Tellabs* case that applied a mere recklessness standard to the scienter analysis. (*Id.* at 8 n.17.) Defendants distinguish *Reese* because that case had specific falsehoods by the defendant that "bridged the [scienter] gap" and no such allegations are present here. (*Id.* (citing *Reese*, 747 F.3d at 572).)

The Court addresses Plaintiffs' two contentions. First, Plaintiffs argue GAAP requires identifying the smallest group of homogenous consumers and Defendants did not do this for students with and without financial aid. Yet, Bridgepoint did stratify accounts receivable based on active and inactive status and the age of the account. As discussed elsewhere in this Order, *see, e.g.*, *supra* p.15, this system was a proxy to separate students

based on whether they received federal financial aid. This information allowed Bridgepoint to reasonably *estimate* collectability. Additionally, GAAP violations must be augmented by other specific allegations. *See Int'l Rectifier*, 2008 WL 4555794, at *13. Thus, Defendants used a proxy for the GAAP principle and, even though the principle itself may have been violated, that alone is not enough for scienter.

Second, Plaintiffs allege it was "extremely unlikely" Defendants were ignorant following the 2012 Restatement. (Opp'n 17.) Bridgepoint's internal analysis conducted prior to issuing the 2012 Restatement is not conclusive. In *Reese*, the defendant made a detailed factual statement that contradicted important data to which she had access. *See* 747 F.3d at 572. Here, Plaintiffs point to Defendant Devine's statement made during a May 6, 2013 earnings calls where he said:

> **We did a deeper analysis.** The issue that kind of caused the spike so to speak is that, in our underlying data we use to build our models, those models that certain credits applied to them **from when a student would leave the institution** or receive a credit for another reason. That created one version of kind of our aging buckets, and then we made the decision that it may be more appropriate if we kind of suppressed those credits and that created another view of the aging buckets which we feel is more appropriate.

(TAC ¶ 76.)

Defendant Devine's statement is not a model of clarity to assess whether Bridgepoint conclusively should or should not have been on notice to change its policy to assess collectability on a student-by-student basis. Indeed, Defendants had an historical 93% tuition collection rate in cash each year since 2010. (*Id.* ¶ 51.) Then, Defendants did a deeper analysis and changed the way they analyzed students when they left an institution. There are no particularized allegations that Defendants were on notice of the specific problem of evaluating collectability on a student-by-student basis. Plaintiffs' allegations demonstrate Defendant recognized issues and attempted to correct them. Thus, Plaintiffs have not established that Bridgepoint's design of its accounts receivable system raises an inference of scienter.

d. Whether Defendant Knew Students Without Financial Aid Had Lower Collectability Rates

Finally, Plaintiffs argue that Defendant Devine acknowledged students without financial aid have lower collection rates, but Bridgepoint never bothered to track those rates. (Opp'n 18 (citing TAC ¶¶ 65–66).) Bridgepoint knew how to determine which students had financial aid and also knew the rate at which to reserve revenue from students without financial aid. (*Id.*) Plaintiffs summarize that Defendants' knew

> GAAP required separation of students with and without financial aid; that Bridgepoint did not separate these students; that students without financial aid are considerably less likely to pay financial aid; and that the increase in the Bad Debt Percentage was due to a spike in the number of students without financial aid, it was unreasonable for Defendants to have continued with the status quo, robotic recognition of all revenue.

(*Id.* at 19.) Plaintiffs also point to an internal memo, included in the February 28, 2014 letter, that purportedly acknowledges the reason why revenue was not reasonably collectable was due to lack of financial aid. The memo stated:

> In Q2 2013 it was determined that the tuition related to the second or greater retake of a course is not reasonably collectible due to financial aid shortfalls and, therefore, revenue is recognized on a cash basis (~$0.8 million reversed, and not recognized as revenue, in Q3 2013, $2.5 million 2013 YTD). As such, related bad debt will not exist going forward.

(*Id.* (emphasis omitted) (quoting TAC ¶ 83).)

Defendants counter that they knew students without financial aid had lower collectability rates and they accordingly raised their Bad Debt levels. (Reply 9.) The "internal memo" cited by Plaintiffs shows that Defendants decided to change their collectability analysis as a result of its experience. (*Id.* (citing Opp'n 14).) Thus, the memo "describes a company that did a collectability analysis[,] which was responsive to changed circumstances and experience." (*Id.*)

Plaintiffs quote *S. Ferry LP #2 v. Killinger*, as stating "[w]hen the facts known to a

person place him on notice of a risk, he cannot ignore the facts and plead ignorance." 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)). Plaintiffs do not explicitly identify the risk, but the Court infers the risk as "students without financial aid are considerably less likely to pay financial aid." (*See* Opp'n 19.) And, when there was a spike in the number of students without financial aid Bridgepoint had to increase its Bad Debt percentage. (*Id.*) Yet, as Defendants point out, Bridgepoint was aware of the risk that students without financial aid were less likely to pay. Bridgepoint reserved revenue at rates of 60 and 85% for students with accounts "older" than 120 days, which was their "assumption that there was no financial aid available for what was owed." (*Id.*) While Defendants' accounting method was contrary to GAAP, Plaintiffs' allegations demonstrate that Defendants were aware, before the Restatements, that students without financial aid were less likely to pay and set their reserve rates accordingly. Therefore, Plaintiffs fail to demonstrate how Defendants awareness amounts to scienter.

The internal memo, attached to Bridgepoint's February 28, 2014 letter to the SEC, does not counsel a different finding. The internal memo describes Bridgepoint's realization in the second quarter of 2013 that "tuition related to the second or greater retake of a course is not reasonably collectible due to financial aid shortfalls" and that revenue would be recognized on a cash basis. (TAC, Ex. B, at 19.) The Court finds Defendants modified their collectability analysis based on their practical experience. Defendants encountered an issue and attempted to correct it. Plaintiffs have not demonstrated that Defendants remained ignorant of the facts and pled ignorance. *See S. Ferry LP #2*, 687 F. Supp. 2d at 1258. Thus, the Court finds that Defendants' knowledge that students without financial aid had lower collection rates does not raise an inference of scienter.

### 2. Bridgepoint's Competitors

Plaintiffs also draw a comparison between Defendant Bridgepoint and its competitors. Plaintiffs point to the fact that Bridgepoint's competitors properly assessed the collectability of revenue at the time it was recorded and specifically considered the

individual student's ability to pay as part of that assessment.  (Opp'n 20 (citing *Medicis Pharm.*, 2010 WL 3154863, at *8 (considering competitor accounting for alleged GAAP violations as part of scienter analysis)).)   For example, the SEC surveyed the Apollo Education Group and that company's revenue collectability assessment was conducted prior to a student's class attendance and was based on various factors.  (*Id.* (citing TAC ¶ 160).)  Plaintiffs suggest that Defendants do not have an adequate explanation as to why they did not follow their competitors' lead.  Instead, Defendants can only point to the fact that the SEC encouraged an industry wide reassessment of collectability when a student's circumstances change.  (*Id.* (citing TAC ¶ 158).)

Plaintiffs also state that Defendants' prior motions to dismiss argued that reasonable accountants could disagree over whether it was appropriate to address the collectability of revenue from independent paying students.  (*Id.* at 21 (citing Prior Order 15).)  Then, Plaintiffs filed their Third Amended Complaint illustrating that no other accountant in the industry took a similar approach as Bridgepoint.  Defendants appear to have withdrawn their argument in their present motion.  Thus, Plaintiffs conclude that Bridgepoint's competitors knew they needed to undergo a collectability assessment for their students, the collectability assessment is a relatively simple accounting principle, and the simplicity of the accounting principle supports the inference of scienter.  (*See id.* (citing *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1187 (S.D. Cal. 2009)).)

Defendants argue that Plaintiffs mischaracterize their own complaint.  The Third Amended Complaint alleges that of the "at least ten other companies in the for-profit post-education sector" the SEC contacted, a "majority of these competitors similarly did not reassess collectability of revenue upon a change in a students' circumstances prior to SEC correspondence."  (Reply 5 (quoting TAC ¶¶ 157–58).)  Defendant contend that they did not abandon their argument that reasonable accountants could disagree as to collectability assessments.   In fact, they argue the Third Amended Complaint describes that Bridgepoint's treatment of the collectability assessment was consistent with a majority of companies in the industry.  (*Id.*)

An alleged GAAP violation concerning a simple accounting procedure can be a consideration as part of the holistic analysis. *See Backe*, 642 F. Supp. 2d at 1187; *see also Okla. Firefighters Pension & Retirement Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1364 (C.D. Cal. 2014) (citing *In re Medicis Pharm.*, 2010 WL 3154863, at *5 ("The magnitude of the error, however, is not the only consideration. Courts must also weigh the complexity or simplicity of the relevant accounting standard.")).

Here, it is clear that Bridgepoint's competitors used different accounting procedures. As Plaintiffs illustrate, the Apollo Education Group collected tuition prior to a student's attendance and used a variety of factors to evaluate its students including whether the student had federal financial aid. (TAC ¶ 160.) American Public Education, Inc. explained that it had five detailed criteria to evaluate students, including review of students with patterns suggesting potential credit abuse. (*Id.* ¶ 159.) American Public Education also stratified its accounts receivable based on students' payment situations; these included those who may be eligible for financial aid, students with deficits beyond the provided financial aid, and those with no financial aid. (*Id.*) Finally, Capella Education Company listed five factors and noted that for students that do not elect to receive federal Title IV funding as their primary option, Capella would review relevant funding materials specific to that individual. (*Id.* ¶ 161.) It also appears that Capella was the only cited competitor that reassessed collectability when a student withdrew from a course, (*id.*), and Plaintiffs allege that "the majority of [Bridgepoint's] competitors similarly did not reassess collectability of revenue upon a change in a students' [sic] circumstances prior to SEC correspondence." (*Id.* ¶ 158.)

Plaintiffs' comparisons to industry competitors illustrate that there was no common standard for assessing the collectability of student debt. Each competitor approached the debt collectability assessment in slightly different ways. This suggests that there was no simple accounting procedure and Defendant Bridgepoint was not an outlier from its competitors. Instead, these examples suggest there is room for disagreement on how to assess collectability. Nor was Defendant an outlier when it came to reassessing

collectability when a student's circumstances changed. As both sides point out, the majority of competitors did not reassess collectability when a student withdrew from a course. (*See* Reply 5; TAC ¶ 158.)

The newly discovered letters in Plaintiffs' Third Amended Complaint illustrate that Bridgepoint did stratify their accounts receivable. Bridgepoint stratified their accounts receivable first, by active versus inactive students and second, by "30-day aging buckets." (TAC, Ex. A., at 12.) Bridgepoint further disclosed in the February 28, 2014 letter to the SEC that after 120 days the collection risk profile increases because federal financial aid should have been received prior to 120 days. (*See id.*) Defendants then assigned probabilities of not collecting the amounts owed at 60% and 85% rates. (*Id.* ¶ 80.) Plaintiffs label the rates "as proxies for the risk that a student would be not paying amounts owed without aid." (*Id.* ¶ 81.) The critical link is that Bridgepoint used the 120-day as a proxy for whether students would or would not receive federal financial aid—the choice was deliberate.

Thus, Bridgepoint did stratify their accounts receivable and its method was a proxy for whether students were with or without financial aid. From this conclusion, the Court finds that reasonable accountants could disagree as to how to assess collectability. Indeed, Plaintiffs' Third Amended Complaint illustrates that different competitors did disagree on assessment specifics. At the very least, there was no simple accounting procedure that Defendants did not follow but the rest of the industry did follow. Thus, the Court finds that this argument does not establish the requisite scienter.

### 3. Additional Scienter Allegations

Plaintiffs bring four additional arguments that they suggest support an inference of scienter.

#### a. Whether Bridgepoint's Accounting Practices Allowed it to Manipulate Its Revenue

Plaintiffs argue that Defendants' collectability assessment allowed Bridgepoint to recognize revenues immediately without considering the actual likelihood of collecting

revenue from students without financial aid funding. (Opp'n 22 (citing TAC ¶ 88).) Plaintiffs point to Defendant Devine's admission that the delay in reporting bad debt, i.e., after 120 days, allowed Bridgepoint's "operational initiatives implemented in late 2012 aimed at reducing bad debt" to kick in. (*Id.* (quoting TAC ¶ 88).)

Plaintiffs also contend that the 120-day assessment scheme allowed Bridgepoint to meet revenue consensus in two out of five financial reports in Plaintiffs' proposed class period. (*Id.*) Plaintiffs suggest that Bridgepoint would not have met its revenue consensus in 1st Quarter, 2013 or Fiscal Year 2013 and would have missed its revenue consensus by almost $44 million in Fiscal Year 2012. (*Id.* (citing TAC ¶ 93).) Plaintiffs cite *In re Medicis Pharmaceutical Corp. Securities Litigation*, 2010 WL 3154863, at *9–10, for the proposition that Bridgepoint's revenue management is a relevant consideration in the scienter analysis. Finally, Plaintiffs point to Defendant Devine's statement in Bridgepoint's Staff Accounting Bulletin ("SAB") 99 that the revenue misstatements were material. (Opp'n 22 (citing TAC ¶¶ 92–93).) The Court considers the two arguments in turn.

First, Plaintiffs argue that Bridgepoint's accounting method allowed it to immediately recognize revenue without considering the actual likelihood of collecting revenue. Plaintiffs' Third Amended Complaint includes a table that compares the default rate of student debt before and after the Restatement.[5] The default rate is calculated by taking the allowance amount over the gross accounts receivable. (TAC ¶ 90.) For example,

---

5

| | | 12/31/12 | 3/31/13 | 6/30/13 | 9/30/13 | 12/31/13 |
|---|---|---|---|---|---|---|
| **Original (as Reported as part of, and after, the 2012 Restatement) (thousands)** | Gross A/R[10] | $132,085 | $134,948 | $128,364 | $116,378 | $85,641 |
| | Allowance | $49,105 | $51,072 | $55,140 | $53,319 | $44,248 |
| | A/R Net | $83,070 | $83,876 | $73,224 | $63,059 | $41,393 |
| | Default Rate | 37% | 38% | 43% | 46% | 52% |
| **As Restated (thousands)** | Gross A/R | $102,820 | $103,026 | $95,590 | $88,269 | $64,826 |
| | Allowance | $33,361 | $36,523 | $37,868 | $32,809 | $29,045 |
| | A/R Net | $69,459 | $66,503 | $57,722 | $55,460 | $35,781 |
| | Default Rate | 32% | 35% | 40% | 37% | 45% |
| **Eliminated[11] (thousands)** | Gross A/R | $29,265 | $31,922 | $32,744 | $28,109 | $20,815 |
| | Allowance | $15,654 | $14549 | $17,272 | $20,510 | $15,203 |
| | A/R Net | $13,611 | $17,373 | $15,502 | $7,599 | $4,569 |
| | Default Rate | 53% | 46% | 53% | 73% | 73% |

(TAC ¶ 89.)

in the third quarter of 2013 Defendants originally reported their gross accounts receivable as $116,378 and their allowance amount as $53,319. Therefore, the default rate was 46%.[6] After the 2014 Restatement, the adjusted gross accounts receivable was $88,269 and the allowance was $32,809 resulting in a default rate of 37%. (*See id.* ¶ 89.) Finally, Plaintiffs calculate the default rate for the revenue that was eliminated or removed by the Restatement from the original. The Restatement for third quarter 2013 eliminated $28,109 in gross accounts receivable and an allowance of $20,510 resulting in a default rate of 73%. (*Id.*) These numbers represent a stratification of students between those with and without financial aid. Put differently, the table represents a before and after snapshot: before Bridgepoint revised its accounting practices and after it revised the practices and restated its revenue positions. After Bridgepoint restated its positions, it determined that the default rate for students with financial aid was 37% and the default rate for those without aid was 73%.

Defendants suggest that these default rates are not far off from the default rates it assigned students before the 2014 Restatement. (*See* MTD 15.) As Plaintiffs allege and Defendants concede, Bridgepoint reserved accounts receivable based on both aging and activity. Thus, student accounts open between 0 and 120 days were given a 3% reserve rate; active accounts greater than 120 days were reserved at 60%; and inactive accounts greater than 120 days were reserved at 85%. (*See* TAC ¶ 63; MTD 15.) Defendants argue that they used the 120-day mark as a "close proxy" for whether or not the government would provide financial aid—after 120 days it was highly unlikely that the government would provide aid. (MTD 15.)

The Court understands Plaintiffs' argument as, had Bridgepoint reassessed on a student-by-student basis it would have found default rates for its students without financial aid ranging between 46% and 73%. (Opp'n 23 ("Put another way, the table shows that had Bridgepoint properly 'put the major problems in one bucket' during the Class Period, 'that

---

[6] $53,319 / $116,378 = .458 or 46%.

bucket [w]ould have high reserves.'" (quoting MTD 11)).)  Yet, Defendants already reserved students beyond 120 days at rates of 60 and 85%.  Thus, Defendants did, in fact, consider the likelihood of collecting revenue from students without financial aid and the rates were similar to or greater than the rates Plaintiffs calculated in their table.  The bucket identified by Plaintiffs had rates within the range of rates historically reserved by Defendants.  Thus, Plaintiffs' argument is not persuasive.

Second, Courts may consider the alleged motive or purpose underlying a defendant's accounting violation.  *In re Medicis Pharm.*, 2010 WL 3154863, at *9 (citing *In re Hypercom Corp. Sec. Litig.*, No. CV-05-455-PHX-NVW, 2006 WL 726791, at *9 (D. Ariz. Jan. 25, 2006)).  Thus, when a defendant's violation of accounting principles allows a company to obtain a financial benefit or competitive advantage, court will generally find some inference of scienter.  *See Telabs*, 551 U.S. at 325.  That conclusion is tempered in part because "motive and opportunity alone are insufficient to show scienter at the pleading stage[;]" however, those factors may "still be considered as circumstantial evidence" of scienter.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (citing *In re Silicon Graphics*, 183 F.3d at 977–79).

Plaintiffs allege that Bridgepoint's accounting methodology had the benefit of meeting its revenue consensus in various financial quarters.  (Opp'n 22.)  Bridgepoint disclosed that its revenue recognition errors "were quantitatively significant."  (TAC ¶ 93.)  In Fiscal Year 2012, Bridgepoint missed its revenue consensus, but had Bridgepoint assessed its revenue without error it would have missed revenue estimates by $44 million—more than double the amount it actually missed consensus.  (*Id.*)  Thus, it is plausible that Bridgepoint derived tangible benefit from their erroneous accounting method.  Given the lack of any other factual allegations demonstrating motive, the allegations here are not overly compelling.  *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 609 (9th Cir. 2014) ("The case law indicates, therefore, that although overstatement of revenues in violation of GAAP may support a plaintiff's claim of fraud, the plaintiff must show with particularity how the adjustments affected the company's financial statements and whether

they were material in light of the company's overall financial position." (citing *In re Daou Sys., Inc.*, 411 F.3d 1006, 1018 (9th Cir. 2005))).  Thus, the Court will consider this factor in its holistic analysis.

### b.  Whether Bridgepoint's Reliance on Its Auditor Negates Scienter

Plaintiffs ask the Court to reject Defendants' argument that the Third Amended Complaint did not allege that scienter was negated in part because Bridgepoint's independent auditor did not counsel against Bridgepoint's accounting practices.  (*Id.* at 23 (citing MTD 12).)[7]  Plaintiffs go on to hypothesize as to what Bridgepoint's independent auditor would have counseled had the auditor been privy to the actual reserve rates alleged in the Third Amended Complaint.  (*See id.* (citing TAC ¶¶ 89–91) ("Had Bridgepoint's auditor actually seen the 73% reserve rates for these students, it is very likely there would have been some sort of 'counsel[ing] against' the revenue recognition practices employed by Defendants.").)

In its Second Motion to Dismiss Order, the Court cited two cases discussing opinions by external, independent auditors.  (*See* Second MTD Order 14 & n.6.)  First, *Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008), stood for the proposition that an allegation that a defendant's external auditor counseled against an improper accounting practice could support an inference that the defendant knowingly and recklessly engaged in that improper accounting practice.  Second, the Court agreed with Plaintiffs that a clean audit opinion "does not, *standing alone*, negate any otherwise compelling inference of scienter" that a plaintiff's pleading raises.  *Okla. Firefighters Pension & Retirement Sys.*, 50 F. Supp. 3d at 1365 n.183 (emphasis added).  The Court understands Defendants' brief as arguing that the allegations in the Third Amended Complaint did not meet the Ninth Circuit's concern in *Metzler*.

Defendants do not argue that their independent auditor gave them a clean bill of

---

[7] The Court believes that Plaintiffs meant to cite Defendants' Motion to Dismiss brief at page 10, according to the CM/ECF pagination.  The only references to an independent auditor are on page 10.

health that might inoculate them against any scienter allegation.  The district court in *Oklahoma Firefighters Pension & Retirement System* explained that, absent discovery, there is no way to know what communications transpired between the defendant and its independent auditor.  50 F. Supp. 3d at 1365 n. 183.  *Oklahoma Firefighters* teaches that, absent discovery, this Court would need to evaluate what an auditor was told and what, if anything, was withheld from the auditor.  Plaintiffs have not alleged facts to this end.  Yet, Plaintiffs invite the Court to speculate as to what Bridgepoint's independent auditor might have concluded if the auditor had all the facts.  The Court will not engage in unsupported conjecture; the appropriate conclusions are that (1) Defendants are not suggesting an independent audit inoculates them and (2) Plaintiffs have not alleged an auditor counseled against Defendants' accounting practice.  Neither conclusion alters the Court's analysis: there is no support here for the scienter inference and no support that Defendants were absolved due to an auditor.

### c.  Whether Bridgepoint Omitted Relevant Facts

Plaintiffs next argue that Defendant Bridgepoint's statements omitted a material explanation as to when Bridgepoint recognized revenue; specifically, when and how it assessed revenue collectability.  (Opp'n 24 (citing TAC ¶¶ 44, 118–19, 134–35).)  This was a factor in *In re Medicis Pharmaceuticals* and Plaintiffs would have the Court make a similar finding here.  *See* 2010 WL 3154863, at *7–9.  In the Third Amended Complaint, Plaintiffs include excerpts from Bridgepoint's Fiscal Year 2012 and 2013 SEC Form 10-K's.  These two excerpts are exactly the same and describe Bridgepoint's revenue recognition policies at the time.  (*See* TAC ¶¶ 118, 134.)  Plaintiffs also include the updated revenue recognition policy published in Defendants' 2014 Restatement.  (*See id.* ¶ 44.)

Plaintiffs are correct that "an omission in public statements of materials facts related to the GAAP violations can also give rise to a strong inference of scienter in certain circumstances.  *Medicis Pharm.*, 2010 WL 3154863, at *7 (citing, e.g., *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994)).  The relevant considerations are worth quoting at length:

> Hence, when a Defendant knowingly adopts a questionable or tenuous accounting methodology and fails to disclose material facts regarding that methodology to investors, an inference of scienter may arise. In contrast, where a defendant fully discloses its accounting methodology in a "transparent manner," and the methodology is later shown to violate GAAP, any inference of scienter will be substantially tempered.

*Id.* (citing *Malone*, 26 F.3d at 479); *see also In re WatchGaurd Sec. Litig.*, No. C05-678J, 2006 WL 2038656, at *5–6 (W.D. Wash. Apr. 21, 2006) (finding that the plaintiffs' allegations failed to support a strong inference of scienter where defendants had "consistently disclosed" the accounting error on which a restatement was based because the "blatant error had been committed . . . in open and notorious fashion for years").

Here, Plaintiffs point to Defendants' 2014 Restatement as disclosing material information regarding Bridgepoint's methodology that it previously did not disclose in its FY 2012 and FY 2013 Form 10-K's. This is not an accurate description of Defendants' disclosures. The 2014 Restatement did include new descriptions about its accounting methodology, but the new disclosure were prompted by the SEC's inquiries and implicitly recognized that their previous methodology violated GAAP. The Third Amended Complaint alleged that on May 12, 2014, Bridgepoint admitted that it was evaluating whether to restate its financial results due, in part, to the lack of student-by-student reassessment of revenue. (TAC ¶ 34.) Plaintiffs then allege that Defendant Devine explained during the May 12, 2014 earnings conference call:

> Under previous revenue recognition, revenues recognized subsequent to a student losing financial aid eligibility, and ultimately not collected, were included in our bad debt expense. Going forward, our policy will exclude these revenues and will result in a corresponding decrease in our bad debt expense that will be realized over subsequent quarters.

(*Id.* ¶ 35.) Defendant Bridgepoint then issued its Restatement which retrospectively corrected its misstated revenue. (*See id.* ¶ 36.) The additions to Bridgepoint's updated

recognition policy reflect the changes that Defendant Devine mentioned in his conference call. Before, Bridgepoint did not conduct a student-by-student reassessment of revenue; going forward, Bridgepoint would "reassess collectability throughout the period revenue is recognized by the Company's institutions, on a student-by-student basis." (*Id.* ¶ 44.)

Thus, Defendants' purported omissions in their public statements was not hiding their "questionable or tenuous accounting method." *In re Medicis Pharm.*, 2010 WL 3154863, at *7. Instead, it was an admission that Defendants had made an error and the updated accounting policy recognized that Bridgepoint should have conducted a student-by-student revenue reassessment. Far from supporting Plaintiffs position, this fact is similar to a defendant who fully discloses its accounting methodology in a "transparent manner," and that methodology is later show to violate GAAP. *Id.* Thus, in Bridgepoint's February 28, 2014 response letter to the SEC, Bridgepoint disclosed the following:

> Historically, the Company has evaluated allowance for doubtful accounts needs using a breakdown of students as active, currently attending class, or inactive, meaning no longer enrolled in courses or graduated, and their relative aging bucket. The company monitors its accounts receivable aging by 30-day aging buckets, however, for ease of presentation, the Company has summarized its accounts receivable analysis into categories of active and inactive, as well as agings of less than and greater than 120 days, which is the date at which the collection risk profile increases as financial aid funding should have been received prior to this time and, in turn, the Company considers an account receivable to be delinquent.

(TAC, Ex. A, at 12.) Thus, Defendants disclosed to the SEC its accounting method: it stratified accounts receivable into inactive vs. active and less than vs. greater than 120 days. In its June 3, 2014 letter to the SEC, Bridgepoint admitted that "[h]istorically, the Company was not performing a reassessment of collectibility under such circumstances"—such circumstances meant reassessing collectability on a student-by-student basis. (*Id.*, Ex. B, at 6–7.) The Court finds Defendants were not hiding their questionable or tenuous accounting method, but rather disclosed the erroneous method to the SEC and then changed

their assessment because it was in error.

    d. Whether Plaintiffs' Additional Allegations Support Scienter as Part of Holistic Analysis

Finally, Plaintiffs argue that the SEC, Department of Education ("DOE"), and Department of Justice ("DOJ") are conducting investigations into Bridgepoint, which supports a scienter inference. (Opp'n 24 (citing Prior Order 17).) Defendants attempt to rebut this argument with a Request for Judicial Notice, (ECF No. 73-1).[8] The Court agrees with Plaintiffs that an SEC letter indicating the SEC does not intend to take enforcement action cannot be construed as indicating that a party has been exonerated. (*See* ECF No. 74, at 3); *see also* 17 C.F.R. § 202.5(d).

Plaintiffs' allegations regarding the DOE and DOJ investigations do not relate to the accounting issue at the core of the Restatements. The DOJ investigation concerned compliance with the 90/10 rule of the Higher Education Act. (*See* TAC ¶ 165 ("U.S. Department of Justice was conducting an 'investigation concerning allegations that the Company may have misstated Title IV refund revenue or overstated revenue associated with private secondary loan programs and thereby misrepresented its compliance with the 90/10 rule of the Higher Education Act.'").) The DOE investigation concerned Ashford University's administration of federal student financial aid—not Bridgepoint's accounting procedures.

The Court finds Plaintiffs' argument unconvincing. They cite no authority why the existence of an investigation supports a scienter inference. Instead, several district courts

---

[8] Defendants' Request for Judicial Notice is a letter from the SEC, dated June 15, 2017, indicating that the SEC would not recommend an enforcement action against Defendants. Courts have noticed the existence of similar letters. *See, e.g., Batwin v. Occam Networks, Inc.*, No. CV 07–2750 CAS (SHx), 2008 WL 2676364, at *2 n.3 (C.D. Cal. July 1, 2008) (citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1197 (3d Cir. 1993)). Plaintiffs oppose the request because the contents of the SEC letter cannot be used as a defense in this litigation. (ECF No. 74, at 3.) The Court **GRANTS** Defendants' Request for Judicial Notice, (ECF No. 73-2), but the Court does not consider the contents of the letter as relevant to the scienter analysis. *See In re Am. Apparel, Inc. Shareholder Litig.*, No. CV 10-6352 MMM (JCGx), 2013 WL 174119, at *13 (C.D. Cal. Jan. 16, 2013).

have found the existence of an investigation, standing alone, insufficient to support scienter. *See In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009); *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007). The Court agrees with the cited opinions and finds that the existence of an SEC investigation, standing alone, does not support Plaintiffs' scienter argument. *See also Am. Apparel*, 2013 WL 174119, at *13 ("[T]he existence or nonexistence of an SEC enforcement action is of little help in assessing whether plaintiffs have alleged sufficient facts to state a claim for violation of the securities laws.").

Plaintiffs also urge the Court to consider Defendant Devine's Sarbanes-Oxley ("SOX") certifications and allegations of internal control deficiencies. (Opp'n 24 (citing TAC ¶¶ 136–38, 166–67).) Defendants argue that Plaintiffs' allegations with respect to the contents of Defendants' SOX certifications in the Third Amended Complaint are largely identical to those alleged in the previous two complaints. (MTD 18 (citing SAC ¶¶ 113–15, 138–39)), which the Court found insufficient in its previous Order, (Second MTD Order 17). Plaintiffs urge the Court to consider the allegations of SOX certifications and internal control deficiencies along with Plaintiffs' other allegations. (Opp'n 24–25.)

With respect to the false SOX certifications, "Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1004 (9th Cir. 2009) (quoting *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747–48 (9th Cir. 2008)). Moreover, "required certifications under Sarbanes-Oxley . . . add nothing substantial to the scienter calculus . . . and do not make . . . otherwise insufficient allegations more compelling by their presence in the same complaint." *Id.* at 1003–04. Because the Court finds Plaintiffs' other allegations insufficient, the Court gives no weight to Plaintiffs' allegations concerning Defendants' false Sarbanes-Oxley certifications.

### B. Holistic Analysis

Although none of Plaintiffs' individual allegations concerning Defendants' scienter are availing, the Court must also "review 'all the allegations holistically.'" *See Matrixx*

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011) (citing *Tellabs*, 551 U.S. at 326). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 322–23. In *Tellabs*, the Supreme Court instructed that "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 324.

Even viewed holistically, however, Plaintiffs' allegations again do not give rise to a strong inference of scienter that is at least as compelling as an inference of nonfraudulent conduct. The Court previously found the holistic analysis did not support Defendants' scienter. (*See* First MTD Order 20; Second MTD Order 18.) After the first Motion to Dismiss Order, Plaintiffs removed allegations of insider trading, (*see* First MTD Order 16–19). After the second Motion to Dismiss Order, Plaintiffs removed allegations concerning a confidential witness's statements that individual defendants were generally aware of the day-to-day workings of the company. (*See* Second MTD Order 13 n.5.) Thus, each iteration has fewer allegations to support the holistic analysis, with the exception of the two letters.

In their Third Amended Complaint, Plaintiffs' additional allegations concern two previously unavailable letters from Defendants to the SEC. The February 28, 2014 letter disclosed Bridgepoint's prior accounting method, which violated GAAP. The June 3, 2014 letter described the new accounting method adopted by Bridgepoint, which would bring the company into GAAP compliance. Neither letter reveals particular facts that give rise to a strong inference. The most plausible, nonculpable explanation is that Defendants used a proxy for student financial aid that did not fully comply with GAAP, but fully disclosed the proxy until Defendants realized it was incorrect. Defendants then amended their accounting methods to remove the proxy and devised a method to account for students on a student-by-student basis. In light of this explanation, Plaintiffs' holistic analysis is not as compelling.

The Third Amended Complaint does not support an inference of scienter "that is

greater than the sum of its parts." *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1165 (9th Cir. 2009) (citing *S. Ferry*, 542 F.3d at 784; and *Metzler*, 540 F.3d at 1049).

### C. Loss Causation

In addition to scienter, Plaintiffs must also show loss causation. *Daou Sys.*, 411 F.3d at 1014. The Court previously concluded that Plaintiffs could plausibly establish loss causation. (Second MTD Order 19.) Defendants suggest that Plaintiffs' loss causation allegations are identical to their Second Amended Complaint. (MTD 5 n.1.) Thus, neither party takes up the loss causation argument except that Defendants request the Court incorporate its loss causation argument by reference. (*Id.*) The Court agrees that Plaintiffs' loss causation allegations are identical. (*Compare* TAC ¶¶ 139–53 *with* SAC ¶¶ 116–30.) Therefore, the Court finds no reason to depart from its previous holding—Plaintiffs' allegations could plausibly establish loss causation. (Second MTD Order 19 (citing *Gilead Scis.*, 536 F.3d at 1057; and *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).) However, in light of the Court's scienter conclusion, this finding does not alter the outcome of Plaintiffs' first cause of action.

The Court finds that Plaintiffs have not established Defendants' acted with the requisite scienter. Plaintiffs' first cause of action cannot prevail without proving the scienter element. Therefore, the Court therefore **GRANTS** Defendants' Motion to Dismiss, (ECF No. 70), and **DISMISSES** Plaintiffs' first cause of action.

## II. Section 20(a)

"Section 20(a) of the Act makes certain 'controlling' individuals also liable for violations of section 10(b) and its underlying regulations." *Zucco Partners*, 552 F.3d at 990. Specifically, Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of

section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "Thus, a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco Partners*, 552 F.3d at 990 (quoting *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003); and citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)). "Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Id.* (citing *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872 (9th Cir. 1993); *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1087 (W.D. Wash. 2003)).

Because the Court has dismissed Plaintiffs' cause of action predicated upon violations of Section 10(b), *see supra* section I, the Court **GRANTS** Defendants' Motion to Dismiss and **DISMISSES WITH PREJUDICE** Plaintiffs' second cause of action against Defendant Devine for violations of Section 20(a).

## III. Leave to Amend

The Court must consider whether to grant leave to amend. In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the Supreme Court provided the following guidance for district courts to determine whether to grant leave to amend:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

Not all factors are equal—"[p]rejudice is the 'touchstone of the inquiry under rule 15(a).'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (per curiam)

36

(quoting *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)). Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend. *Id.* (citations omitted).

The Ninth Circuit has stated that adherence to *Foman* and its progeny is especially important in the context of the PSLRA. *See id.* In *Eminence Capital*, the Ninth Circuit reversed a district court that denied leave to amend even though the plaintiffs had three "bites at the apple." *Id.* at 1053. The Circuit determined that the plaintiffs had not filed three substantially similar complaints alleging substantially similar theories—"it [was] not accurate to imply that plaintiffs had filed multiple pleadings in an attempt to cure pre-existing deficiencies." *Id.*

Here, Plaintiffs amended their complaint three times. Each prior order found that Plaintiffs failed to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." (First MTD Order 11–20; Second MTD Order 9–18.) Plaintiffs did not amend their complaint to state different causes of action, but rather amended the complaints to demonstrate a strong inference of scienter, as required by the PSLRA and Rule 10b-5. Moreover, Plaintiffs removed allegations from their complaints. After the first Motion to Dismiss Order, Plaintiffs removed allegations of insider trading, (*see* First MTD Order 16–19). After the second Motion to Dismiss Order, Plaintiffs removed allegations concerning a confidential witness's statements that individual defendants were generally aware of the day-to-day workings of the company. (*See* Second MTD Order 13 n.5.) Thus, each iteration focused primarily on the scienter issue and each iteration failed to develop factual allegations to support the scienter element.

Plaintiffs have repeatedly failed to cure their scienter deficiency. Unlike *Eminence Capital*, Plaintiffs here have filed multiple pleadings in an attempt to cure the deficiency identified by the Court regarding scienter. With the exception of the two additional letters sent by Defendants to the SEC, no new factual allegations have come to light. The basic facts have not changed throughout the amended complaints, despite the addition of the letters. The letters confirm the basic facts of the case. The prejudice to Defendants alone

does not warrant denying leave to amend—a fourth round of amendments and motions would impose the same burden as the prior iterations.  However, Plaintiffs have failed to cure the specific deficiency identified by the Court despite multiple opportunities to do so.  Failure to correct identified deficiencies "is a strong indication that the plaintiffs have no additional facts to plead." *Zucco Partners*, 552 F.3d at 1007 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1098 (9th Cir. 2002), *abrogated on other grounds by Tellabs*, 551 U.S. 308).  Therefore, the Court will deny leave to amend.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 70).  Accordingly, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' Third Amended Complaint. (ECF No. 66.)  This Order ends the litigation in this matter.  The Clerk of Court **SHALL** close the file.

**IT IS SO ORDERED.**

Dated:  March 12, 2018

Hon. Janis L. Sammartino
United States District Judge

15-CV-408 JLS (DHB)